**FILED**

JUL 2 1 2006  NF

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CHICAGO PARK DISTRICT, an Illinois )
Municipal Corporation,                 )
                                       )
                    Plaintiff,         )
                                       )
          v.                           )
                                       )
THE CHICAGO BEARS FOOTBALL CLUB,       )
INC., a Delaware Corporation, and THE  )
CHICAGO BEARS STADIUM LLC, a           )
Delaware Limited Liability Company,    )
                                       )
                    Defendants.        )

06CV3957
JUDGE MANNING
MAGISTRATE JUDGE SCHENKIER

## COMPLAINT FOR DECLARATORY JUDGEMENT

Pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201), Plaintiff The Chicago Park

District ("CPD"), a municipal corporation organized and existing under 70 ILCS 1505/1 et seq.,

brings this Complaint against Defendants The Chicago Bears Football Club, Inc. and The

Chicago Bears Stadium LLC (collectively, "the Bears"), seeking a declaration that the Fourth

Amendment prohibits the CPD (as a municipal corporation) from conducting and/or using

taxpayer funds to pay for pat-down searches at Soldier Field, which the CPD owns and operates.

In support thereof, the CPD alleges as follows:

## INTRODUCTION

1.     This action stems from: (a) the Bears' continuing demand that under the parties'

agreement governing the Bears' use of Soldier Field, the CPD must conduct, using taxpayer

funds, pat-down searches of everyone entering Soldier Field on Bear game days in the upcoming

2006 season; and (b) the CPD's continued refusal to do so because it would force the CPD to

violate the Fourth Amendment's prohibition against unreasonable searches and seizures.

Dockets.Justia.com

## PARTIES, JURISDICITON AND VENUE

2.      Plaintiff The Chicago Park District is an Illinois municipal corporation organized under and existing under 70 ILCS 1505/1 et seq., with its principal place of business in Chicago, Illinois, and the owner and operator of Soldier Field in Chicago, Illinois, where the Bears play their home football games.

3.      Defendant The Chicago Bears Football Club, Inc. is a Delaware Corporation, with its principal place of business in Illinois (Chicago and Lake Forest), and is the owner of the NFL's Chicago franchise.

4.      Defendant the Chicago Bears Stadium LLC is Delaware limited liability company and a wholly owned subsidiary of Defendant the Chicago Bears Football Club, Inc.

5.      This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

6.      Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391.

## BACKGROUND

7.      On August 1, 2001, the CPD and the Bears entered into a Permit and Operating Agreement ("POA"), which governs the parties' obligations with respect to the Bears' use of Soldier Field for professional football games.

8.      In 2005, based on a mandate from the NFL to the Bears, the Bears demanded that the CPD, pursuant to the POA, begin performing and paying for pat-down searches of everyone entering Soldier Field on Bears home game days. The pat down procedure mandated by the NFL to the Bears consisted of the following:

- In the instance of a patron wearing a zippered or buttoned outer garment, it should be opened and held away from the body by the patron. Inspect the clothing by touching, patting or squeezing the garment sufficiently to locate large or suspect foreign objects. Inspect blankets being carried in by squeezing thoroughly.

- Ask the person to be inspected to extend his or her arms to the side, parallel to the ground, with palms facing up. Gloves should be removed. Visually inspect the wrists and palms for switches, wires or push button devices.

- Security screeners should inspect the person by touching, patting or lightly rubbing the torso of the inspected person, confining the area to the belt line and a few inches above the belt. Following inspection of the complete circumference of the torso at the belt line, pat, touch or lightly rub the center of the patron's back from the belt line to collar line. Large trouser pockets should be inspected by patting or lightly squeezing. Large items discovered in the pockets should be displayed to the screener for visual inspection. The screener's hands remain fully open during the pat down screening and no skin-on-skin contact should occur during the pat down.

9.    CPD refused the Bears' demand based on the unconstitutionality of the demanded pat-down searches.

10.    Neither CPD nor the Bears performed any pat-down searches at Soldier Field for Bears home games in 2005 until the December 18, 2005 game against the Atlanta Falcons. For that game and for the one home playoff game on January 15, 2006 against the Carolina Panthers, the Bears' agent, independently of CPD, hired, paid for and conducted pat-down searches on all persons entering Soldier Field. Additionally, the Bears specifically notified all persons entering Soldier Field for those two games that the pat-down searches were being conducted by the Bears and not the CPD. The Bears also specifically agreed to defend the CPD, indemnify the CPD and hold the CPD harmless against any and all "losses" or liabilities arising out of the Bears' pat-down searches, including but not limited to any claims regarding the constitutionality of the pat-down searches.

11.    After the 2005 football season ended, the Bears filed a demand for arbitration seeking to force the CPD, under the POA, to conduct, using taxpayer funds, pat-down searches for the up-coming 2006 NFL season, and be responsible for all costs and liabilities associated with the pat-down searches, including the defense of any lawsuits challenging the constitutionality of the searches. (Demand for Arbitration, Ex. A.)

3

12.    The CPD believes that the Fourth Amendment prohibits it, as a municipal corporation, from conducting and/or using taxpayer funds to pay for the demanded pat-down searches at Soldier Field.

13.    The Fourth Amendment prohibits the government from searching individuals without "an individualized suspicion of wrongdoing." This stringent requirement applies to public gatherings at venues owned and operated by government entities, such as Soldier Field.

14.    As held by the court in Bourgeois v. Peters, 387 F.3d 1303, 1303 (11th Cir. 2004) (a copy of which is attached hereto as Ex. B), a general fear and threat of terrorism after 9/11, which the Bears cite to in their demand for arbitration ("events taking place in large stadiums COULD BE POTENTIAL targets of terrorist attacks") (Ex. A, emphasis added), has not decreased the Fourth Amendment's broad protections, which apply equally to large gatherings of citizens at public venues.

15.    A Florida Court recently concurred with Bourgeois and the CPD's position and ruled that it is a violation of the Fourth Amendment for a municipal corporation to pay for and conduct mandatory pat-down searches at Raymond James Stadium where the NFL's Tampa Bay Buccaneers play their home games because it constituted state action for purposes of search-and-seizure analysis, and the Buccaneers could not show any individualized suspicion which would override the Fourth Amendment's prohibition.  Neither could the Buccaneers show that the proposed searches fell within either of the specifically established exceptions to the prohibition: (1) special circumstances or (2) implied consent.

16.    The Florida action was brought by a Tampa Bay Buccaneer season ticket holder against the Tampa Bay Sports Authority ("TSA") (the Tampa Bay equivalent of the CPD which operates Raymond James Stadium), claiming that the NFL mandated pat-down searches when

4

conducted and paid for by the TSA violated the Fourth Amendment's prohibition against government searches of individuals without a warrant or a particularized suspicion. (A Copy of the Florida state court enjoining the Tampa Bay Sports Authority from conducting and/or paying for pat-down searches at Tampa Bay home games is attached hereto as Ex. C.)

17.     In spite of the Florida decision, the holding in Bourgeois and the fact that neither the CPD nor the Bears have ever received a specific credible threat against Soldier Field, the Bears continue to demand arbitration to attempt to force the CPD to conduct the pat-down searches.

18.     Although the POA contains an arbitration provision, the overriding constitutional issue -- whether the Fourth Amendment prohibits the CPD from conducting and/or using taxpayer funds to pay for the pat-down searches -- must be decided before the issue of who, if anyone, under the POA is required to conduct and pay for the pat-down searches.

19.     Because of the Bears' continuing demand for arbitration, an actual, substantial and justifiable constitutional dispute exists, which this Court should adjudicate.

## COUNT I – REQUEST FOR DECLARATORY JUDGMENT

20.     The CPD realleges and incorporates the above paragraphs as fully set forth herein.

21.     As detailed above, this matter presents a ripe constitutional issue that stems from an actual, substantial, and justicable controversy between the parties -- whether the Bears' continuing demand that the CPD, a municipal corporation, conduct, using taxpayer funds, pat-down searches for the upcoming 2006 NFL season (which begins in August), of all persons entering Soldier Field, a public venue owned and operated by the CPD, violates the Fourth Amendment's prohibition against the government searching individuals without a warrant or a particularized suspicion of wrongdoing.

5

22.    Neither the CPD nor the Bears have ever received any credible threat to Soldier Field in relation to a Bears game. In fact, as the Florida court found, since 9/11 there has not been any credible terrorist threat to any NFL stadium. (Ex. C at p. 6.) Therefore, the Bears have not and cannot show any "special needs" exception to the Fourth Amendment prohibition against unlawful searches and seizures.

WHEREFORE, the CPD prays for entry of a judgment in its favor and against the Bears declaring that the Fourth Amendment prohibits the CPD from conducting the pat-down searches demanded by the Bears of all persons entering Soldier Field for Bears games at any time.

Dated: July 21, 2006

CHICAGO PARK DISTRICT

By: _George J. Lynch_
One of its attorneys

Richard W. Burke
George J. Lynch
Aaron H. Stanton
Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-3607
(312) 840-7000 (Telephone)
(312) 840-7900 (Facsimile)
Attorney No. 41904

402226.6

6

# EXHIBIT
# A

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

### COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent | Name of Representative (if known) |
|---|---|
| Chicago Park District | Richard W. Burke |
| **Address** | **Name of Firm (if applicable)** |
| 541 North Fairbanks Court | Burke, Warren, MacKay & Serritella, P.C. |
| | **Representative's Address** |
| | 330 North Wabash Avenue |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Chicago | IL | 60611- | Chicago | IL | 60611- |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| (312) 742-7529 | (312) 742-5314 | (312) 840-7000 | (312) 840-7900 |

| Email Address: | Email Address: |
|---|---|
| jessica.faulkner@cpp.com | rburkesr@burkelaw.com |

The named claimant, a party to an arbitration agreement dated August 1, 2001_____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

See Attached

| Dollar Amount of Claim  $75,000/150,000.00 | Other Relief Sought: ☐ Attorneys Fees   ☐ Interest |
|---|---|
| | ☐ Arbitration Costs  ☐ Punitive/ Exemplary  ☒ Other  Declatory |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $1,800.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Hearing locale Chicago, IL_____    (check one) ☒ Requested by Claimant   ☐ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business: Claimant ___ professional football club |
|---|---|
| _____ hours or 1 _____ days | Respondent governmental entity _____ |

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA ☒ Dallas, TX ☐ East Providence, RI ☐ Fresno, CA ☐ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)    Date: | Name of Representative |
|---|---|
| John Scholnick  by CWH [signature] | Gary Mowder  John Scholnick |
| **Name of Claimant** | **Name of Firm (if applicable)** |
| Chicago Bears Football Club, Inc. | SCHIFF HARDIN LLP |
| **Address (to be used in connection with this case)** | **Representative's Address** |
| Halas Hall at Conway Park, 1000 Football Drive | 6600 Sears Tower |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Lake Forest | IL | 60046- | Chicago | IL | 60606- |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| (847) 295-6600 | (847) 295-8986 | (312) 258-5500 | (312) 258-5600 |

| Email Address: | Email Address: |
|---|---|
| do not have e-mail | gmowder@schiffhardin.com |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879

## NATURE OF THE DISPUTE

Pursuant to Article 32 of the Permit and Operating Agreement between the Chicago Park District and the Chicago Bears Football Club, Inc., dated as of August 1, 2001, (which Agreement shall hereinafter be referred to as the "POA") and the further agreements of the parties regarding resolution of the dispute described herein, the Chicago Bears Football Club, Inc. (hereinafter the "Bears") request that the dispute described herein be decided by Expedited Arbitration. A copy of Article 32 of the POA, together with the Provisional Agreement for Pat Down Security Checks at Chicago Bears Home Games and the February 16, 2006 letter confirming the extension for initiating this arbitration, are enclosed for your convenience.

The POA is the agreement between the Bears and the Chicago Park District that, among other things, allocates between the parties the responsibilities and costs for operations in connection with the Bear's use of Soldier Field for home games.

This dispute relates to which of the parties is required under the terms of the POA to pay for the costs of certain security measures mandated by the National Football League (hereinafter the "NFL") to be performed at all NFL games.

On or about August 18, 2005, the Commissioner of the NFL issued a mandate to all member clubs requiring them to have instituted at all NFL games a pat down procedure. A copy of the memorandum to all clubs dated August 18, 2005 issuing the mandate is attached hereto at Exhibit 1. All NFL clubs were to have instituted pat down procedures for all games no later than September 25, 2005.

The pat down policy was instituted by the NFL in light of the events of September 11, 2001 and the recognition that sporting events taking place in large stadiums could be potential targets of terrorist attacks. Therefore, the NFL mandated that pat down screening be undertaken at all football games to ensure the safety of the people attending those games.

Following the NFL Commissioner's issuance of the August 18, 2005 memorandum the Bears notified the Chicago Park District that under the terms of the POA the Chicago Park District was responsible for making arrangements for, establishing procedures for (consistent with the NFL's requirements) and paying for the costs of pat down procedures that were mandated for games by the NFL Commissioner. The Chicago Park District has denied any responsibility for the costs of establishing and implementing pat down procedures at Soldier Field for Bears home games.

Although the parties entered into a provisional agreement for the 2005-2006 football season for the implementation of the NFL's pat down policy, there has been no permanent resolution of the dispute over which party is responsible under the terms of the POA for the payment of costs for pat down screening. The parties have, therefore, agreed to submit this dispute to Expedited Arbitration under Article 33 of the POA, subject to such additional arbitration procedures as the parties may agree to.

In general, the Chicago Park District is obligated under the POA to provide Soldier Field, a first-class facility, for use by the Bears for home games. This facility is to be provided for such use in accordance with all requirements, whether mandated by the NFL or otherwise, needed for the presentation of an NFL game. To the extent that the Bears are obligated to pay for particular costs and expenses associated with the use of Soldier Field, such costs and expenses are set forth in the POA. The costs associated with mandates of the NFL with regard to security procedures to be implemented for all NFL games would fall under the Chicago Park District's general obligations in the POA.

In addition, under Article 22 of the POA, which is entitled "Game Day Costs, Expenses and Responsibilities," the Chicago Park District is obligated to pay for costs associated with the operation of Solider Field on "Game Days." More specifically, paragraph 22.2.1 provides that "[i]n general, the CPD shall be responsible for the performance and payment of Game Day Expenses." It is the Bears' position that among the "Game Day Expenses" for which the Chicago Park District is responsible is the cost of implementing pat down screening, consistent with the NFL's mandate and guidelines.

The Bears reserve the right to make further submissions in support of the claim at the hearing of this arbitration and at such other time and in such other manner as the parties may agree.

CHI\4513175.1

## MEMORANDUM

**TO:**           Chief Executives and Club Presidents

**FROM:**         Commissioner Tagliabue

**DATE:**         August 18, 2005

**SUBJECT:**      Stadium Security on Game Days:
                  Mandatory Pat Down Screening of Fans Attending Games


At the August 10th Special League Meeting in Chicago, the membership endorsed the recommendation of the League's Security Department that the mandatory security measures for all clubs should be expanded to include "pat downs" of fans to be carried out by properly trained security personnel in accord with guidelines shortly to be distributed by the League's Security Department.

As discussed at the Chicago meeting, a large number of clubs are already screening patrons attending games using "pat down" procedures. All other clubs should have already trained security personnel to promptly implement such security measures. All clubs putting such measures into practice for the first time during the upcoming season will be given a reasonable period for re-training to affect the mandatory screening procedures now to be applied. Absent highly unusual circumstances, we would expect that these procedures would be fully implemented at all stadiums by no later than the third weekend of the regular season, i.e., by September 25th.

An important aspect of employing these procedures will be to provide clear, advance notice to fans attending games. This can be accomplished in a variety of ways, including through press releases that provide notice in local media ; mailings to season ticket holders; notices on team websites and in other team publications (such as weekly team newspapers); public address announcements at upcoming games; and signage clearly posted in parking lots or at the approaches to gates in stadiums.

We will shortly distribute to each club suggested language for inclusion in club media releases and other notices to fans. For your information, we are attaching an illustrative release issued recently by the Pittsburgh Steelers relative to these stadium screening and pat down procedures.



The League's Security Department will shortly distribute to all clubs a detailed memorandum setting forth guidelines to be followed by all clubs in implementing these security measures.

If you wish to discuss any aspect of this in the meantime, please contact Milt Ahlerich or Jeff Pash so that our Security Department can be of assistance in implementing this policy.

PT:gd


**SCHIFF HARDIN** LLP

6600 SEARS TOWER
CHICAGO, ILLINOIS   60606
t 312.258.5500
f 312.258.5600
www.schiffhardin.com

John N. Scholnick
(312) 258-5813
jscholnick@schiffhardin.com

April 12, 2006

**VIA FACSIMILE**

Ms. Candi E. Harris
Case Manager
American Arbitration Association
13455 Noel Road
Suite 1750
Dallas, TX 75240

   Re:  51 196 00498 06
      Chicago Bears Football Club, Inc.
      and
      Chicago Park District

Dear Ms. Harris:

   Please find enclosed an Amended Statement of the Nature of the Dispute which is to be attached to the Demand for Arbitration submitted by the Chicago Bears Football Club, Inc. Please substitute this Amended Statement of the Nature of the Dispute for the description of the Nature of the Dispute that was originally attached to the Demand for Arbitration.

   By copy of this letter to Mr. Richard W. Burke I have delivered a copy of the Amended Statement of the Nature of the Dispute to counsel for the Chicago Park District.

   If you should have any questions about this, please contact me.

         Sincerely,

         John N. Scholnick

Attachment
cc:  Richard W. Burke, Esq. (via facsimile)
   Gary Mowder, Esq.

CH1\ 4524938.1

Matter No. 51 196 00498 06

Chicago Bears Football Club, Inc.
and
Chicago Park District

## AMENDED STATEMENT OF THE NATURE OF THE DISPUTE

Pursuant to Article 32 of the Permit and Operating Agreement between the Chicago Park District and the Chicago Bears Football Club, Inc., dated as of August 1, 2001, (which Agreement shall hereinafter be referred to as the "POA") and the further agreements of the parties regarding resolution of the dispute described herein, the Chicago Bears Football Club, Inc. (hereinafter the "Bears") request that the dispute described herein be decided by Expedited Arbitration. A copy of Article 32 of the POA, together with the Provisional Agreement for Pat Down Security Checks at Chicago Bears Home Games and the February 16, 2006 letter confirming the extension for initiating this arbitration, are enclosed for your convenience.

The POA is the agreement between the Bears and the Chicago Park District that, among other things, allocates between the parties the responsibilities and costs for operations in connection with the Bear's use of Soldier Field for home games.

This dispute relates to which of the parties is required under the terms of the POA to pay for the costs of certain security measures mandated by the National Football League (hereinafter the "NFL") to be performed at all NFL games.

On or about August 18, 2005, the Commissioner of the NFL issued a mandate to all member clubs requiring them to have instituted at all NFL games a pat down procedure. A copy of the memorandum to all clubs dated August 18, 2005 issuing the mandate is attached hereto at Exhibit 1. All NFL clubs were to have instituted pat down procedures for all games no later than September 25, 2005.

The pat down policy was instituted by the NFL in light of the events of September 11, 2001, the recognition that sporting events taking place in large stadiums could be potential targets of terrorist attacks, and the high visibility and national attention associated with NFL games (America's number one spectator sport with broad television coverage). Therefore, the NFL mandated that pat down screening be undertaken at all football games to ensure the safety of the people attending those games.

Following the NFL Commissioner's issuance of the August 18, 2005 memorandum the Bears notified the Chicago Park District that under the terms of the POA the Chicago Park District was responsible for making arrangements for, establishing procedures for (consistent with the NFL's requirements) and paying for the costs of pat down procedures that were mandated for games by the NFL Commissioner. The Chicago

Park District has denied any responsibility for the costs of establishing and implementing pat down procedures at Soldier Field for Bears home games.

Although the parties entered into a provisional agreement for the 2005-2006 football season for the implementation of the NFL's pat down policy, there has been no permanent resolution of the dispute over which party is responsible under the terms of the POA for the payment of costs for pat down screening. The parties have, therefore, agreed to submit this dispute to Expedited Arbitration under Article 32 of the POA, subject to such additional arbitration procedures as the parties may agree to.

In general, the Chicago Park District is obligated under the POA to provide Soldier Field, a first-class facility, for use by the Bears for home games. This facility is to be provided for such use in accordance with all requirements , whether mandated by the NFL or otherwise, needed for the presentation of an NFL game. To the extent that the Bears are obligated to pay for particular costs and expenses associated with the use of Soldier Field, such costs and expenses are set forth in the POA. The costs associated with mandates of the NFL with regard to security procedures to be implemented for all NFL games would fall under the Chicago Park District's general obligations in the POA.

Pursuant to Article 25 of the POA, which is entitled "Security and Crowd Control," the Chicago Park District is obligated to pay for costs associated with security and crowd control on "Game Days." More specifically, paragraph 25.1 provides that "[e]xcept for locker rooms, Team Areas and the Field, the CPD shall be responsible for the performance and payment of security and crowd control on Game Days." Since pat down screening does not involve the locker rooms, the Team Areas and the Field, the Chicago Park District is responsible for the performance and payment of such screening.

In addition, under Article 22 of the POA, which is entitled "Game Day Costs, Expenses and Responsibilities," the Chicago Park District is obligated to pay for costs associated with the operation of Solider Field on "Game Days." More specifically, paragraph 22.2.1 provides that "[i]n general, the CPD shall be responsible for the performance and payment of Game Day Expenses." It is the Bears' position that among the "Game Day Expenses" for which the Chicago Park District is responsible is the cost of implementing pat down screening, consistent with the NFL's mandate and guidelines.

The Bears reserve the right to make further submissions in support of the claim at the hearing of this arbitration and at such other time and in such other manner as the parties may agree.

CHI\4518195.1

# EXHIBIT
# B

Westlaw.

387 F.3d 1303                                                                              Page 1

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

▷
Briefs and Other Related Documents

United States Court of Appeals,Eleventh Circuit.
Roy L. BOURGEOIS, Jeff Winder, Becky Johnson,
Eric Lecompte, School of the Americas Watch,
Plaintiffs-Appellants,
v.
Bobby PETERS, Willie L. Dozier, Consolidated
Government of Columbus, Georgia,
Defendants-Appellees.
**No. 02-16886.**

Oct. 15, 2004.

**Background:** Organization and its members
seeking to pressure the federal government to cut
funding to United States military school sought
injunction preventing city from requiring protestors
to submit to a metal detector search prior to
entering protest site. The United States District
Court for the Middle District of Georgia, No.
02-00171-CV-CDL-4,Clay D. Land, J., dismissed
complaint, and appeal was taken.

**Holdings:** The Court of Appeals, Tjoflat, Circuit
Judge, held that:

3(1) challenge fell within the exception to the
mootness doctrine for issues that are capable of
repetition;

6(2) city's policy to conduct magnetometer searches
violated protestors' Fourth Amendment right to be
free of unreasonable searches and seizures; and

8(3) city's policy of magnetometer searches was a
burden on free speech and association in violation
of the First Amendment.

Vacated and remanded.

West Headnotes

**[1] Federal Courts 170B ⚖➔12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
       170Bk12   Case   or   Controversy
Requirement
       170Bk12.1 k. In General. Most Cited
Cases
Past injury from alleged unconstitutional conduct
does not in itself show a present case or controversy
regarding injunctive relief, if unaccompanied by
current adverse effects.

**[2] Federal Courts 170B ⚖➔12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
       170Bk12   Case   or   Controversy
Requirement
       170Bk12.1 k. In General. Most Cited
Cases
A federal court may entertain a moot case if it arises
from a situation that is capable of repetition, yet
evading review; this standard is satisfied where (1)
the challenged action was in its duration too short to
be fully litigated prior to its cessation or expiration,
and (2) there was a reasonable expectation that the
same complaining party would be subjected to the
same action again.

**[3] Federal Courts 170B ⚖➔13**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
       170Bk12   Case   or   Controversy
Requirement
       170Bk13  k.  Particular  Cases  or
Questions, Justiciable Controversy. Most Cited
Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

Challenge to city's requirement that protestors at organization's annual protest to military school submit to a metal detector search prior to entering protest site fell within the exception to the mootness doctrine for issues that are capable of repetition, yet evading review; the time between the city's decision to institute the searches at a protest in a given year and the protest itself was too short to allow full judicial consideration, it could be reasonably expected that future protests would continue to be subject to these searches, and many of the protestors subject to the searches could be expected to attend future protests, satisfying requirement that dispute involve the same parties.

**[4] Federal Courts 170B ⚚12.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
Where a defendant voluntarily ceases challenged conduct, the case is not moot because nothing would prevent the defendant from resuming its challenged action.

**[5] Federal Courts 170B ⚚12.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
Voluntary cessation of a challenged practice renders a case moot only if there is no reasonable expectation that the challenged practice will resume after the lawsuit is dismissed.

**[6] Searches and Seizures 349 ⚚39**

349 Searches and Seizures
    349I In General
        349k36 Circumstances Affecting Validity of Warrantless Search, in General

349k39 k. Particular Concrete Cases. Most Cited Cases
City's policy to conduct mass, suspicionless, warrantless magnetometer searches of protestors on their way to protest of military school violated protestors' Fourth Amendment right to be free of unreasonable searches and seizures. U.S.C.A. Const.Amend. 4.

**[7] Searches and Seizures 349 ⚚42.1**

349 Searches and Seizures
    349I In General
        349k42 Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant
            349k42.1 k. In General. Most Cited Cases
City's policy of conducting mass, suspicionless, warrantless magnetometer searches of protestors on their way to protest of military school did not fall within special needs exception to Fourth Amendment's warrant and probable cause requirement. U.S.C.A. Const.Amend. 4.

**[8] Constitutional Law 92 ⚚90.1(1)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations
            92k90.1(1) k. In General. Most Cited Cases

**Constitutional Law 92 ⚚91**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k91 k. Right of Assembly and Petition. Most Cited Cases

**Searches and Seizures 349 ⚚39**

349 Searches and Seizures
    349I In General
        349k36 Circumstances Affecting Validity of Warrantless Search, in General
            349k39 k. Particular Concrete Cases. Most Cited Cases
City's policy of conducting mass, suspicionless,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

warrantless magnetometer searches of protestors on their way to protest of military school was a burden on free speech and association in violation of the First Amendment, given that there were no objective, established standards for the police chief to utilize in making the decision to conduct the searches. U.S.C.A. Const.Amend. 1.

**[9] Constitutional Law 92 ☞90(3)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90(3) k. Limitations on Doctrine in General. Most Cited Cases
Even if a particular restriction or condition is an otherwise permissible content-neutral regulation of the time, place, or manner of speech, it is unconstitutional under the First Amendment if a government official has unbridled discretion to apply it. U.S.C.A. Const.Amend. 1.

**[10] Constitutional Law 92 ☞90.1(1)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(1) k. In General. Most Cited Cases

**Constitutional Law 92 ☞91**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k91 k. Right of Assembly and Petition. Most Cited Cases

**Searches and Seizures 349 ☞39**

349 Searches and Seizures
   349I In General
      349k36 Circumstances Affecting Validity of Warrantless Search, in General
         349k39 k. Particular Concrete Cases. Most Cited Cases
City's policy of conducting mass, suspicionless, warrantless magnetometer searches of protestors on

their way to protest of military school was a form of prior restraint on speech and assembly, and thus violated the First Amendment; to participate in the protest, individuals had to receive the prior permission of officers manning the checkpoints, and there was no available route through which protestors excluded at the checkpoints from the protest site could seek meaningful judicial relief prior to the end of the protest. U.S.C.A. Const.Amend. 1.

**[11] Constitutional Law 92 ☞90.1(4)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(4) k. Use of Streets and Public Places; Licenses and Permits. Most Cited Cases
Under the First Amendment, a prior restraint of expression exists when the government can deny access to a forum before the expression occurs. U.S.C.A. Const.Amend. 1.

**[12] Constitutional Law 92 ☞90.1(1)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(1) k. In General. Most Cited Cases

**Searches and Seizures 349 ☞39**

349 Searches and Seizures
   349I In General
      349k36 Circumstances Affecting Validity of Warrantless Search, in General
         349k39 k. Particular Concrete Cases. Most Cited Cases
Under the First Amendment, city's policy of conducting mass, suspicionless, warrantless magnetometer searches of protestors on their way to protest of military school was a content-based regulation of speech, given that the decision to implement the searches was based on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

Page 4

determination that other organizations would react violently to the protest. U.S.C.A. Const.Amend. 1.

**[13] Constitutional Law 92 ☞90.1(1)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(1) k. In General. Most Cited Cases

**Searches and Seizures 349 ☞39**

349 Searches and Seizures
   349I In General
      349k36 Circumstances Affecting Validity of Warrantless Search, in General
         349k39 k. Particular Concrete Cases. Most Cited Cases
City's policy of conducting mass, suspicionless, warrantless magnetometer searches of protestors on their way to protest of military school was not narrowly tailed to city's professed interest in maintaining public safety, and thus constituted an impermissible content-based regulation of speech; although the city professed a desire to remove the threat of knives, bombs, guns, and incendiary devices from the protest, the magnetometer searches would not detect flammable items and could be triggered by a number of objects that would have no combative or militaristic utility. U.S.C.A. Const.Amend. 1.

**[14] Constitutional Law 92 ☞90.1(4)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(4) k. Use of Streets and Public Places; Licenses and Permits. Most Cited Cases
Under the First Amendment, content-based restrictions on speech in a public forum are subject to strict scrutiny, which means that the court must ascertain whether the policy employs the least restrictive means to meet a compelling government

interest. U.S.C.A. Const.Amend. 1.

**[15] Constitutional Law 92 ☞90.1(1)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(1) k. In General. Most Cited Cases

**Searches and Seizures 349 ☞39**

349 Searches and Seizures
   349I In General
      349k36 Circumstances Affecting Validity of Warrantless Search, in General
         349k39 k. Particular Concrete Cases. Most Cited Cases
Even if city's policy of conducting mass, suspicionless, warrantless magnetometer searches of protestors on their way to protest of military school was a content-neutral regulation of speech, rather than content-based, such searches were not a form of time, place, or manner restrictions, and thus placed an impermissible burden on the protestors' First Amendment rights. U.S.C.A. Const.Amend. 1.

**[16] Constitutional Law 92 ☞90(3)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90(3) k. Limitations on Doctrine in General. Most Cited Cases
Under the First Amendment, reasonable restriction on a manner of speech must leave open alternative channels of communication and not restrict substantially more speech than necessary to further a legitimate government interest. U.S.C.A. Const.Amend. 1.

**[17] Constitutional Law 92 ☞90.1(1)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                                    Page 5

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

Limitations
      92k90.1(1) k. In General. Most Cited
Cases

**Constitutional Law 92 ☜91**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k91 k. Right of Assembly and Petition.
Most Cited Cases

**Searches and Seizures 349 ☜39**

349 Searches and Seizures
   349I In General
      349k36 Circumstances Affecting Validity of
Warrantless Search, in General
         349k39 k. Particular Concrete Cases.
Most Cited Cases
City's requirement that protestors submit to
magnetometer searches prior to participating in
protest against military school constituted an "
unconstitutional condition" that violated the First
Amendment; the protestors were required to
surrender a constitutional right, freedom from
unreasonable searches and seizures, not merely to
receive a discretionary benefit but to exercise two
other fundamental rights, freedom of speech and
assembly. U.S.C.A. Const.Amends. 1, 4.

*1306 Gerald R. Weber, American Civil Liberties
Union Foundation, Atlanta, GA, William P. Quigley
, Loyola University Law Clinic, New Orleans, LA,
for Plaintiffs-Appellants.
James C. Clark, Jr., Page, Scrantom, Sprouse,
Tucker & Ford, P.C., Clifton C. Fay, Jaimie Briggs
DeLoach,        Columbus,        GA,        for
Defendants-Appellees.

Appeal from the United States District Court for the
Middle District of Georgia.

Before TJOFLAT, BIRCH and GOODWIN FN*,
Circuit Judges.

      FN* Honorable Alfred T. Goodwin,
      United States Circuit Judge for the Ninth
      Circuit, sitting by designation.

TJOFLAT, Circuit Judge:
The plaintiffs in this case are an organization called
"School of the Americas Watch" ("SAW") and
several of its members, including SAW's founder,
Rev. Roy Bourgeois. The group engages in various
forms of nonviolent protest, seeking to pressure the
federal government to cut funding to the Western
Hemisphere Institute for Security Cooperation,
better known as the "School of the Americas"
(SOA). The SOA is run by the United States Army
and housed at Fort Benning, Georgia. It trains
military leaders from other countries throughout the
Western Hemisphere in combat and various
counterinsurgency techniques. SAW contends that
the SOA bolsters military dictatorships by training
their leaders how to kill, to torture, and otherwise to
suppress their citizens.

As part of its ongoing efforts to shut down the SOA,
the SAW engages in an annual protest each
November on property open to the public
immediately    outside    of    Fort    Benning.
Approximately    15,000    people    attend    the
demonstration    each    year.    Throughout    the
thirteen-year history of these protests, no weapons
have ever been found at the protest site, and no
protestor has ever been arrested for an act of
violence. Each year, however, a small number of
protestors violate 18 U.S.C. § 1382 by entering
onto Fort Benning and attempting to march to the
SOA,FN1 which is actually located a few miles
inside the base.

      FN1. The law provides:
      Whoever, within the jurisdiction of the
      United States, goes upon any military,
      naval, or Coast Guard reservation, post,
      fort, arsenal, yard, station, or installation,
      for any purpose prohibited by law or
      lawful regulation; or
      Whoever reenters or is found within any
      such reservation, post, fort, arsenal, yard,
      station, or installation, after having been
      removed therefrom or ordered not to
      reenter by any officer or person in
      command or charge thereof-
      Shall be fined under this title or
      imprisoned not more than six months, or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                                          Page 6

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

both.
18 U.S.C. § 1382.

*1307 In November 2002, a week before that year's
protest, the City of Columbus ("the City") instituted
a policy requiring everyone wishing to participate in
the protest to submit to a magnetometer (essentially,
a metal detector) search at a checkpoint "a couple
of long city blocks" away from the SAW protest
site. If the magnetometer indicated the presence of
metal as a protester was walking through it, police
would physically search that individual's person and
belongings. The police estimated that protestors "
would probably have to arrive ... an hour and a half,
maybe 2 hours, ahead of time" to get through the
metal detector checkpoints to the protest site.

The City contends that its decision to conduct mass
searches was based on several factors. First, the
Department of Homeland Security threat assessment
level was "elevated," indicating a "significant" risk
of attack. Second, protestors in previous years had
demonstrated a history of "lawlessness" because
many of them engaged in frenzied dancing, did not
immediately disburse at the end of the scheduled
protest, and "formed a 'global village' from large
debris." In addition, some of them ignited a smoke
bomb, and a few entered onto Fort Benning in a
peaceful march to the SOA. Finally, SAW had
invited several "affinity groups"-in particular, the
Anarchists-to attend the protest that had allegedly
instigated violence at other, unrelated protests such
as the one that led to a riot in Seattle during a 1999
meeting of the World Trade Organization.[FN2]

> FN2. The proposed magnetometer
> searches, which do nothing more than
> detect the presence of metal, would have
> done little, if anything, to deter or to
> interdict any of this conduct.

SAW immediately sought a temporary restraining
order and preliminary injunction from the United
States District Court for the Middle District of
Georgia,[FN3] alleging that the searches violated
protestors' First and Fourth Amendment rights.
Two days later, the court held a hearing on
preliminary relief, which the parties agreed to

consolidate with the trial on the merits. The court
refused to enter an injunction and instead dismissed
the complaint. As a result, the City conducted the
magnetometer searches as planned. SAW appeals
the denial of a permanent injunction against the
magnetometer searches. While this appeal was
pending, in November 2003, SAW again held a
protest, and the City again conducted magnetometer
searches.

> FN3. The complaint also sought damages,
> but since the searches had not occurred at
> the time of the trial on the merits, the
> damages issue was not yet ripe. Although
> SAW is free to file a new § 1983 suit for
> damages (subject, of course, to the statute
> of limitations), we have no occasion to
> consider the damages claim from their
> original complaint.

We conclude that these searches violate the First
and Fourth Amendments to the Constitution. Part I
of this opinion explains why this case falls within
the exception to the mootness doctrine for issues
that are "capable of repetition, yet evading review."
Part II discusses how the City of Columbus search
policy contravenes the Fourth Amendment, while
Part III sets forth the reasons why the searches
violate the First Amendment. Part IV briefly
concludes.

I.

[1] Before reaching the merits of this matter, we
must first determine whether we may exercise
jurisdiction over it. Because Article III of the
Constitution limits the jurisdiction of federal courts
to "cases and controversies," *Nat'l Adver. Co. v.
City of Ft. Lauderdale,* 934 F.2d 283, 285-86 (11th
Cir.1991), we cannot entertain this *1308 appeal
unless an actual dispute continues to exist between
the parties. If the matter has become moot, we
must vacate the district court's ruling and dismiss
the case. *See De La Teja v. United States,* 321
F.3d 1357, 1364 (11th Cir.2003) ( "[W]hen an issue
in a case becomes moot on appeal, the court not
only must dismiss as to the mooted issue, but also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

Page 7

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

vacate the portion of the district court's order that addresses it."). The City points out that the original complaint sought an injunction against mass searches at SAW's 2002 protest. Because that protest occurred over two years ago, they argue, this matter is moot. The point is well-taken. "Past injury from alleged unconstitutional conduct does not in itself show a present case or controversy regarding injunctive relief, if unaccompanied by current adverse effects." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir.1984).

[2] There is an exception to this general rule, however. We may entertain a moot case if it arises from a situation that is "capable of repetition, yet evading review." *Alabama Disabilities Advocacy Program v. J.S. Tarwater Devel.*, 97 F.3d 492, 496 n. 1 (11th Cir.1996) ("[E]ven if the appeal would otherwise be moot, this case is an appropriate one to decide on the merits because the challenged action is capable of repetition, yet evading review."). This standard is satisfied where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). As a final requirement, if there exists some alternative vehicle through which a particular policy may effectively be subject to a complete round of judicial review, then courts will not generally employ this exception to the mootness doctrine. *See Sierra Club v. EPA*, 315 F.3d 1295, 1303 n. 11 (11th Cir.2002) ("The lawfulness of the Extension Policy can be reviewed in any challenge to EPA's approval of [permanent air quality standards]. Thus, even if the allegedly improper reliance on the Extension Policy [in promulgating interim quality standards] could be repeated, it would not evade review, and the exception to the mootness doctrine does not apply."). The mass searches at issue in this case satisfy all three prongs of this test.

[3] First, the time between the City's decision to institute magnetometer searches at an SAW protest in a given year and the protest itself is too short to allow full consideration by the district court, this

court, and possibly the Supreme Court. In 2002, the City announced that it was mandating magnetometer searches barely two weeks before the protest; a two week period is clearly insufficient to allow meaningful judicial review. Even if SAW were to file a preemptive suit for an injunction a full year prior to its next rally, that period of time could well prove insufficient for a complete round of judicial review. The instant appeal, for example, has been pending in this court close to a year.

We have never definitively stated the amount of time the federal judiciary must have to adjudicate a dispute that would constitute sufficient opportunity for review. Among the time periods that we have held to be insufficient for full judicial review of a dispute are twenty-four hours, [FN4] an "[e]lection period[ ]" of unspecified *1309 length,[FN5] and four months.[FN6] *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), sets a useful benchmark in this area; the Supreme Court there held that a 266-day pregnancy is insufficient time to allow for full appellate review. *See Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1257 (11th Cir.2001). Guided by these precedents, as well as our experience with appellate dockets, we conclude that one year is an insufficient amount of time for a district court, circuit court of appeals, and Supreme Court to adjudicate the typical case. Consequently, if this issue arises again regarding a future protest, it is likely to evade review because the protest will occur before the parties have a final ruling on the merits from a court of last resort.

> FN4. *Doe v. O'Brien*, 329 F.3d 1286, 1293 (11th Cir.2003) (holding that because a period of 24 hours was insufficient to allow judicial review of challenged governmental actions, an aggrieved party had standing to challenge them under the " capable of repetition yet evading review" doctrine).

> FN5. *Fla. Right to Life v. Lamar*, 273 F.3d 1318, 1324 n. 6 (11th Cir.2001) ("Election periods are too short to fully litigate the constitutionality of [a law] before a given election ends.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                   Page 8

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

FN6. *Sierra Club v. Martin,* 110 F.3d 1551, 1554 (11th Cir.1997) ( "[T]he four-month term of the preliminary injunction was too short to allow for appellate review prior to its expiration.").

SAW also satisfies the second prong of the "capable of repetition yet evading review" test because it has a "reasonable expectation" that the City will continue to implement mass, warrantless, suspicionless magnetometer searches at SAW protests in future years. *Christian Coalition v. Cole,* 355 F.3d 1288, 1291 (11th Cir.2004) ("Only when the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated are federal courts precluded from deciding the case on mootness grounds." (quotation marks omitted)). This standard requires more than a " mere possibility" that the conduct at issue will recur, but far less than absolute certainty. *Najjar v. Ashcroft,* 273 F.3d 1330, 1340 (11th Cir.2001); *C & C Products, Inc. v. Messick,* 700 F.2d 635, 637 (11th Cir.1983) ("A controversy is not capable of repetition if there is only 'a mere physical or theoretical possibility' of recurrence." (citation omitted)). The threat of future injury may not be " conjectural" or "hypothetical." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The City bears a "heavy burden" in demonstrating that SAW's expectation that the searches will continue is fanciful or unreasonable. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). For this " reasonable expectation" standard to be met, future recurrences must involve substantially the same parties. *See, e.g., Adler v. Duval Cty. Sch. Bd.,* 112 F.3d 1475, 1478 (11th Cir.1997) ("Because the complaining students have graduated from high school, there is no reasonable expectation that they will be subjected to the same injury again."); *accord Soliman v. United States,* 296 F.3d 1237, 1243 (11th Cir.2002) ("Furthermore, since [the plaintiff] has been removed from the United States and there is absolutely no reason to believe that he will again be detained or force-fed under the same circumstances, the narrow exception for cases that are capable of repetition yet evading review does not apply.").

[4][5] "Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction." *Lynch,* 744 F.2d at 1456. The City has argued for over two years that its search policy is constitutional and has continued to implement it even in the face of ongoing litigation. Moreover, there has been no suggestion that the upcoming 2004 protests will be exempt from the search policy.FN7 Finally, the basis for exception *1310 in this case is not predicated upon an unlikely future confluence of events, such as that in *C & C Products,* 700 F.2d at 638 (refusing to resolve a mooted discovery dispute under the " capable of repetition yet evading review" doctrine because the plaintiff "would be subjected to [future] disclosure of materials covered by a protective order only if it is involved in another lawsuit in which a protective order has been entered and a nonparty moves to modify the order"). This case also stands in stark contrast to *Christian Coalition v. Cole,* wherein the government officials facing the prospect of injunction expressly guaranteed that they would not reinstate their unconstitutional policy, in light of an intervening Supreme Court decision. 355 F.3d 1288, 1292-93 (11th Cir.2004) ( "[T]he [plaintiff] has every reason to believe that the [defendant's] representation is genuine, and can reasonably expect that the [defendant] will not [reinstate its unconstitutional policy]."). Consequently, we find that SAW's fear of future magnetometer searches is reasonable.

FN7. Indeed, even if the City declared that it would not conduct a search this year, that would not in itself be enough to avoid the "capable of repetition" doctrine. " Where a defendant voluntarily ceases challenged conduct, the case is not moot because nothing would prevent the defendant from resuming its challenged action." *Sierra Club v. EPA,* 315 F.3d 1295, 1303 (11th Cir.2002). "[V]oluntary cessation of a challenged practice renders a case moot only if there is no 'reasonable expectation' that the challenged practice will resume after the lawsuit is dismissed." *Jews for Jesus v. Hillsborough Cty.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                                    Page 9

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

Aviation Auth., 162 F.3d 627, 629 (11th Cir.1998).

The City contends that a Fourth Amendment case like this can almost never fit into the "capable of repetition, yet evading review" exception to the mootness doctrine because the decision to implement magnetometer searches is made anew each year, based on circumstances as they exist at that time. While this is a valid point, it does not make this case moot because all of the cir cumstances that the City deemed sufficient to implement the search in 2002 continue to exist today, and by all indications will continue to persist into the indefinite future.

As noted earlier, the decision to institute magnetometer searches was based on several factors: (1) events at prior protests, (2) the affinity groups likely to get involved, and (3) the "elevated" status of the Department of Homeland Security's threat advisory system. Because all of these circumstances continue to exist and are likely to do so for the foreseeable future, it is quite likely that the City will arrive at the same conclusion regarding future protests and implement mass searches. Thus, SAW may reasonably expect that its future protests will continue to be subject to these searches.

The requirement that the dispute involve the same parties is satisfied in this case. Because this case involves the likelihood of future searches by the City at SAW's annual protest, and many of the plaintiffs are likely to attend these future protests, this requirement is easily met.

Finally, there is no other available method for obtaining a complete round of judicial review of magnetometer searches at upcoming protests. As discussed above, a new lawsuit aimed specifically at an upcoming search is likely to take as long as the instant one and be similarly mooted. For these reasons, we find that we may exercise jurisdiction over the instant dispute, because while moot, it is capable of repetition yet evading review.

II.

[6] The plaintiffs' first contention is that the mass, suspicionless, warrantless magnetometer searches violate their Fourth Amendment right to be free of " unreasonable searches and seizures." We agree. The City makes several arguments in defense of its searches; we explore each in turn.

*1311 A.

The City's brief begins with the bold declaration that "[l]ocal governments need an opinion that, without question, allows non-discriminatory, low-level magnetometer searches at large gatherings. " *Appellees' Brief* at 13. Citing nothing more than a single case from 1980, the City contends that " [p]ost September 11, 2001, this Court can determine [that] the preventive measure of a magnetometer at large gatherings is constitutional as a matter of law." *Id.* (*citing Donovan v. Dewey,* 452 U.S. 594, 606, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981)).[FN8]

FN8. The City's reference to September 11 is largely new on appeal. It did not attempt to establish by testimony or other evidence that the searches were justified by fear of a terrorist attack. The City's counsel made an oblique reference to that day very briefly during closing argument before the district court: "We've got new terror alerts happening everyday [sic]. We had another one last night. Everybody heard on CNN, for four different cities and hospitals in the U.S., and they don't know who's coming to this event and they can't control who's coming." V2-R15-159. This passing mention of terror is the only time the issue was even plausibly put before the district court. That mention may have resonated with the district court, which referenced September 11 while issuing its decision from the bench: [Law enforcement officers] should be commended for their efforts in a difficult, often impossible job, particularly given the post September 11 environment. They are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L., Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

criticized when their actions appear to tilt too much in favor of public safety and infringe upon fundamental rights, and they are criticized when they do not go far enough and a tragedy results.

V2-R15-162. Nothing in the substance of the court's reasoning, however, reflected a concern that the demonstration at issue in this case was actually a potential source or target of terrorist threats.

This argument is troubling. While the threat of terrorism is omnipresent, we cannot use it as the basis for restricting the scope of the Fourth Amendment's protections in any large gathering of people. In the absence of some reason to believe that international terrorists would target or infiltrate this protest, there is no basis for using September 11 as an excuse for searching the protestors.

Even putting aside the City's ill-advised and groundless reference to September 11, its demand for the unbridled power to perform "magnetometer searches at [all] large gatherings" is untenable. The text of the Fourth Amendment contains no exception for large gatherings of people. It cannot be argued that the Framers simply failed to foresee the possibility of large protests of this character. The Assembly Clause of the First Amendment, expressly guaranteeing "the right of the people peaceably to assemble," U.S. Const. amend. I, demonstrates the Framers' commitment to protect individuals exercising this fundamental right from governmental interference. The City's request for the broad authority to conduct mass, suspicionless, warrantless searches is similarly bereft of any support from either the Supreme Court or the Eleventh Circuit.

As SAW points out, under the City's theory, mass suspicion-less [sic] searches could be implemented for every person who attends any large event including: a high school graduation, a church picnic, a public concert in the park, an art festival, a Fourth of July parade, sporting events such as a marathon, and fund-raising events such as the annual breast cancer walk. And if the government began to pick and choose amongst [sic] these groups, viewpoint discrimination would likely result.

*Reply Brief of Appellants* at 4.

The City's position would effectively eviscerate the Fourth Amendment. It is **\*1312** quite possible that both protestors and passersby would be safer if the City were permitted to engage in mass, warrantless, suspicionless searches. Indeed, it is quite possible that our nation would be safer if police were permitted to stop and search anyone they wanted, at any time, for no reason at all. *Cf. Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring that police demonstrate individualized suspicion that a suspect is armed before frisking him). Nevertheless, the Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on evidence-rather than potentially effective, broad, prophylactic dragnets-as the constitutional norm.

We also reject the notion that the Department of Homeland Security's threat advisory level somehow justifies these searches. Although the threat level was "elevated" at the time of the protest, "[t]o date, the threat level has stood at yellow (elevated) for the majority of its time in existence. It has been raised to orange (high) six times." Wikipedia, *Homeland Security Advisory System, available at* http://en.wikipedia.org/wi
ki/Department_of_Homeland_
Security_Advisory_System (last referenced Aug. 16, 2004). Given that we have been on "yellow alert" for over two and a half years now, we cannot consider this a particularly exceptional condition that warrants curtailment of constitutional rights. We cannot simply suspend or restrict civil liberties until the War on Terror is over, because the War on Terror is unlikely ever to be truly over. September 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country. Furthermore, a system that gave the federal government the power to determine the range of constitutionally permissible searches simply by raising or lowering the nation's threat advisory system would allow the restrictions of the Fourth Amendment to be circumvented too easily. Consequently, the "elevated" alert status does not aid the City's case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### B.

[7] The City, quoting the district court, next contends that the search is permissible as a "special needs" search because its purpose is "not to detect unlawful activity or criminal wrongdoing, but ... [to] detect[ ] dangerous devices to ensure the safety of participants, spectators, and law enforcement." *Appellees' Brief* at 10. The Supreme Court has held that warrantless, suspicionless searches are constitutionally permissible in certain narrow cases where they are meant to further "special needs, beyond the normal need for law enforcement." *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 653, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995) (quotation marks and citation omitted).

The City contends that the searches here were not intended to further the City's interest in law enforcement, but instead to help to achieve its "special need" to keep the protestors and others safe by detecting weapons and contraband. The City of Columbus and State of Georgia have enacted a variety of laws against the possession or use of certain kinds of weapons, smoke bombs, and incendiary devices to achieve this goal of public safety. As the City admits, many arrests under these laws occurred as a result of these searches. In a case such as this, where the very purpose of a particular law (such as the law banning the possession of certain dangerous items) is to protect the public, and the government protects the public by enforcing that law, it is difficult to see how public safety could be seen as a governmental interest independent of law enforcement;*1313 the two are inextricably intertwined.

Under the City's rationale, a search intended to enforce a given law would be permissible so long as the government officially maintained that its purpose was to secure the objectives that motivated the law's enactment in the first place (e.g., public safety) rather than simply to enforce that law for its own sake. Such a distinction is untenable. Moreover, it is difficult to conceptualize what the government's interest in "enforcing a law for its own sake" would be, if not to secure the benefits of having that law enforced. Given "[t]he extensive involvement of law enforcement and the threat of

prosecution" in this search, and our inability to tease out a rationale totally independent of the City's interest in law enforcement, we find that the search does not fall within the special needs doctrine. *Ferguson v. City of Charleston,* 532 U.S. 67, 83-84 & n. 20, 121 S.Ct. 1281, 1291 & n. 20, 149 L.Ed.2d 205 (2001); *cf. Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 454-55, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (upholding highway sobriety checkpoints run by police who arrested drunk drivers).

Even putting aside this difficulty, the type of search at issue here does not fall within any of the "special needs" exceptions recognized by the Supreme Court. Both due to the potentially unlimited sweep of the "special needs" standard, as well as to the concerns discussed in Part II.A *supra,* we decline to take it upon ourselves to craft another exception to the Fourth Amendment's general requirement of individualized suspicion.

### C.

The City's final argument is that this search is constitutionally permissible because it is "reasonable." A necessary ancillary to this argument is that the Fourth Amendment permits all reasonable searches, whether or not the officials conducting them have either a warrant, probable cause, or indeed any degree of individualized suspicion. The City focuses too much on the grammatical construction of the first half of the amendment, however. As the Supreme Court reminds us in *Chimel v. California,* 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969), discussions of reasonableness "must be viewed in the light of established Fourth Amendment principles."

As the Court has repeatedly emphasized, "[T]he most basic constitutional rule in this area is that ' searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specially established and well-delineated exceptions,' " *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)), which are "jealously and carefully drawn." *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958); *accord Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Swint v. City of Wadley,* 51 F.3d 988, 995 (11th Cir.1995). Similarly, "[i]n enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution." *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 419 (1970). "A search or seizure is ordinarily unreasonable in the absence of [at least some] individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond,* 531 U.S. 32, 37, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000).

*1314 Conducting an *ad hoc* analysis of the reasonableness of the search based on the judge's personal opinions about the governmental and privacy interests at stake, instead of applying the Supreme Court's well-established *per se* rules regarding warrants, prior judicial scrutiny of proposed searches, probable cause, and individualized suspicion ignores these crucial Fourth Amendment principles. The need to apply these *per se* rules reaches all searches, whether of the home, office, person, or other location. *See, e.g., O'Rourke v. Hayes,* 378 F.3d 1201, 1206 (11th Cir.2004) ("[The Fourth Amendment's] protection extends to any area in which an individual has a reasonable expectation of privacy. Offices and other workplaces are among the areas in which individuals may enjoy such a reasonable expectation of privacy." (quotation marks and citations omitted)).[FN9]

FN9. The Supreme Court conducted *ad hoc* balancing in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a case involving pat-downs that the City contends is similar to-and, indeed, involved allegedly more intrusive searches than-the instant case. We note that the searches in

this case could quite easily be as intrusive or more intrusive than those in *Terry* because if a magnetometer reveals the presence of metal, the individual and his belongings would be physically searched, and he could likely be asked to remove his shoes, belt, or other articles of clothing. In *Terry,* in contrast, nothing other than a cursory pat-down could occur unless an officer actually felt something believed to be a weapon.

Putting aside this quibble, the Court employed balancing in *Terry* because the searches there involved "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat-which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id* at 20, 88 S.Ct. at 1879. The searches at issue here involve no such long historical pedigree. Moreover, the 12-year history of SAW protests prior to the creation of this policy-as well as the long history of large and sometimes raucous public gatherings without such searches in this case-casts doubt on any claim that officers could not "as a practical matter" conduct their jobs without suspicionless magnetometer searches. Finally, *Terry* did away with the warrant and probable cause requirements for pat-down searches, but not an individualized suspicion requirement. *Id.* at 26, 88 S.Ct. at 1883 (" [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual."). Our conclusion in this case is entirely consistent with this rationale, and as discussed at the end of this Subpart, leaves officers with a variety of alternatives approved by the Supreme Court for ensuring that large public gatherings are safe.

In general, warrantless searches are permissible only where an individual has a substantially reduced

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

Page 13

expectation of privacy. That expectation of privacy has both a subjective and objective component. That is, a person must both assert or otherwise exhibit a belief in a right to privacy in the object of the search, and that expectation must be one that society is prepared to accept as reasonable. *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Situations in which such expectations are reduced include automobile searches,[FN10] searches incident to arrest,[FN11] *1315 border searches,[FN12] and searches of open fields,[FN13] items in plain view believed to contain contraband, [FN14] and prisoners' cells.[FN15]

> FN10. *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031 (1996) (noting that an "individual's reduced expectation of privacy in an automobile" is a justification for the automobile exception to the warrant requirement).

> FN11. *United States v. Robinson*, 414 U.S. 218, 237, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973) (Powell, J., concurring) ("[A]n individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person."); *see also Mincey v. Arizona*, 437 U.S. 385, 391, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (accepting the proposition that "one who is legally taken into custody has a lessened right of privacy in his person").

> FN12. *United States v. Montoya de Hernandez*, 473 U.S. 531, 539, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985) (noting that "the expectation of privacy [is] less at the border than in the interior" of the country).

> FN13. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) ("[T]he common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields").

> FN14. *See, e.g., New York v. Class*, 475 U.S. 106, 114, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986) ("[B]ecause of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view, we hold that there was no reasonable expectation of privacy in the VIN.")

> FN15. *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) ("[S]ociety is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell.").

The logic underlying recognition of these enclaves of diminished protection simply does not apply here. In each of those situations, some unique and identifiable heightened state or diminished private interest was a catalytic ingredient in the "reasonable expectations" formula. Because the Fourth Amendment protects people rather than places, for example, individuals have reduced privacy expectations in their automobiles and open fields. *See Labron*, 518 U.S. at 940, 116 S.Ct. at 2487 (noting that individuals have a reduced privacy expectation in an automobile, "owing to its pervasive regulation"); *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742 (explaining that open fields do not share the characteristics of the "sanctity of a man's home and the privacies of life" (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886) (quotation marks omitted))). Transborder travel and arrests are two contexts in which compelling state interests may diminish legitimate privacy expectations. *See Montoya de Hernandez*, 473 U.S. at 539, 105 S.Ct. at 3309 ("These cases reflect longstanding concern for the protection of the integrity of the border. The concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics...."); *Robinson*, 414 U.S. at 234, 94 S.Ct. at 476 ("The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

as it does on the need to preserve evidence on his person for later use at trial.").

In this case, ordinary citizens seek to assemble and exercise free speech rights in a public place. Under such circumstances, participants might have a diminished privacy interest in their conversations. *See Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring) ("[C]onversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable."). In their persons and property, however, individuals "are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks." *Delaware v. Prouse*, 440 U.S. 648, 662-63, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). Nothing unique to this gathering indicates that reasonable privacy expectations ought to diminish. It is a large gathering, but the line-drawing problems that attend any attempt to decide when a crowd is "too big" for Fourth Amendment purposes should be self-evident. The SAW protest historically has been perhaps an unusually expressive gathering, but it has been unblemished by violence. As a result, the *1316 individuals attending the rally retained a legitimate expectation of privacy in their person and possessions. Consequently, the main justification for doing away with a warrant requirement is inapplicable to this case.

"Exigent circumstances" may also excuse the warrant requirement in some cases, but not here. Such searches are permitted when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Satterfield*, 743 F.2d 827, 844 (11th Cir.1984). Even a search under exigent circumstances must be supported by probable cause. *See United States v. Santa*, 236 F.3d 662, 668 (11th Cir.2000) ("A warrantless search is allowed, however, where both probable cause and exigent circumstances exist."); *United States v. Pantoja-Soto*, 739 F.2d 1520, 1523 (11th Cir.1984) ("When exigent circumstances coexist with probable cause, the Fourth Amendment has been held to permit warrantless searches and seizures."). The mass searches here were not. Moreover, a person walking to a rally hardly seems like the type

of "exigent circumstance" the Supreme Court had in mind in crafting this doctrine. Consequently, the searches here are invalid for two reasons: they do not fall within any recognized exception to the warrant requirement, and they were not supported by probable cause, which is a requirement for most warrantless searches.

Our holding here does not leave police without any means of promoting public safety and detecting wrongdoing. First, if they have "reasonable suspicion" that anyone is carrying a weapon, they may conduct an ordinary *Terry* stop. If they have probable cause to believe anyone is carrying a weapon, they may either conduct a full-fledged exigent-circumstances search, *see United States v. Banshee*, 91 F.3d 99, 101 (11th Cir.1996) (" [B]ased upon the inconsistent statements and the bulge in [the defendant's] mid-section, we find that [the officer] had probable cause to believe a search would uncover evidence of a crime. We also find that there were exigent circumstances excusing the need for a warrant." (citations omitted)), or arrest the individual and conduct a search incident to arrest, *id.* ("[T]he search could be considered a lawful search incident to an arrest. Specifically, we find that the bulge in [the defendant's] mid-section, coupled with the inconsistent statements, were sufficient grounds for [the officer] to conclude that [the defendant] was committing a crime."). Armed with these alternatives, the City cannot plausibly claim that it has no alternative but to accost innocent people who show no indication of possessing contraband or weapons. We therefore find that the mass, warrantless, suspicionless search policy violated the Fourth Amendment.

## III.

The City's search policy also violates the First Amendment in five ways. First, it is a burden on free speech and association imposed through the exercise of a government official's unbridled discretion; restrictions on First Amendment rights may not be left to an executive agent's uncabined judgment. Second, the searches were a form of prior restraint on speech and assembly; to participate in the protest, individuals had to receive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

Page 15

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

the prior permission of officers manning the checkpoints. Third, the search policy was implemented based on the content of the protestors' speech. Fourth, even assuming the searches were implemented exclusively for content-neutral reasons, they were impermissible because they did not constitute reasonable time, place, and manner limitations, which are the only permissible content-neutral burdens that may be placed upon free speech and association. Finally, even putting aside First Amendment*1317 analysis, the search policy constitutes an "unconstitutional condition;" protestors were required to surrender their Fourth Amendment rights (as discussed in Part II) in order to exercise their First Amendment rights. We explore each of these deficiencies in turn.

A.

[8][9] The first crucial problem with the City's decision to search the protestors entering the SAW protest area is that it was not made according to any set, objective, neutral criteria. The Supreme Court has repeatedly held that burdens on First Amendment rights imposed by executive officials are invalid "in the absence of narrowly drawn, reasonable and definite standards for the officials to follow.... [A restriction is invalid when] [n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power." Niemotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). Even if a particular restriction or condition is an otherwise permissible content-neutral regulation of the time, place, or manner of speech, it is unconstitutional if a government official has unbridled discretion to apply it. See Burk v. Augusta-Richmond County, 365 F.3d 1247, 1256 (11th Cir.2004) ("Even a facially content-neutral time, place, and manner regulation may not vest public officials with unbridled discretion over permitting decisions.").

Although this doctrine originated with cases involving grants of power to executive officials to determine whether or not to grant licenses to engage in expression at all, see Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938) (invalidating an ordinance requiring individuals to

obtain permits before circulating leaflets), it has subsequently been held to apply to a wider range of burdens on expression. For example, in Secretary of State of Maryland v. Joseph H. Munson, Co., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the Supreme Court considered a local ordinance that permitted door-to-door solicitation for charitable causes, but empowered a local official to burden such speech by granting him complete discretion over whether to require a solicitor to certify that 75% or more of collected funds actually went to charitable purposes rather than administrative costs. One of the reasons (albeit not the primary one) the Court invalidated the ordinance was that it "place[d] discretion in the hands of an official to grant or deny a license [based on the exemption]," thereby creating a "threat of censorship that by its very existence chills speech." Id. at 964 n. 12, 104 S.Ct. at 2850 n. 12. Similarly, in Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Supreme Court addressed an ordinance that permitted the distribution of newspapers, but empowered the Mayor to burden such expression by granting him complete discretion over whether newsstands could be used to aid the process. The Court invalidated the ordinance, holding, "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." Id. at 757, 108 S.Ct. at 2144.

Along these same lines, in Burk, we struck down an ordinance giving a county attorney unbridled discretion in determining whether speakers must indemnify the county against damages caused by their activities. 365 F.3d at 1256 ("We readily conclude that the indemnification provision in the ... [o]rdinance fails to provide adequate standards [for the county attorney to follow]."); see also Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (invalidating an ordinance that permitted political communications, but gave an executive official unbridled discretion to burden them by deciding whether to permit*1318 certain candidates to use loudspeakers).

In this case, the City's search policy unquestionably

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                                      Page 16

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

placed a burden on the speech and assembly rights of individuals wishing to participate in SAW's protest against the SOA. Protestors were inconvenienced by having to wait in line to be searched in order to enter the protest area. They were then subjected to a magnetometer, and possibly physical, search of their person and possessions. Those who refused to submit to magnetometer searches were prevented from speaking altogether.

The decision to implement this search policy was an exercise of the apparently unbridled discretion of Police Chief W.L. Dozier. The City does not provide us with any generally applicable state laws or local ordinances that set forth the circumstances under which individuals attending a large public gathering will be searched. The decision to implement searches instead appears to be left to the Chief's personal discretion, to be based on whatever factors he deems appropriate at any given point in time. The First Amendment does not permit the government to place burdens on speech and assembly in such an unprincipled, *ad hoc* manner.

The Chief contends that he decided to search the protestors because he felt there was probable cause to believe violence might erupt. SAW's unblemished thirteen-year history of nonviolence at its protests forces us to question this self-serving claim. Even taking his explanation at face value, however, it entirely misses the point. The problem is not that the Chief applied an inappropriate standard in deciding whether to implement this search policy. Instead, the problem is that there were no objective, established standards for the Chief to utilize in making this decision other than those he happened to deem relevant. In this respect, this case is quite similar to *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), in which the Supreme Court invalidated an ordinance that permitted a county official to decide how much to charge for a permit to hold a public gathering. The Court noted,

The decision how much to charge for police protection or administrative time-or even whether to charge at all-is left to the whim of the administrator. There are no articulated standards either in the

ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable.

*Id.* at 133, 112 S.Ct. at 2403. Because there are no established standards, nothing prevents the Chief from applying one standard to the SAW protest and an entirely different standard to other public gatherings (including those sponsored by organizations with which he might be more sympathetic). *Cf. id.* ("Nothing prevents the official from encouraging some views and discouraging others through the arbitrary application of fees.").

We emphasize that, in establishing such a general policy for determining the specific occasions on which mass searches may be implemented, legislatures or municipal governing bodies must establish specific criteria susceptible to judicial review. They may not simply craft ordinances permitting mass searches "when public safety so requires" or "when the Chief shall deem it advisable." Such general language does not meaningfully constrain the Chief's discretion. Instead, the ordinance must include specific, non-conclusory factors to guide these determinations. See *Niemotko*, 340 U.S. at 271, 71 S.Ct. at 327 (holding *1319 that when executive officials are given discretion in implementing restrictions on speech, there must be "narrowly drawn, reasonable and definite standards for the officials to follow"); *see, e.g., Shuttlesworth v. Birmingham*, 394 U.S. 147, 150, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969) (holding that an ordinance directing public officials to grant licenses where the proposed expression is consistent with "public welfare, peace, safety, health, decency, good order, morals or convenience" is too amorphous meaningfully to cabin their discretion).

Even if this search would have been constitutional had it been conducted under a general policy that appropriately limited the Chief's discretion,[FN16] the Chief's unilateral, unprincipled decision to implement the search outside the context of such a general policy would still have been improper. See

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                           Page 17

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

*Miami Herald Pub. Co. v. Hallandale,* 734 F.2d 666, 674 (11th Cir.1984) ( "[I]n the unique context of first amendment challenges upon the facial validity of licensing statutes, it is the very existence of official discretion that gives rise to a threat of injury sufficient to warrant an injunction."). In the absence of objective criteria establishing when individuals attending large public gatherings may be searched, the *ad hoc* imposition of such a burden on free expression and assembly in this case must be invalidated.

> FN16. For the reasons discussed in the following Subparts, the searches in this case would still have been unconstitutional, even if the Chief's discretion in implementing the policy had been appropriately cabined.

### B.

[10][11] Even putting aside the question of the Chief's unlimited discretion in deciding whether to require mass searches at the SAW protest, the searches are still unconstitutional because they constitute a prior restraint on free speech and assembly. "A prior restraint of expression exists when the government can impose a restraint before the expression occurs." *United States v. Frandsen,* 212 F.3d 1231, 1236-37 (11th Cir.2000). To enter SAW's protest site, individuals must be waived through a checkpoint by a police officer. Officers are authorized to prevent people from assembling at the protest site and engaging in expression if they refuse to submit to a search or possess certain otherwise legal items that have been prohibited from the protest area. Because individuals must, in effect, receive the permission of police officers to enter the area of the protest and to exercise their rights to freedom of speech and assembly, the search policy establishes a prior restraint on protected expression. *Cf. id.* at 1237 (" Because the superintendent can deny the use of the park for expression by denying a permit, [the law at issue] is a prior restraint on expression.").

Because the searches constitute prior restraints, " there is a strong presumption against their

constitutionality." *Id.* To be valid, a prior restraint must, at the very least, provide constitutionally adequate procedural safeguards for potential speakers. The policy here fails to provide such safeguards.

In *Frandsen,* we held, perhaps ambiguously, that under Supreme Court precedent, prior restraints must satisfy "at least some" of these requirements:
(1) the burden of going to court to suppress the speech, and the burden of proof once in court, must rest with the government; (2) any restraint prior to a judicial determination may only be for a specified brief time period in order to preserve the status quo; and (3) an avenue for prompt judicial review of the censor's decision must be available.

*Id.* Meaningful judicial review is the touchstone of the test. "[P]rompt judicial *1320 review must be available to correct erroneous denials" of access to expression. *Cafe Erotica of Fla., Inc. v. St. John's County,* 360 F.3d 1274, 1283 (11th Cir.2004). Here, however, there was no available route through which protestors excluded at the checkpoints from the protest site could seek meaningful judicial relief prior to the end of the protest. Furthermore, the City never availed itself of the courts in seeking initially to suppress the speech, nor did it limit its speech restraint for a "brief time period" pending judicial review. As a result, none of the *Frandsen* factors are satisfied, placing this prior restraint plainly outside of what is permissible under the First Amendment.

### C.

[12] Even assuming the searches did not constitute a "prior restraint," they were still invalid. The Supreme Court has recognized two categories of restrictions on expression-content-based and content-neutral. The district court found that the decision to institute searches was content-neutral; that is, it was motivated by a legitimate governmental concern other than disagreement with the message conveyed. In support of this conclusion, the court offered only the following observation-"[T]he fact that everyone will be searched in the same manner indicates that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                                    Page 18

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

restriction is content neutral." This is a non sequitur; the fact that all the protestors were searched does not suggest that the decision to search them was content-neutral; it suggests only that the City treated each SOA protestor equally *vis-a-vis* the other SOA protestors. The decision to search all the SOA protestors but not other persons or groups is entirely consistent with the notion that the City targeted them precisely because of the message they were sending.

Under the Supreme Court's holding in *Forsyth County v. Nationalist Movement*, the decision to institute the mass search policy was content-based. In *Nationalist Movement*, Forsyth County enacted a policy requiring individuals seeking permits for public gatherings to pay a fee to defray the cost of law enforcement and the county administrator's time in processing the permit. The county administrator was permitted to determine the amount of the fee, based on the amount of law enforcement assistance he anticipated would be necessary to maintain order. The Court observed:

In order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed, estimate the response of others to that content, and judge the number of police necessary to meet that response. The fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit.

.... [I]t cannot be said that the fee's justification has nothing to do with content.

505 U.S. at 134, 112 S.Ct. at 2403 (quotation marks and citations omitted).

In this case, the Chief conducted a somewhat similar analysis in deciding to require magnetometer searches. Apparently anticipating how other organizations such as the Anarchists would react, the Chief infringed upon SAW's right to protest by requiring magnetometer searches. Under *Nationalist Movement*, when a government official decides that certain expressive activity will lead others to break the law, he is making a

content-based distinction. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92, 112 S.Ct. 2538, 2547-48, 120 L.Ed.2d 305 (1992) (striking down as content-based a local ordinance that *1321 banned only fighting words that targeted specific minority groups, even though such fighting words might well have produced the type of violence the city sought to prevent). Having concluded that the magnetometer searches are content-based, we must next determine whether the City's policy is a permissible content-based regulation of speech.

[13][14] Content-based restrictions on speech in a public forum are subject to strict scrutiny, which means that we must "ascertain whether [the policy] employs the least restrictive means to meet a compelling government interest." *Burk*, 365 F.3d at 1255 (citing *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000)).[FN17] Neither side disputes that the protest takes place in a public forum, though none of the briefs indicate with any specificity the situs of the demonstrations. Bourgeois indicates only that the "large, non-violent demonstration and memorial procession [take place] outside the front gate of Fort Benning." *Appellants' Brief* at 2. It appears from uncontradicted testimony on the record, however, that the demonstrations take place on some combination of public roads and parks, the use of which SAW secured by permit. V2-R15-54. We assume it is this area to which Bourgeois refers in his brief. *See Appellants' Brief* at 23-24 ("[S]treets are natural and proper places for the dissemination of information [....]" (quoting *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) (quotation marks omitted)).[FN18] Thus, we proceed on the assumption that strict scrutiny applies, and we begin by identifying the interest in the policy.

> FN17. The City asserts that it need only establish a "significant" government interest to which its policy is narrowly tailored. *Appellees' Brief* at 38-39. This argument assumes, however, that the ordinance is a content-neutral regulation, which it is not. Although the City's brief

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

Page 19

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

describes as merely "significant" the government's purported interest in " maintain[ing] public safety, security, and order, which includes physical protection of demonstration participants, spectators, passers-by, and law enforcement," *Appellees' Brief* at 41 (quoting the district court), we take the City to be arguing that this interest is not just "significant," but " compelling." *See Appellees' Brief* at 38-39 ("[T]he actual test is whether Columbus had a 'significant' government interest. However, the evidence of record supports not only a 'significant' interest, but also supports a heightened finding of a 'compelling' interest.").

FN18. We recognize that we determined in another case involving protests of the School of Americas that Fort Benning *itself* is a *non* public forum. *United States v. Corrigan,* 144 F.3d 763, 767 (11th Cir.1998). That case did not purport to rule on areas surrounding the Fort and thus does not bind us here. The City does not claim that its purpose in administering magnetometer searches is to burden speech only in the Fort itself, nor could it, for the policy is manifestly not tailored to such a purpose.

The asserted government interest here is in " maintain[ing] public safety, security, and order" for the protection of participants, law enforcement, and innocent bystanders. *Appellees' Brief* at 41. Here again the City asserts that the post-September 11 environment further substantiates the government's interest. *Appellees' Brief* at 41 ("First, there is a new and real threat of terrorist attack [that] did not exist previously. This threat is so authentic that the President ... created the Department of Homeland Security. This Department has requested [that] local governments implement precautionary measures to assist in the prevention and detection of terrorist attack."). Although this argument was never before the district court, the City asserts that " this fact is one of which the Court can take judicial notice." *Appellees' Brief* at 41 n.15 (citing Fed.R.Evid. 201). The City then somewhat*1322

tautologically posits that magnetometer searches are narrowly tailored because they are the "least intrusive manner of removing the threat of knives, bombs, guns, and incendiary devices." *Appellees' Brief* at 43.

In fact, magnetometer searches do not seem narrowly tailored at all to the City's professed interest in maintaining safety. As discussed in Part II, there are other ways of ensuring public safety at this event, and the availability of alternatives casts serious doubt on any narrow tailoring analysis. *See Carey v. Brown,* 447 U.S. 455, 465, 100 S.Ct. 2286, 2292, 65 L.Ed.2d 263 (1980) ("[C]ertain state interests may be so compelling that where no adequate alternatives exist a content-based distinction-if narrowly drawn-would be a permissible way of furthering those objectives ...." (citing *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919))). Furthermore, the list the City provides of problems historically posed by the SAW protests includes a number of incidents against which magnetometer searches would provide little utility, suggesting underinclusivity. *See Appellees' Brief* at 42-43 (noting that affinity groups will attend the protest, but failing to indicate any proclivities of such groups to bring metallic objects to protests; that each year violence and illegal activity has occurred, but failing to indicate that even a single instance of such activity involved the use of a metallic object; that a large crowd will be in attendance, but failing to show any meaningful relationship between the size of a crowd and the likelihood that anyone would carry metallic objects to such a crowd; that the 2001 protest included an effort to "gather[ ] items and [an] attempt[ ] to ignite a large fire," but failing to explain how a metal detector could prevent flammable (and therefore presumably nonmetallic) items from being brought into the protest; and that attendees once brought feces and blood to the protest, but failing to show that a magnetometer could detect these " weapons"). In addition, it does not strain belief to imagine that a magnetometer search could be triggered by a number of objects that have no combative or militaristic utility. In any event, the magnetometer searches are, at a minimum, substantially underinclusive to meet the government's purported interest in public safety.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
(Cite as: 387 F.3d 1303)

Page 20

The City's policy is underinclusive along another dimension as well. Bourgeois points out that the magnetometer search policy has not been implemented for any other large gatherings the City has faced. In particular, sporting events-at which large crowds gather; where authorities have no way of knowing who is coming; at which "affinity groups" of various sorts are regularly in attendance; where "violent acts had *in fact* occurred," *Appellants' Brief* at 33; and which confine large numbers of people into a compact area (presumably even more so than a protest in a public park)-would seem to implicate the government's purported interest even more gravely than the SAW protests. Thus, the City's apparently arbitrary application of its magnetometer search policy from one type of event to the next underscores both our "unbridled discretion" concerns outlined above and our doubts here about whether the policy is narrowly tailored to any kind of government interest, whether compelling or even simply "significant."

Because we hold that the policy here is not narrowly tailored to serve the government's interest, we need not address the question whether the interest is compelling. It bears mentioning here, however, that the City's attempt to employ terrorism to bolster its alleged interest in the search policy, without having developed a record at the district court level indicating that concerns about terrorism motivated *1323 the adoption of that policy, is unavailing. The City asks us to take "judicial notice" that the Department of Homeland Security has asked local governments to "implement precautionary measures" to sniff out terrorist threats. *Appellees' Brief* at 41 & n.15. The question, however, is not whether we may or may not take notice; it is whether the City actually took this directive into consideration when drafting its policy. Otherwise, the City merely invites us to engage in *post hoc* rationalizations of its policy, which is precisely one of the dangers that attaches to the sort of uncabined, impulsive policymaking practice at issue in this case. *Cf. Plain Dealer*, 486 U.S. at 758, 108 S.Ct. at 2144 ("Without ... guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular

case whether the licensor is permitting favorable, and suppressing unfavorable, expression."). The fact that the City cannot even decide from one stage of litigation to the next what precisely was the basis for its decision to search protestors precludes a determination that the policy was in any way "narrowly tailored." Thus, the policy here is an impermissible content-based regulation of speech.

D.

Even if we were to accept that the searches were entirely motivated by content-neutral concerns, they still violate the First Amendment. Content-neutral restrictions are permissible so long as they amount to "reasonable time, place, and manner restrictions" on speech. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) ("Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions.... [R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech."). Because these searches were not a form of "time, place, or manner restriction," they were an impermissible burden on the protestors' First Amendment rights.

[15] Here, the City contends that the search was a permissible restriction on the *manner* of the protest. The City might be correct to suppose that a mere ban on the use of weapons or incendiary devices at the protest would withstand a "reasonable manner restriction" analysis. Examples of "manner" restrictions that have been upheld by the Supreme Court include bans on certain types of amplification equipment or requirements that speakers do not exceed a particular volume. *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (upholding restrictions on the volume of a concert in a public bandshell), *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949) ("We think it is a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of municipalities.").

[16] Simply identifying a manner of speech that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                                                    Page 21

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

legitimately may be restricted is not the end of the matter, however. We have said that any restriction must be "reasonable," meaning "not the anemic simulacrum of a constraint on governmental power found in the Due Process Clause's 'rational basis' test, but rather a more robust notion of ' reasonableness' such as that applied in the Fourth Amendment context." *Holloman ex rel Holloman v. Harland,* 370 F.3d 1252, 1271 (11th Cir.2004) (citations omitted). Specifically, a reasonable restriction on a manner of speech "must leave open alternative channels of communication and ... not restrict *1324 substantially more speech than necessary to further a legitimate government interest." *Burk,* 365 F.3d at 1251.

An antecedent mass search for weapons or incendiary devices goes far beyond merely regulating the manner in which the protest is conducted. Such a search is, instead, a prophylactic measure designed to implement and enforce an otherwise permissible "manner" restriction and is conceptually distinct from the underlying restriction itself. Under the City's policy, every person who wishes to speak by taking part in the SAW protest is burdened by a magnetometer search. The scope of this far-reaching policy alone would pose difficult First Amendment problems without the additional fact that, as noted above, the magnetometer searches will fail to catch a number of additional dangers that implicate the City's alleged interest. Because the search policy thus "restrict[s] substantially more speech than necessary to further a legitimate government interest," *id.,* it is impermissible.

E.

[17] The City may contend that the searches are permissible because they are entirely voluntary. No protestors are compelled to submit to searches; they must do so only if they choose to participate in the protest against the SOA. This is a classic " unconstitutional condition," in which the government conditions receipt of a benefit or privilege on the relinquishment of a constitutional right. *See Adams v. James,* 784 F.2d 1077, 1080 (11th Cir.1986) ("The doctrine of unconstitutional

conditions prohibits terminating benefits, though not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe."). This case presents an especially malignant unconstitutional condition because citizens are being required to surrender a constitutional right-freedom from unreasonable searches and seizures-not merely to receive a discretionary benefit but to exercise two other fundamental rights-freedom of speech and assembly.

Our circuit has roundly condemned the use of unconstitutional conditions. *See, e.g., Bertrand v. United States,* 467 F.2d 901, 902 (5th Cir.1972) (ordering resentencing due to the trial judge's questioning of the defendant because "[t]he effect of the trial judge's questioning was to impose an unconstitutional condition on the petitioner's Fifth Amendment rights: he could go into the details of the other offense ... that might constitute a confession or he could exercise his right to be silent and receive a long sentence"); [FN19] *Boykins v. Fairfield,* 399 F.2d 11, 13 (5th Cir.1968) ("Even if the school board were under no obligation to provide public education to children of military personnel on the air base, it could not provide that education subject to an unconstitutional condition." ). We are especially careful to ensure that the government does not use unconstitutional conditions to chill speech. *See, e.g., Leary v. United States,* 431 F.2d 85, 89 (5th Cir.1970) ("[I]f the appellant's eligibility to be enlarged on bail under the Eighth Amendment may be lost because he exercises his first amendment right to freedom of speech and to freedom of the press, then [the law at issue] imposes an unconstitutional condition.").

> FN19. In *Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

The ability of protestors to avoid the searches by declining to participate in the protest does not alleviate the constitutional infirmity of the City's search policy; indeed, the very purpose of the unconstitutional conditions doctrine is to prevent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

387 F.3d 1303                                                                      Page 22

387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125
**(Cite as: 387 F.3d 1303)**

the Government from subtly pressuring citizens, **\*1325** whether purposely or inadvertently, into surrendering their rights. Similarly, the existence of other vehicles through which protestors could voice their disagreement with the SOA (e.g., letters to Congress) does not in any way alleviate the unconstitutional conditions problem. "The applicability of the unconstitutional conditions doctrine does not turn on whether conferral of the discretionary benefit is conditioned upon completely foregoing the right to engage in expression or instead upon foregoing the right to engage in that expression in certain places or manners or at certain times." *Sammy's, Ltd. v. City of Mobile,* 140 F.3d 993, 1000 n. 2 (11th Cir.1998). The one situation in which the doctrine applies with slightly reduced force, public employment, is inapplicable here. *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) ( "[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.").

As discussed in Part II, the searches violated the Fourth Amendment. The speech and assembly in which the protestors sought to engage were unquestionably protected by the First Amendment. Consequently, the City's decision to require protestors to waive their Fourth Amendment rights and submit to searches in order to exercise their First Amendment rights was an unconstitutional condition that violated the First Amendment.

### IV.

The City's search policy violated both the First and Fourth Amendments to the United States Constitution. The plaintiffs are entitled to a permanent injunction against its implementation. The judgment of the district court is VACATED and the case is REMANDED for the entry of appropriate injunctive relief.

SO ORDERED.

C.A.11 (Ga.),2004.

Bourgeois v. Peters
387 F.3d 1303, 17 Fla. L. Weekly Fed. C 1125

Briefs and Other Related Documents (Back to top)

• 2004 WL 3037597 (Appellate Brief) Supplemental Brief of Appellees (Feb. 17, 2004) Original Image of this Document (PDF)
• 2004 WL 3037596 (Appellate Brief) Supplemental Brief of Appellants Pursuant to Directive of Pa Nel (Feb. 04, 2004) Original Image of this Document (PDF)
• 2003 WL 23960108 (Appellate Brief) Reply Brief of Appellants (Apr. 17, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23960109 (Appellate Brief) Brief of Appellees (Mar. 26, 2003) Original Image of this Document (PDF)
• 2003 WL 23960110 (Appellate Brief) Brief of Appellants (Feb. 13, 2003) Original Image of this Document with Appendix (PDF)
• 02-16886 (Docket) (Dec. 20, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# C

IN THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

GORDON JOHNSTON,

    Plaintiff,

Case No. 05-09151
Division: E

vs

TAMPA SPORTS AUTHORITY and
HENRY G. SAAVEDRA, in his official
Capacity as Executive Director of the
TAMPA SPORTS AUTHORITY,

    Defendants.

## ORDER GRANTING PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

This matter came before the Court on Plaintiff's Emergency Motion for Preliminary Injunction on October 19 and 27, 2005, and for a hearing to determine the amount of the bond on November 1, 2005. The Court after considering the evidence, the arguments of counsel, and the written memoranda of the parties, makes the following findings of fact and conclusions of law:

Plaintiff Gordon Johnston, a Tampa Bay Buccaneers season ticket holder, moved this Court to enter a preliminary injunction preventing the Defendants from performing suspicionless pat-down searches upon all persons entering Raymond James Stadium during National Football League games. The evidence reveals that the four factors warranting entry of a preliminary injunction are all shown here: 1) the likelihood of irreparable harm, 2) the lack of an adequate remedy at law, 3) the substantial likelihood of success on the merits, and 4) that the public interest is served by granting the injunction. *Charlotte County v. Vetter*, 863 So. 2d 465, 468 - 69 (Fla. 2d DCA 2004) (citing *Snibbe v. Napoleonic Soc. of Am., Inc.*, 682 So. 2d 568, 570 (Fla

EXHIBIT A

2d DCA 1996)). These factors are discussed in more detail below.

1. *Irreparable Harm*  First, irreparable harm to Plaintiff will occur if a preliminary injunction is not granted. Plaintiff alleges a violation of his constitutional right to be free from government-directed searches of his person at Raymond James Stadium ("RJS"). RJS is a sports stadium where the National Football League ("NFL") team the Tampa Bay Buccaneers ("Bucs") play their home games. RJS is operated by defendant Tampa Sports Authority ("TSA"), a governmental entity created pursuant to Florida law  Plaintiff Johnston has been a season ticket holder with the Bucs for several years. To become a season ticket holder, he had to pay a seat deposit that is being repaid in annual increments  If Mr Johnston cancels his season tickets this year, he will forfeit a substantial portion of his seat deposit.

Mr. Johnston renewed his tickets for the 2005 season the early spring of 2005 at a cost of $869 20 plus $250.00 for stadium parking. When Mr Johnston paid for his tickets, he received no notice that the TSA would conduct pat-down searches of patrons entering RJS.    On September 13, 2005, the TSA, at the request of the Bucs and after the NFL issued a mandate, voted to require all persons attending Bucs games at RJS to submit to a pat-down search from the waist up.[1]  Mr. Johnston must either permit this pat-down search or he will be denied entry to RJS to see the Bucs' games. Mr. Johnston will be irreparably harmed if TSA continues its policy of requiring these pat-down searches because (as explained later), he will be forced to undergo a search in violation of his Florida constitutional right to be free from unreasonable government-directed searches. Injunctive relief is proper to protect persons from such searches and unwanted intentional touching. *See, e.g*. *Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) (enjoining magnetometer searches); *Stroeber v. Commission Veteran's Auditorium*, 453 F. Supp  926 (S D

---

[1] The TSA does not require persons attending University of South Florida football games at RJS to submit to pat-down searches

Iowa 1977) (enjoining searches of arena patrons); *see also Wilkinson v. Forst*, 832 F.2d 1330, 1340 (2d Cir. 1987) (enjoining mass pat-down searches, even in light of history of weapons being brought to past rallies).

2. *No Adequate Remedy at Law*  Second, Mr Johnston has no adequate remedy at law. Specifically, money damages cannot compensate Mr. Johnston for a violation of his constitutional right to be free from the TSA required searches. *Cf State v. Iaccarino*, 767 So 2d 470 (Fla. 2d DCA 2000) (ruling that state cannot force patrons to forego right to enjoy event if they do not consent to pat-down search). *See also Bourgeois*, 387 F.3d 1303; *Wilkinson*, 832 F.2d 1330; and *Stroeber*, 453 F Supp 926 (all enjoining mass searches).

3. *Substantial Likelihood of Success on the Merits*  Third, Mr. Johnston has a substantial likelihood of success on the merits.  The Constitution prohibits governmental entities from conducting searches without any cause for individualized suspicion. *See Sosa-Leon v. State*, 848 So. 2d 342, 343 (Fla. 2d DCA 2003) (officer must have "articulatible suspicion" that person being searched was armed). *See also State v. Iaccarino*, 767 So. 2d 470 (Fla. 2d DCA 2000) (rejecting pat-down searches at rock concert); *North Dakota v. Seglen*, 700 N.W 2d 702 (N D 2005) (finding unconstitutional a pat-down search of a hockey fan).

The TSA argues that the Constitution is not implicated because the TSA is not acting as a governmental actor when conducting the searches  The evidence and the law, however, show that the TSA performs the pat-down searches as a state actor. The Tampa Sports Authority is a public agency, created by the state legislature in 1965 "'for the purpose of planning, developing, and maintaining a comprehensive complex of sports and recreation facilities for the use and enjoyment of the citizens of Tampa and Hillsborough County,' as a public purpose." *State v Tampa Sports Authority*, 188 So.2d 795, 796 (Fla 1966).  Although the TSA hires a private

3

security company to perform the searches, that company operates at the direction of the TSA, pursuant to TSA policy; the searches are performed under the visual observation of uniformed police officers; and they are paid for with taxpayer dollars. Although the TSA argues the searches are done for a private function and do not implicate law enforcement purposes, this argument is contradicted by the evidence. The TSA's own witnesses established that individuals performing the pat-downs are trained to get the attention of law enforcement if any contraband is found, and that if anyone were found attempting to bring contraband into the stadium, they would be subject to arrest, not allowed to walk away freely

Under such circumstances, the searches constitute state action for purposes of search-and-seizure analysis. *See Barton Protective Services, Inc v Faber*, 745 So 968, 973 (Fla. 4th DCA 1999); *State v Iaccarino*, 767 So.2d 470 (Fla. 2d DCA 2000) (off-duty officers, hired by and for the benefit of the interests of a private concert promoter, are state actors) [2]

---

[2] *See also Nakamoto v Fasi*, 635 P 2d 946 (Hawaii 1981)(searches by private security guards hired by rock concert promoter at city owned auditorium violate constitution when conducted pursuant to city policy); *Jensen v. City of Pontiac*, 317 N.W.2d 619 (Mich. App. 1982)(visual searches by unarmed stadium security guards at city owned NFL football stadium subjected to constitutional analysis); *Stroeber v Commission Veteran's Auditorium*, 453 F.Supp. 926, 931 (S.D. Iowa 1977)(holding warrantless and suspicionless searches at rock concert violate Fourth Amendment: "Here, where the commissioners purported to act in a capacity made possible by virtue of state statutes and were acting to provide security for a public facility financed by public monies, the requisite 'state action' is present."); *Gatoni v Folmar*, 460 F.Supp 10 (M D. Ala. 1978)(random, warrantless searches of patrons attending rock concerts at municipally owned civic center unconstitutional); *State v Carter*, 267 N.W 2d 385 (Iowa 1978)

4

Article I, Section 12 of the Florida Constitution affords the same protection against unreasonable searches and seizures that the Fourth Amendment, as construed by the U.S. Supreme Court, provides. *Thomas v. State*, 761 So. 2d 1010, 1014 (Fla. 1999). The first test is whether a reasonable expectation of privacy attaches to the stadium searches at issue here. *Cf. State v. Shapiro*, 390 So. 2d 344 (Fla 1980). Courts uniformly protect one's interest in bodily privacy, even in crowded venues and mass gatherings. *See, e g , Bourgeois v Peters*, 387 F 3d at 1311 ("The text of the Fourth Amendment contains no exception for large gatherings of people."); *Iaccarino*, 767 So. 2d 470. Even if Mr. Johnston might be inadvertently jostled by other football fans while entering the gate, he still retains an expectation of privacy in not being forced to subject his person to unwanted intentional touching by state actors.

"Warrantless searches conducted by instruments of the state are per se unreasonable unless the searches fall within one of a few specifically-established and well-delineated exceptions " *Iaccarino*, 767 So.2d at 476 (citing *Katz v United States*, 389 U.S 347 (1967)). The government bears the burden of proving that the exceptions exist. *Cf. Reynolds v State*, 592 So.2d 1082 (Fla 1992). The TSA has not met this burden

As the first exception to the rule against unreasonable searches, the TSA asserts that special circumstances exist to justify pat-down searches of every person entering RJS for a Bucs football game. No special circumstances exist. The only evidence of a particularized threat to RJS was a call that the TSA received approximately two years ago that was investigated and determined to be a false alarm. The TSA did not pass any pat-down requirements in response to

_____

(use of off duty police officers as security guards to conduct pat-down search of rock concert attendees constitutes state action)

5

this threat. The only other testimony regarding a threat to NFL stadiums came from a press story reporting that downloads of two stadiums (neither of them RJS) were discovered on computers linked to possible terrorists, approximately two years ago. The FBI Field Office in St. Louis investigating that incident stated that what was found was not a threat or even a potential threat. Rather, that FBI Field Director stated that there was no need to change anything about attendance at NFL games. The only other evidence regarding threats to NFL stadiums is that terrorists would like to target NFL games because they are an "American icon."

The second exception that the TSA claims is the doctrine of implied consent. "When the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Iaccarino*, 767 So.2d at 476 (Fla. 2d DCA 2000) (citing *Florida v. Royer*, 460 U.S. 491 (1983). The requirements for implied consent are (1) "whether the defendant was aware that his conduct would subject him to a search," (2) whether a "vital interest" supports the search, (3) the apparent authority of the officer to conduct the search, (4) "whether the defendant was advised of his right to refuse," and (5) "whether refusal would result in a deprivation of a benefit or right." *Id.* (citations omitted).

The TSA argues that that Mr. Johnston impliedly consented to the searches as a result of e-mail notices, signs, and public address announcements at the stadium as a condition of attending an event at a public stadium. However, there was no announcement of the policy before season ticket holders purchased their tickets. The Buccaneers told Mr. Johnston that they would refuse to grant Johnston a refund of his season tickets when Johnston called to complain about the pat-down policy. Mr. Johnston testified that even if he would be offered a refund, he would have rejected it. And even if Johnston would have received refunds for an individual

6

season's worth of tickets, he would still lose the remainder of his seat deposit and would move to the back of the line of approximately 100,000 people waiting for season tickets in the future Further, Mr Johnston is being forced to consent to the search upon pain of being barred from exercising his rights as a ticket-holder to enter the stadium and experience the games in person.

Mr. Johnston testified that he expressed his lack of consent to the stadium searchers, but was patted down anyway. A person cannot be required to consent to an unlawful search as a condition of attending an event at a public venue In *Iaccarino*, the Second District Court of Appeal ruled there was no implied consent when the "failure to acquiesce in a search would result in a deprivation of a patron's right to attend the concert, if not their ticket cost as well" *State v. Iaccarino*, 767 So. 2d 470 (Fla 2d DCA 2000); *see also Gaioni v Folmar*, 460 F Supp. 10 (M.D. Ala. 1978).

In short, the pat-down searches constitute suspicionless, warrantless searches performed by a state actor and are per se unconstitutional. The TSA has not met its burden of showing that special circumstances justify granting an exception to this rule Neither has it shown that Mr Johnston impliedly consented to the searches. It is substantially likely that Mr. Johnston will prevail in the merits of this lawsuit.

4. *Public Interest* The public interest favors the granting of an injunction to protect against unconstitutional searches. The right of the public to be free from unreasonable searches is within the public interest. September 11 is a tragedy, but it does not mean that the Constitution needs to be torn up and thrown out the door. *See State v Iaccarino*, 767 So 2d 470 (Fla. 2d DCA 2000) (finding pat-down searches unconstitutional when they would require patrons to forego right to enjoy event if they did not consent to search) *See also Bourgeois v Peters*, 387 F 3d 1303, 1311-12 (11th Cir. 2004):

7

The City's position would effectively eviscerate the Fourth Amendment. It is quite possible that both protestors and passersby would be safer if the City were permitted to engage in mass, warrantless, suspicionless searches. Indeed, it is quite possible that our nation would be safer if police were permitted to stop and search anyone they wanted, at any time, for no reason at all. Cf. *Terry v. Ohio*, 392 U.S. 1, 88 S Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring that police demonstrate individualized suspicion that a suspect is armed before frisking him). Nevertheless, the Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on evidence – rather than potentially effective, broad, prophylactic dragnets – as the constitutional norm ... We cannot simply suspend or restrict civil liberties until the War on Terror is over, because the War on Terror is unlikely ever to be truly over. September 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country.

Accordingly, it is hereby ordered, adjudged, and decreed:

    1.    The Emergency Motion For Preliminary Injunction is hereby GRANTED.

    2.    TSA is hereby enjoined from engaging in mass, suspicionless pat-down searches

of every person attending Bucs games at RJS, upon posting of the bond set forth below.

    3.    Mr. Johnston shall post a bond in the amount of $21,000 in case this injunction is

later determined to be wrongly entered. This bond may be posted as cash or through a surety.

    DONE and ORDERED in Chambers at Tampa, Hillsborough County, Florida this ____.

day of November, 2005.

**ORIGINAL SIGNED**

**NOV - 2 2005**

_____PERRY A. LITTLE____.
Judge Perry A. Little  CIRCUIT JUDGE
Circuit Court Judge

Copies to:
John D. Goldsmith
Rebecca H. Steele
Richard Zabak

[PED  Granting Injunction Unopposed change #FDFBF5.]

8