# EXHIBIT 1
# Part 2

CH1\ 4014096.1

Dockets.Justia.com

## ARTICLE 4.
## MEMORANDUM OF AGREEMENT

**4.1    General.**  Notwithstanding any provision contained herein, the Club and the CPD shall continue to perform and satisfy their obligations and duties under and pursuant to the terms and conditions of the Memorandum of Agreement until the Memorandum of Agreement is terminated pursuant to Section 4.2 below.   In the event of any conflict between the terms and conditions of the Memorandum of Agreement and this Agreement, the terms of this Agreement shall control.

**4.2    Termination Upon Adaptive Reuse.**  The Memorandum of Agreement shall be deemed terminated for all purposes on the earlier to occur of (a) the issuance of a Certificate of Occupancy for the Facility following the Adaptive Reuse, (b) the usage of the Facility for a Bears Game following the Adaptive Reuse, or (c) a termination date or Event as provided for in the Memorandum of Agreement.  Such termination shall in no way relieve or release the CPD or the Club from any liability or obligations incurred under the Memorandum of Agreement prior to such termination date.

**4.3    Disruptions.**  Each of the parties understands and agrees that the Adaptive Reuse is anticipated to occur during the Club's Football Season commencing in Year 2001 and continuing through Year 2003 and that the Adaptive Reuse may limit, cause disruptions or inconveniences to, or prevent the Club's use or occupancy of Soldier Field as contemplated by the Memorandum of Agreement.  The Club agrees that the CPD shall not be liable for or be deemed in breach of the Memorandum of Agreement in the event that the Adaptive Reuse causes any such limitations, disruptions or inconveniences or prevents the Club's use and occupancy of Soldier Field under the terms of the Memorandum of Agreement.

## ARTICLE 5.
## PROFESSIONAL SPORTS EVENTS

**5.1    Bears Games.**  During the Term, the Club shall play all of its pre-season, regular season and all of its post-season games at the Facility for which it is the "home team," other than Special Games. The Club will use its best efforts to limit the number of Special Games and to ensure that the Club does not play more than a pro rata share of Special Games relative to the other NFL teams.  The parties anticipate that there will be very few Special Games during the Term.

**5.2    Other Professional Football Games.**  No other professional football games will be permitted to be played at the Facility except for (a) NFL sanctioned events, and (b) sanctioned events by another professional football league, provided, however, that the schedule for such other professional football league shall not permit games to be played at the Facility prior to the end of an NFL Season or after May 31st of any calendar year. Notwithstanding the foregoing, no professional football game will be permitted to be played at the Facility by another NFL franchise located in Chicago, Illinois (except for a game for which the Club shall be the "home team" or a Special Game or a NFL Major Event) to which the Club has not consented in advance in writing. Except as contemplated above, the Club shall have no obligation to consent in the future to any other professional football games being played at the Facility.

5.3    **Other Professional Sports Teams.**  The Club shall be the primary sports tenant of the Facility and no other professional sports team shall be allowed to play its regular season home games at the Facility unless the payments it makes for its use of the Facility are reasonable, taking into account payments made by similar sports teams (other than the Club) for the use of their facilities, the amount of revenues and other benefits realized by such team for its use of the Facility, the benefits to be realized by the CPD from making the Facility available to such other team, and other factors that the CPD may, in good faith, deem relevant.   In proposing terms to any other professional sports teams for the use of the Facility, the CPD will use reasonable efforts to not provide such other team with economic benefits or advantages which are inconsistent with the foregoing.

### 5.4    General Conditions.

5.4.1    <u>Facility</u>.  Subject to the terms and conditions of this Agreement, the CPD agrees that the overall Facility will be in a condition suitable for playing an NFL professional football game (including but not limited to the conditions set forth in Article 23).  Without limiting the foregoing, subject to the specific terms and conditions of this Agreement, the CPD agrees (i) the Field shall be of standard NFL dimensions, and contain standard NFL markings and goal posts, (ii) the Facility shall have the equipment and fixtures necessary for playing an NFL professional football game, (iii) all mechanical, heating, cooling, electrical systems, lighting systems, Video Boards, and public address systems shall be in reasonably good working order, and (iv) the CPD shall have in place the personnel necessary to satisfy the CPD's obligations hereunder. This Section 5.4.1 shall not be deemed to modify, limit, restrict, expand or enlarge the CPD's rights and obligations as set forth in Article 20 with respect to Capital Improvements.

5.4.2    <u>Parking</u>.  Subject to the terms and conditions of this Agreement, the CPD agrees that the North Parking Structure, the Mid-South Parking Structure and the South Parking Lot will be in a condition suitable to allow the Club to exercise its rights as contemplated herein.

## ARTICLE 6.
## CLUB USE RIGHTS

Subject to the terms and conditions of this Agreement, the CPD grants to the Club, and the Club shall have the right to use and occupy the Facility or a certain portion thereof during the following periods and for the following uses (collectively, the "Club Use Rights"):

### 6.1    Bowl.

6.1.1    Subject to (i) previously scheduled Public Sector Events, (ii) the Five Day Rule, and (iii) CPD's Specifically Reserved Use Rights, the Club may use the Bowl for scheduled Weekday Practices during the Football Season.

### 6.2    Club-Lounge Area.

- 29 -

6.2.1    Subject to (i) previously scheduled Public Sector Events, and (ii) CPD's Specifically Reserved Use Rights, the Club may use the Club Lounge Area, the Club Seat Area, the Suites, and such other areas (e.g. the Beer Garden) of the Facility that the CPD may consent to in its reasonable discretion upon receipt of a written request by the Club, for a total each calendar year for 34 Club-Related Events and Sponsor-Related Events ("34 Dates"), plus NFL Days (except in the event that the Super Bowl is held at the Facility).

### 6.3    Facility and Game Day Site.

6.3.1    Except as specifically provided for herein, the Club shall use the Facility and the Game Day Site on each Game Day.

6.3.2    Subject to (i) previously scheduled Public Sector Events, (ii) the Five Day Rule, and (iii) the CPD's Specifically Reserved Use Rights, the Club shall be entitled to use the Facility (including the Bowl) on six (6) occasions per calendar year for Club-Related Events.

### 6.4    Parking.

6.4.1    In consideration of its payment of the Parking Allotment Fee, the Club shall be entitled to use (and to sell or authorize the use of) the Parking Allotment on each Game Day.  Such parking spaces shall be in the North Parking Structure and the Mid-South Parking Structure (all of which shall be devoted entirely to the Club's needs on Game Days) and, to the extent necessary, the South Parking Lot.  The Club and the CPD shall cooperate with one another to provide parking spaces to the Club (and its Invitees) on Game Days and to the extent that the Club (and its Invitees) require additional parking spaces over and above the Parking Allotment; provided that the Club acknowledges that such additional parking spaces may be allocated on a "first come, first served basis" and that the Club (and its Invitees) will be charged the standard rental rate and fees for such parking spaces.

6.4.2    In consideration of its payment of the Facility Fee, the Club (and its Invitees) shall be entitled to use up to one hundred (100) parking spaces located under the Facility, but these parking spaces shall be subject to availability; the Club acknowledges that such parking spaces shall be on a "first come, first served basis" and that the Club and (its Invitees) will be charged the standard rental rates and fees for any additional parking spaces over the one hundred (100) parking spaces provided; and the Club also acknowledges that such one hundred (100) parking spaces may not be available due to an Event or the staging of work at the Facility.

6.4.2.1    In consideration of its payment of the Facility Fee, for Club-Related Events and Sponsor-Related Events held on non-Game Days which use the Bowl, the Club (and its Invitees) shall be entitled to use up to one hundred (100) parking spaces located under the Facility; the Club acknowledges that any additional parking spaces shall be subject to availability on a "first come, first served basis" and that the Club and (its Invitees) will be charged the standard rental rates and fees for any

additional parking spaces over the one hundred (100) parking spaces provided; and the Club also acknowledges that such one hundred (100) parking spaces may not be available due to an Event or the staging of work at the Facility.

**6.5    Suites.**

6.5.1    The Club shall have the exclusive right to use all of the Suites on Game Days, and during Club-Related Events and Sponsor-Related Events provided that the CPD is not utilizing the Bowl.

6.5.2    The Club, the Bears Suite Licensees and a limited number of invited guests of the Club or the Bears Suite Licensees may use the Suites (but not any other part of the Facility) at all reasonable times when the Facility, the Bowl or the Club Lounge Area is not being used for any other Events (including, but not limited to any Public Sector Event); provided (i) that the number of invited guest shall not exceed the reasonable capacity of a Suite, (ii) that the Club and the Bears Suite Licensees provide the CPD with reasonable prior notice of their intention to use a Suite; (iii) that in no event shall the Club or Bears Suite Licensee sublicense or otherwise transfer this use right to another party; and (iv) that the Club shall be responsible for all costs and expenses related to such use (i.e. cleaning and security costs) and shall reimburse the CPD for all costs and expenses incurred by the CPD relating to such use.

**6.6    Corporate Parties.** The Club may use on each Game Day those portions of the Game Day Site which are appropriate and conducive for Corporate Parties; provided, that the number of people attending such Corporate Parties shall be reasonable in number to reflect the limited space available; and provided further such Corporate Parties shall begin no earlier than three hours prior to the start of any Bears Game and shall end no later than the earlier of (i) 12:00 a.m., (ii) one and one half hours after the completion of a Bears Game, or (iii) such time as required by Law.

**6.7    Tailgate Parties.**  The Club may allow its Invitees to use on Game Day those portions of the Game Day Site which are appropriate and conducive for Tailgate Parties; provided that the number of people attending such Tailgate Parties shall be reasonable in number to reflect the limited space available; and provided further such Tailgate Parties shall begin no earlier than three hours prior to the start of any Bears Game and shall end no later than the earlier of (i) 12:00 a.m., (ii) one and one half hours after the completion of a Bears Game, or (iii) such time as required by Law.

**6.8    Team Areas.**  The Club shall have exclusive use and occupancy of the Team Areas at all times subject to the CPD's rights as provided in Section 8.3.  In the event that in the future there is a Bears Hall of Fame, Bears Retail Shop, Bears Sports Bar/Restaurant or other "revenue generating" Team Areas, the Club and the CPD shall negotiate in good faith to determine each parties' rights and obligations with respect thereto.

**6.9    Video Boards and Sound System.**  The Club shall have the use of and control over the public address system and Video Board on Game Days and non-Game Days on which the Club is entitled to use the Bowl.

6.10   **Invitees.**  The Club Use Rights shall include the right to invite Invitees to use and occupy the Facility or the applicable portions thereof.  In no event shall the Club's Invitees be deemed to have greater rights or licenses than the Club itself.

6.11   **Commencement.**  Except as provided for in Article 11 [Permanent Seat Licenses], Article 12 [Licensing of Suites and Club Seats] and Article 16 [Marketing Rights], the Club and Subsidiary acknowledge and agree that this Agreement does not provide any use or occupancy rights or other licenses or interests in the Facility prior to Substantial Completion of the Stadium and North Garage.

## ARTICLE 7.
## COMPLIANCE WITH LAWS, AND RESTRICTIONS ON USE

7.1   **General Compliance with the Laws.**  In the exercise of its rights and licenses hereunder and in its use and occupancy of the Facility and the Game Day Site, the Club shall comply with any applicable Law.  The Club shall use its reasonable efforts to ensure that its Invitees comply with any applicable Law.

7.2   **No Gambling.**  During Club Use Periods, the Club specifically agrees not to permit any wagering, gambling or other similar gaming activities to occur at the Facility.

7.3   **Alcoholic Beverages.**  During Club Use Periods, the Club specifically agrees not to permit the sale or distribution of any alcoholic or intoxicating beverages at the Facility except in compliance with all applicable Laws.

7.4   **No Narcotics.**  During Club Use Periods, the Club shall use its reasonable efforts to ensure that illegal narcotics are not being used, sold or distributed at the Facility.

7.5   **Immoral Acts.**  During Club Use Periods, the Club shall not permit any of its employees, agents, independent contractors or representatives to engage in any improper immoral conduct at the Facility.  During Club Use Periods, the Club will use its reasonable efforts to ensure that no Invitee engages in any improper or immoral conduct at the Facility.

7.6   **No Endangerment of Public Safety.**  During Club Use Periods, the Club shall take all reasonable actions necessary to ensure the public safety of its Invitees.

7.7   **Compliance with Food and Safety Laws.**  During Club Use Periods, the Club shall take all reasonable actions necessary to ensure that the Club, the Subsidiary and the Concessionaires are all in compliance with applicable food and safety laws.

7.8   **Compliance with Environmental Laws.**  During Club Use Periods, the Club and the Subsidiary shall take all reasonable actions necessary to ensure that the Club, the Subsidiary and its Invitees are all in compliance with any applicable Environmental Laws.  The Club and the Subsidiary shall take or cause to be taken all actions necessary and desirable to ensure that the representations and warranties set forth in Section 2.1.10 and Section 2.3.10 are true and correct at all times during the Term of this Agreement, and that the covenants set forth in Section 2.1.10 and Section 2.3.10 are fully and promptly performed and satisfied.

06298/00024/189933/20

**7.9    Compliance with the Illinois Prevailing Wage Act and the Davis-Bacon Act.**  At all times, the Club and the Subsidiary shall comply with the Illinois Prevailing Wage Act and the Davis-Bacon Act, to the extent that these laws are applicable.

**7.10   General Compliance with the Laws.**  With respect to the Facility and the Game Day Site, the CPD shall comply with any applicable Law (including Environmental Laws) and CPD shall use its reasonable efforts to ensure that its invitees comply with any applicable Law (including Environmental Laws).

**ARTICLE 8.**
**CPD USE RIGHTS**

**8.1    Generally.**  Subject to the limitations set forth below in Section 8.2, the CPD shall have the exclusive right to use and occupy the Facility and the Game Day Site, and to permit other parties to use and occupy the Facility and the Game Day Site.

**8.2    Limitations on the CPD Use of the Facility.**

   **8.2.1    Club Use Rights.**  The CPD shall not hold any Public Sector Event at the Facility or the Game Day Site which would materially interfere with a Confirmed Schedule Request.

   **8.2.2    Five Day Rule.**  Subject to Section 9.3, the CPD shall not hold any Public Sector Event on the Field which would conflict with the Five Day Rule.

   **8.2.3    Other Football Games.**  The CPD shall not schedule any college or high school football game prior to the public release of the NFL Schedule except for one Major College Football Game and the Mayor's High School Championship Game.

   **8.2.4    Team Areas.**  The CPD shall not use or occupy the Team Areas except as provided in Section 8.3.7.

   **8.2.5    Non-Competition.**  The CPD shall not advertise, promote, market, sell or distribute any Bears Related Merchandise on the Museum Campus on Game Days, and shall not authorize any other party to advertise, promote, market, sell or distribute Bears Related Merchandise on the Project Site or the Museum Campus on Game Days.

**8.3    Reservation of Rights.**

   **8.3.1    General.**  Any right, license or interest to use or occupy the Facility, including but not limited to rights, licenses and interests relating to Marketing Rights and Future Marketing Rights, that are not specifically granted to the Club or the Subsidiary pursuant hereto, shall be deemed reserved by the CPD. Without limiting the foregoing, the CPD specifically reserves the rights set forth in Section 8.3.2 through Section 8.3.10 set forth herein.

06298/00024/189933/20

- 33 -

8.3.2    Mayor's Championship.  Notwithstanding any other provision contained herein, the CPD specifically reserves the right to hold the Mayor's High School Championship Game at the Facility except on Game Days.

8.3.3    Professional Soccer Playoff Games. Notwithstanding any other provision contained herein, the CPD specifically reserves the right to hold one professional soccer game per playoff round not to exceed two professional playoff soccer games per year in violation of the Five Day Rule; provided that in no event shall such soccer games be held on the day of or the day before a Game Day.

8.3.4    Major College Football Games.  Notwithstanding any other provision contained herein, the CPD specifically reserves the right to hold one (1) Major College Football Game per year, provided that such Major College Football Game is scheduled at least twelve (12) months in advance.

8.3.5    Video Boards and Sound System.  Notwithstanding any other provisions contained herein, the CPD specifically reserves the right to use of and control over the public address system and the non-permanent displays on the Video Boards and LCDs on non-Game Days (except for non-Game Days on which the Club is entitled to use the Bowl) including but not limited to the advertising to be placed thereon.

8.3.6    Bowl. Notwithstanding any other provision contained herein, the CPD specifically reserves the right to hold Public Sector Events in the Bowl during any Club-Related Event or Sponsor-Related Event which is not utilizing the Bowl (i.e. a Club-Related Event or Sponsor-Related Event in the Club Lounge Area).

8.3.7    Team Areas.  Notwithstanding any other provision contained herein, the CPD specifically reserves (i) the right to enter and inspect Team Areas in case of emergency or as required by law or upon reasonable prior notice to the Club, and (ii) the right to repair and maintain the Team Area, as may be required by Law or to reasonably ensure public safety, and as may be necessary to perform and satisfy its other obligations and duties contemplated by this Agreement.  The Club and the Subsidiary shall at all times provide the CPD with any keys, codes and other devices necessary to enter and inspect the Team Areas; the CPD will reasonably restrict access to such keys, codes and other devices.  Unless the circumstances reasonably require otherwise, the CPD shall provide the Club with reasonable notice prior to entering a Team Area.

8.3.8    Initial Football PSLs.  Notwithstanding any other provision contained herein, the CPD specifically reserves the right to (i) sell, market, promote and receive any and all proceeds from the sale or license of the Initial Football PSLs, (ii) to appoint an agent or other party to do any of the foregoing, and (iii) to determine and decide any and all terms relating to or associated with the Initial Football PSLs.

8.3.9    Public Sector Event Sponsor PSLs. Notwithstanding any other provision contained herein, the CPD specifically reserves the right to (i) sell, market, promote and receive any and all proceeds from the sale or license of Public Sector

06298/00024/189933/20

- 34 -

Event Sponsor PSLs, (ii) to permit a Public Sector Event Sponsor to do any of the foregoing, (iii) to appoint an agent or other party to do any of the foregoing, and (iv) to determine and decide any and all of the terms relating to or associated with the Public Sector Event Sponsor PSLs.

       8.3.10    Salvageable Property.    Notwithstanding any other provision herein, the CPD specifically reserves all rights, title and interests to all salvageable property and memorabilia from Soldier Field except for such property and memorabilia which is owned by the Club, including, without limitation, the Club's locker room furnishings.  For the avoidance of doubt, the Club specifically acknowledges that it does not own the lockers in the locker room.

       8.3.11    No Limitation.    For the avoidance of doubt, the provisions set forth in Section 8.3.2, Section 8.3.3 and Section 8.3.4 shall in no way be deemed to limit or restrict the CPD's right to hold high school football games, college football games and soccer games at the Facility.

## ARTICLE 9.
## FIVE DAY RULE

    **9.1    General Rule.**  During any Football Season, the Field shall not be used by any party (including, but not limited to the CPD, the Club and the Subsidiary) for any purpose (whether public or private) other than for Field Maintenance during the five (5) days proceeding a Game Day (the "Five Day Rule") except as set forth in Section 9.3 hereof.

    **9.2    Purpose.**  The parties agree and acknowledge that the sole purpose of the Five Day Rule is to provide reasonable assurances that the Field will be in satisfactory condition on the Game Day.

    **9.3    Exceptions.**   The Five Day Rule shall not apply to the following exceptions (the "Five Day Rule Exceptions"): (1) the CPD's Specifically Reserved Use Rights, (2) the removal of equipment and staging from a concert or other Public Sector Event (provided that such removal takes place not less than four (4) days prior to a Game Day), and (3) the Club's use of the Bowl for Weekday Practices provided that such use does not present an unreasonable risk of damage to the Field.

    **9.4    Advances in Technology.**  The parties acknowledge that during the Term of this Agreement advances in technology and other advances may occur with respect to the composition, repair, maintenance and replacement of Natural Turf for professional football which would reduce the time period needed to provide reasonable assurances that the Field would be in satisfactory condition on Game Days.  In such event, the parties agree to negotiate in good faith to determine whether the Five Day Rule should be modified or reduced.

    **9.5    Natural Turf.**  In the event that the playing Field is changed from Natural Turf to Artificial Turf, the parties agree to negotiate in good faith to determine whether the Five Day Rule should be modified, reduced or remain in effect.

9.6    **Major National or International Events.**  In the event that the CPD seeks to attract a Major Event to the Facility, the Club agrees to waive or modify the Five Day Rule to accommodate such Major Event given the positive impact on the City if such a Major Event can be booked.

## ARTICLE 10.
## SCHEDULING AND CONFIRMATION OF THE USE OF THE FACILITY

**10.1    Schedule Requests**

10.1.1    Bears Games.  To schedule the use of the Facility for a Bears Game, the Club shall submit a Schedule Request to the CPD as soon as the NFL Schedule is made available to the Club.

10.1.2    NFL Days.  To schedule the use of the Club Lounge Area, Club Seat Area and Suites for a NFL Day, the Club shall submit a Schedule Request to the CPD at any time after the NFL Schedule is made available to the Club.

10.1.3    Practices.  To schedule the use of the Bowl for a Practice during the Football Season, the Club shall submit a Schedule Request to the CPD within a reasonable period of time prior to the requested date.

10.1.4    Club-Related Events and Sponsor-Related Events.    To schedule the use of the Club Lounge Area, Club Seat Area and Suites or the Facility as a whole for a Club-Related Event or Sponsor-Related Event, the Club shall submit a Schedule Request to the CPD within a reasonable period of time prior to the requested date.

**10.2    Response.**  The CPD shall be obligated to respond to a Schedule Request received from the Club as follows:

10.2.1    For any Schedule Request which requests a date between December 1 and January 31, the CPD shall be obligated to respond to the Club within five (5) days after receipt of the Schedule Request.

10.2.2    For any Schedule Request which requests a date on a Monday, Tuesday, Wednesday or Thursday between February 1 and March 31, the CPD shall be obligated to respond to the Club within five (5) days after receipt of the Schedule Request.

10.2.3    For any Schedule Request which requests a date on a Friday, Saturday or Sunday between February 1 and March 31, the CPD shall not be obligated to respond to the Club any earlier than sixty (60) days prior to the date so requested in the Schedule Request; provided that if specifically requested in writing by the Club, the CPD will make reasonable efforts to respond to the Club prior to the expiration of such sixty (60) days, if possible.

06298/00024/189933/20

- 36 -

10.2.4    For any Schedule Request which requests a date between April 1 and October 31, the CPD shall not be obligated to respond to the Club any earlier than sixty (60) days prior to the date so requested in the Schedule Request; provided that if specifically requested in writing by the Club, the CPD will make reasonable efforts to respond to the Club prior to the expiration of such sixty (60) days, if possible.

10.2.5    For any Schedule Request which requests a date on a Monday, Tuesday, Wednesday or Thursday between November 1 and November 31, the CPD shall be obligated to respond to the Club within five (5) days after receipt of the Schedule Request.

10.2.6    For any Schedule Request which requests a date on a Friday, Saturday or Sunday between November 1 and November 31, the CPD shall not be obligated to respond to the Club any earlier than sixty (60) days prior to the date so requested in the Schedule Request; provided that if specifically requested in writing by the Club, the CPD will make reasonable efforts to respond to the Club prior to the expiration of such sixty (60) days, if possible.

**10.3    Effect of a Schedule Request.**  The submission of a Schedule Request does not guarantee that the Club will be entitled to use or occupy the Facility or any part thereof as requested in such Schedule Request.

**10.4    Confirmation Conditions.**  If the following conditions ("Confirmation Conditions") are satisfied (or waived by the CPD) at the time that the CPD is obligated to respond to a Schedule Request as set forth by Section 10.2, then the CPD shall be obligated to confirm the Schedule Request in writing ("Schedule Request Confirmation"):

10.4.1    No Bears Terminating Default has occurred and is continuing;

10.4.2    No event has occurred which with the passage of time, or the giving of notice, or both, would be deemed a Bears Terminating Default.

10.4.3    No Bears Non-Terminating Default has occurred and is continuing, for which the Club has not provided the CPD with reasonable assurances satisfactory to the CPD that such Bears Non-Terminating Default will be promptly cured.

10.4.4    No event has occurred which with the passage of time, or the giving of notice, or both, would be deemed a Bears Non-Terminating Default for which the Club has not provided the CPD with reasonable assurances satisfactory to the CPD that such Bears Non-Terminating Default will not occur or will be promptly cured.

10.4.5    The use and occupancy of the Facility (or any part thereof) requested by the Club in the Schedule Request is within and consistent with the Club Use Rights and the other terms of this Agreement.

10.4.6    The use and occupancy of the Facilities (or any part thereof) requested by the Club in the Schedule Request will not be in conflict with a previously scheduled Public Sector Event.

**10.5    Denial.** If each of the conditions set forth in Section 10.4 are not satisfied (or waived by the CPD), during the time that the CPD is obligated to respond to a Schedule Request as set forth by Section 10.2, then the CPD shall be entitled to deny such Schedule Request ("Schedule Request Denial"), and the Club shall have no right to use or occupy the Facility as requested in the Schedule Request. Upon receipt of a Schedule Request Denial, if the Club, in good faith, disputes the basis for the CPD's denial of its Schedule Request, the Club may submit the dispute to Expedited Arbitration.    In the event that (i) the Club makes such submission for Expedited Arbitration within five (5) days of receipt of such Schedule Request Denial; and (ii) the Expeditious Arbitrator determines that the CPD has no basis for not confirming the Club's Schedule Request, then the Club's Schedule Request shall be confirmed.

**10.6    Failure to Respond.** In the event that the CPD fails to respond to a Schedule Request within the time periods set forth in Section 10.2, then such Schedule Request shall be deemed confirmed.

**10.7    Bears Games.** Notwithstanding any other provision contained in this Article 10 including, but not limited to Section 10.4 and the Confirmation Conditions set forth therein, the CPD shall be obligated to confirm a Schedule Request with respect to a Bears Game immediately upon receipt of such Schedule Request; provided if and only if NFL rules and regulations provide the Club with the right to request a change in the date of a scheduled Bears Game, the CPD may request that the Club apply to the NFL for a change in the date of one Bears Game in each Football Season to avoid a conflict with a previously Scheduled Public Sector Event. Once a Schedule Request is confirmed with respect to a Bears Game, the Club will not request that the NFL change such date without the consent of the CPD. In the event that the requested change cannot be accommodated by the NFL, then the CPD shall confirm the Schedule Request. Subject to Section 8.3.4 [Major College Football Game], the Club shall have an absolute priority on the usage of the Facility with respect to the Bears Games.

**10.8    NFL Days.** Notwithstanding any other provisions in this Article 10, in the event that the Club submits a Schedule Request for the use of the Club Lounge Area for an NFL Day within thirty (30) days after the NFL Schedule is made available to the CPD, then the CPD shall immediately confirm such Schedule Request. In the event that the Club submits a Schedule Request for the use of any part of the Facility, except for the Club Lounge Area, for an NFL Day, then CPD shall respond to such Schedule Request in accordance with Section 10.2.

**10.9    Effect of Confirmation.** Subject to Force Majeure, a Confirmed Schedule Request shall guarantee the Club the right to use and occupy the Facility as requested in the Schedule Request.

**10.10  Procedure and Form**

10.10.1   All Schedule Requests, Schedule Request Confirmations, and Schedule Request Denials shall be in writing delivered by e-mail, facsimile or in person.

10.10.2   Unless otherwise requested in writing by the CPD, the Club shall deliver to the CPD all Schedule Requests as follows:

> Chicago Park District
> 541 N. Fairbanks Court
> Chicago, Illinois, 60611
> Attention:  General Superintendent

with a copy to:

> Stadium Manager
> 425 East McFetridge Drive
> Chicago, Illinois 60605

10.10.3   Unless otherwise requested in writing by the Club, the CPD shall deliver to the Club all Schedule Request Confirmations and all Schedule Request Denials as follows:

> Chicago Bears Football Club, Inc.
> Halas Hall at Conway Park
> 1000 Football Drive
> Lake Forest, Illinois 60046
> Attention:  President

with a copy to:

> Schiff, Hardin & Waite
> 233 South Wacker Drive
> Chicago, Illinois 60606
> Attention:  Gary Mowder

**10.11 Effect.**   To be effective, any Schedule Request, Schedule Request Confirmation Schedule Request Denial shall substantially satisfy the procedure and form set forth in this Article 10 ("Scheduling Procedures"); provided the recipient party of any such Schedule Request, Schedule Request Confirmation or Schedule Request Denial may waive any deficiency in procedure or form in its sole and absolute discretion.

**10.12 Rescheduling; Cancellation.**

10.12.1   If after the Club receives a Confirmed Schedule Request, the CPD provides the Club with notice that it has a request for a Public Sector Event using the Bowl or Club Lounge Area for the date requested in the Confirmed Schedule Request, and the Club does not promptly after the receipt thereof cancel its Confirmed Schedule Request, and the Club later cancels its Confirmed Schedule Request, then upon the cancellation of the Confirmed Schedule Request by the Club, the Club will pay the CPD a cancellation fee equal to CPD's anticipated loss of net revenues from the requested Public Sector Event unless CPD has rescheduled such Public Sector Event.

10.12.2   If the Club or a Major Corporate Sponsor notifies the CPD of a cancellation of a Club-Related Event or Sponsor-Related Event, less than fourteen (14)

days prior to the scheduled date of such event, then notwithstanding such cancellation, such event shall count towards the Club's 34 Dates.

10.13 **Cooperation.** To facilitate the cooperative scheduling of Events, the Club and the CPD shall consult with each other to exchange information about proposed usage of the Facility and the scheduling of Events and shall cooperate to avoid conflicts in such scheduling and usage.

10.14 **No Expansion of Club Use Rights.** Nothing contained in this Article 10 shall be interpreted, construed or deemed to expand or increase any of the Club's Use Rights and all of the Club's scheduling confirmation rights shall be deemed limited in all respects by the Club Use Rights and the terms of this Agreement.

# ARTICLE 11.
## PERMANENT SEAT LICENSES

### 11.1 Initial Football PSLs.

11.1.1    Notwithstanding any other provisions contained herein, prior to Final Completion, the CPD shall have the exclusive right (i) to sell, market and promote the Initial Football PSLs; (ii) to appoint an agent or other party to do any of the foregoing on its behalf; and (iii) to determine and decide any and all terms and conditions relating to the Initial Football PSLs.

11.1.2    The CPD shall be entitled to any and all proceeds from the Initial Football PSLs and may use such proceeds in its sole and absolute discretion.

11.1.3    The Club commits and agrees to sell season tickets to Bears Games to Initial Football PSL Licensees at such prices and upon such terms as are determined by the Club for other purchasers of season tickets who are not Initial Football PSL Licensees so long as such Initial Football PSLs remain in effect. The Club further commits and agrees that the season tickets to Bears Games, which it sells to Initial Football PSL Licensees, shall be for specified seat locations in the Facility as contemplated by the Initial Football PSLs.

11.1.4    The CPD acknowledges and agrees upon termination or cancellation of an Initial Football PSL, the CPD shall have no right to resell or relicense such Initial Football PSL. The CPD further acknowledges and agrees that the Club may sell a Future Football PSL with respect to the specified seat location in the Facility contemplated by the cancelled or terminated Initial Football PSL.

### 11.2 Future Football PSLs.

11.2.1    The Club shall have the exclusive right (i) to sell, resell, market and promote Future Football PSLs, (ii) to appoint an agent or other party to do any of the foregoing on its behalf, and (iii) subject to the provisions of this Agreement, to determine and decide any and all terms and conditions related to the Future Football PSLs.

06298/00024/189933/20

- 40 -

11.2.2    The Club shall be entitled to any and all proceeds from the Future Football PSLs and may use such proceeds in its sole and absolute discretion.

11.2.3    The Club shall have the right to oversee, control and implement a Future Football PSLs program ("Bears PSL Program"). The Club shall also have the right to enter into such agreements ("Bears PSL Agreements") related to such Bears PSL Program.

11.2.4    The CPD shall have no obligations or liabilities with respect to the administration, sale, resale, marketing, or promotion of any Future Football PSLs, Bears PSL Program or Bears PSL Agreements.

11.2.5    All Bears PSL Programs and all Bears PSL Agreements for Bears Games shall be subject to the approval of the CPD. The CPD agrees that such approval shall be granted unless such Bears PSL Programs and Bears PSL Agreements materially violate the rules of public policy of the CPD.

11.2.6    The Club shall ensure that the rights and licenses granted to Future Football PSL holders do not exceed the rights or licenses granted to the Club or the Subsidiary hereunder.

11.2.7    The Club shall comply with all applicable Law with respect to and shall be responsible for and pay all costs and expenses associated with the administration, sale, resale, marketing, and promotion of any Future Football PSLs, the Bears PSL Program and the Bears PSL Agreements.

**11.3    Public Sector Event Sponsor PSLs.**

11.3.1    Notwithstanding any other provision contained herein, the CPD and any Public Sector Event Sponsor shall have the exclusive right to (i) sell, market and promote Public Sector Event Sponsor PSLs, (ii) to appoint an agent or other party to do any of the foregoing, and (iii) to determine and decide any and all terms and conditions relating to the Public Sector Event Sponsor PSLs.

11.3.2    The CPD or the Public Sector Event Sponsor shall be entitled to any and all proceeds from the Public Sector Event Sponsor PSLs, and may use such proceeds in its sole and absolute discretion.

11.3.3    The Club and Subsidiary shall have no obligations, rights or interests in or relating to the Public Sector Event Sponsor PSLs under this Agreement.

### ARTICLE 12.
### LICENSING OF SUITES AND CLUB SEATS

**12.1    Club Rights.**

12.1.1    The Club, or at the direction of the Club, the Subsidiary, shall have the exclusive right to license others to use and occupy the Suites and Club Seats on Game Days.

12.1.2    The Club or at the direction of the Club, the Subsidiary, shall have the exclusive right to license others to use and occupy the Suites and Club Seats for Club-Related Events and Sponsor-Related Events.

**12.2    CPD Rights.**  Subject to the provisions of Section 12.3 and Section 12.4, the CPD or a Public Sector Event Sponsor shall have the exclusive right to license others to use and occupy the Suites and Club Seats for Public Sector Events except on Game Days, and during Club-Related Events and Sponsor-Related Events.

**12.3    Non-Franchise Public Sector Events – Right of First Refusal.**

12.3.1    <u>Non-Franchise Right of First Refusal</u>.  For any Public Sector Event which is a Non-Franchise Public Sector Event, the Club, on behalf of each Bear Suite Licensee and each Bear Club Seat Licensee, shall be given a non-transferable right of first refusal ("Non-Franchise Right of First Refusal") to attend such Non-Franchise Public Sector Events in seating in the Suites or Club Seats, as the case may be, at rates no greater than the ticket price charged to non-Bears Suite Licensees and non-Bears Club Seat Licensees for such seating, or if there are none, not greater than the highest priced ticket charged for any areas of the Facility comprising in total not less than 5,000 seats or such different number as the CPD and the Club may agree; provided further, however, that this Non-Franchise Right of First Refusal shall not apply to Major Events.

12.3.2    <u>Procedure</u>.  Promptly upon scheduling a Non-Franchise Public Sector Event, the CPD or the Public Sector Event Sponsor shall provide the Club with written notice of such Non-Franchise Public Sector Event.  Such notice shall include the date, nature and pricing of the Non-Franchise Public Sector Event, and such other information as the Club may reasonably request.  With respect to a Bear Suite Licensee, the Club shall have thirty (30) days after the commencement of the public sale of tickets for the Non-Franchise Public Sector Event to exercise its Non-Franchise Right of First Refusal.  With respect to a Bear Club Seat Licensee, the Club shall have five (5) days after the announcement of a public sale of tickets (provided such five (5) day period shall occur during the fifteen day period prior to the commencement of a public sale of tickets) for the Non-Franchise Public Sector Event to exercise its Non-Franchise Right of First Refusal.   To exercise such Non-Franchise Right of First Refusal, the Club shall provide written notice to the CPD or the Public Sector Event Sponsor indicating the number of people, which Suites, etc., and such other information as the CPD or the Public Sector Event Sponsor may request, together with the appropriate payment. Any Non-Franchise Right of First Refusal which is exercised shall be irrevocable.   Any Non-Franchise Right of First Refusal which is not properly exercised within the time frame provided above shall be cancelled and be deemed null and void.

12.3.3    Administration.  The Club shall be responsible for and shall pay all costs and expenses associated with the administering and carrying out the transactions contemplated by this Section 12.3.  The Club shall be entitled to charge the Bear Suite Licensees and the Bear Club Seat Licensees a reasonable service charge for the purposes of recovering its costs and expenses incurred in administering and carrying out the transactions contemplated by this Section 12.3.

### 12.4    Franchise Public Sector Events – Right of First Refusal.

12.4.1    Franchise Right of First Refusal.  For any Public Sector Event which is a Franchise Public Sector Event, the Club, on behalf of the Bear Suite Licensees and Bear Club Seat Licensees, shall be given a right of first refusal ("Franchise Right of First Refusal") to purchase a Suite License or Club Seat License with respect to such Franchise Public Sector Event.  This Franchise Right of First Refusal shall allow the Club to purchase any Suite License or Club Seat License on the same terms and conditions as the CPD or the Public Sector Event Sponsor propose to offer such Suite License or Club Seat License to non-Bear Suite Licensees or non-Bear Club Seat Licensees.  Without limiting the foregoing sentence, this Franchise Right of First Refusal shall allow the Club to purchase any Suite License or Club Seat License for a single game or event once the CPD or the Public Sector Event Sponsor propose to offer such Suite License or Club Seat License for a single game or event to non-Bear Suite Licensees or non-Bear Club Seat Licensees.

12.4.2    Procedure.  Promptly upon scheduling a Franchise Public Sector Event the CPD or the Public Sector Sponsor shall provide the Club with written notice of such Franchise Public Sector Event.  Such notice shall include the date(s), nature and pricing of such Franchise Public Sector Event, and such other information as the Club may reasonably request.  The Club shall have thirty (30) days after the commencement of the public sale of tickets for the Franchise Public Sector Event to exercise its Franchise Right of First Refusal.  To exercise this Franchise Right of First Refusal, the Club shall provide written notice to the CPD of the Public Sector Event Sponsor indicating the number of Suites and Club Seats which are committed for purchase and such other information as the CPD or the Public Sector Event Sponsor may request, together with the appropriate payment.  Any Franchise Right of First Refusal which is exercised shall be irrevocable.  Any Franchise Right of First Refusal which is not properly exercised within the timeframe provided above shall be cancelled and deemed null and void.

12.4.3    Administration.  The Club shall be responsible for and shall pay all costs and expenses associated with the administering and carrying out the transactions contemplated by the Section 12.4.  The Club shall be entitled to charge the Bear Suite Licensees and the Bear Club Seat Licensees a reasonable service charge for the purpose of recovering its costs and expenses incurred in administering and carrying out the transactions contemplated by this Section 12.4.

12.4.4    Unsold Suite.  In the event that there are Suites which are not sold at least one week prior to a Bears Game, then the Club shall provide, at no charge

to the CPD, one (1) and only one (1) Suite for the CPD to donate to a charitable organization.

# ARTICLE 13.
## ALLOCATION OF REVENUES

### 13.1  Club Revenue.

13.1.1    Bears Games.  Except as provided for in Section 13.2.3, the Club shall receive and retain any and all of the revenues derived from Bears Games including, but not limited to, ticket sales, Bear Club Seat License fees, Bear Suite License fees, pouring rights, broadcasting and telecasting revenues, general concession revenues, Club Lounge Area and Suite concession revenue, revenues from the sale of souvenirs, game programs and other miscellaneous game day merchandise, promotion revenue, sponsorships, Signage, advertising revenues, pre-game and post-game events, revenues generated by the Parking Allotment, revenues generated by the Club's use of 100 parking spaces located within the Facility, revenues from events or attractions staged within the Game Day Site, NFL Experience and other revenues derived from the performance of Bears Games in the future, whether similar or dissimilar to the types of revenues presently realized from Bears Games.

13.1.2    Team Areas.  The Club shall receive and retain all of the revenues derived from all Team Areas.

13.1.3    Club-Related Events and Sponsor-Related Events.  The Club shall receive and retain all of the revenues derived from Club-Related Events except for revenues related to Parking.  The Club shall receive and retain all of the revenues derived from Sponsor-Related Events except for Parking and Concessions.

13.1.4    Marketing Rights.  The Club shall receive and retain all of the revenues derived from the sale or licensing of Marketing Rights and Future Marketing Rights by the Club or the Subsidiary.

13.1.5    Future Football PSLs.  The Club shall receive and retain all revenues derived from Future Football PSLs.

### 13.2  CPD Revenue.

13.2.1    Public Sector Events.  The CPD shall receive and retain all of the revenues derived from Public Sector Events.

13.2.2    Public Sector Event Sponsor PSLs.  The CPD shall receive and retain all of the revenues derived from the sale or license of the Public Sector Event Sponsor PSLs.

13.2.3    Parking - Game Days.  Except with respect to parking revenue generated by the Club on Game Days with respect to the Parking allotment and the

Club's use of 100 parking spaces located within the Facility, the CPD shall receive and retain all parking revenue on Game Days.

13.2.4   Parking – Non Game Days , The CPD shall receive and retain all parking revenue on non-Game Days including but not limited to parking revenue generated from Club-Related Events, Sponsor-Related Events and Public Sector Events.  Parking rates charged for Club-Related Events and Sponsor-Related Events shall be consistent with the standard parking rates available to the general public as in effect from time to time.

13.2.5   Concessions.  The CPD shall receive and retain all revenues derived from Concessions during Public Sector Events and Sponsor-Related Events and outside the Game Day Site on Game Days.

13.2.6   NFL Major Event.  As between the CPD and the Club, in the event that the Facility is the site of a NFL Major Event, the CPD shall be entitled to all revenue and economic benefits derived therefrom. The CPD shall negotiate the rental charge and other terms with the sponsor of the NFL Major Event.

13.2.7   Other Revenue.  The CPD shall receive and retain all other revenue derived from the use or occupancy of the Facility not otherwise received and retained by the Club pursuant to Section 13.1.

13.2.8   Signage Rights.  The CPD shall receive and retain all revenues derived from the sale or licensing of Signage Rights for Public Sector Events.

13.2.9   Hook-Up Fees.  Notwithstanding Section 13.1.1, the CPD shall, to the extent permitted by NFL rules and broadcasting agreements, be entitled to receive and retain all fees derived from television truck and satellite dish hook-up and related technical services in connection with the Bears Games.

13.2.10   Non-Exhibit - Attraction.  The CPD shall receive and retain all revenues on Bears Games from events and attractions staged outside the Game Day Site.

**13.3   PSL Revenue.**  The revenue and proceeds generated from the license, sale or resale of Football PSLs shall be subject to the provisions of Article 11.

## ARTICLE 14.
## CLUB PAYMENTS TO CPD

**14.1   General.**

14.1.1   Facility Fee.  From the period commencing January 1, 2004 until December 31, 2007, the Club shall pay to the CPD an annual Facility Fee equal to Four Million Seven Hundred Thousand and No/100ths Dollars ($4,700,000).  Thereafter, the Club shall pay to the CPD an annual Facility Fee as increased herein.

14.1.2     Parking Allotment Fee.  From the period commencing January 1, 2004 until December 31, 2007, the Club shall pay to the CPD an annual Parking Allotment Fee equal to One Million and No/100ths Dollars ($1,000,000).  Thereafter, the Club shall pay to the CPD an annual Parking Allotment Fee as increased herein.

14.1.3     Adjustment.  The Facility Fee and the Parking Allotment Fee shall be increased on January 1, 2008 by fifty percent (50%) of the cumulative increase, in the CPI, if any, occurring from January 1, 2003 through December 31, 2007.  On each fifth (5th) anniversary of January 1, 2008, the amount of the Facility Fee and the Parking Allotment Fee will be increased in a similar manner by fifty percent (50%) of the cumulative increase in the CPI, if any, occurring from the date of the last increase in the Facility Fee and the Parking Allotment Fee, respectively.  At the expiration of the Term, the Club shall pay immediately the total increase caused by the CPI adjustment which has not been paid.

14.1.4     Timing.  The Total Permit Fee shall be paid in seven (7) equal monthly installments commencing on June 1 of each year commencing June 1, 2004.

14.1.5     Special Games.  The Club's payment obligations to the CPD hereunder shall not be reduced or otherwise affected in the event that the Club plays Special Games away from the Facility except that the Total Permit Fee shall be reduced to reflect any decrease in the direct operating expenses which the CPD experiences as a result of a Bears Game not being played at the Facility.

14.1.6     Other Professional Football Team Fee Credit.  The Club will receive a fee credit on its payment of Total Permit Fee of thirty-five percent (35%) of the rental received by the CPD from any other professional football team in which the NFL neither has a direct or indirect ownership interest in nor receives a direct or indirect share of the revenue from, that uses the Facility to hold a football game ("Fee Credit"). In calculating the Fee Credit, the rental received by the CPD shall be deemed to include the amounts received by the CPD for usage of the Facility or any portion thereof, together with any expenses or obligations of the CPD that are assumed by such teams in consideration of such usage of the Facility, but shall be reduced by any reasonable charges paid to the CPD by such teams for clean-up services.  In calculating the Fee Credit, however, the revenues received by the CPD from concessions, parking, advertising and the like shall not be included.  The Fee Credit shall not apply to the NFL Major Events.

## 14.2   Special Payment Provisions for 2003.

14.2.1     General.  The parties acknowledge and agree that, for the 2003 Football Season due to the proposed Adaptive Reuse  (1) the Facility may not be available for all ten (10) anticipated Bears Games, and (2) the parking facilities may not be able to satisfy the Club's Parking Allotment.

14.2.2     2003 Facility Per Game Fee.  On and after the Substantial Completion of the Stadium and North Garage, the Club shall pay to the CPD the 2003

Facility Per Game Fee for each Bear Game played at the Facility or which could have been played at the Facility in the 2003 Football Season.

14.2.3    2003 Parking Allotment Per Game Fee.    On and after the Substantial Completion of the Stadium and North Garage, the Club shall pay to the CPD the 2003 Parking Allotment Per Game Fee for each Bear Game played at the Facility or which could have been played at the Facility in the 2003 Football Season.  To the extent that there are not 4,250 parking spaces available in the North Parking Structure, the Mid-South Parking Structure and the South Parking Lot, the CPD and the Club will negotiate substitute parking arrangements for such deficit.

14.2.4    Timing.  The Club shall pay the 2003 Facility Per Game Fee and the 2003 Parking Allotment Per Game Fee promptly following each Bears Game which was played or could have been played at the Facility.

14.2.5    Development Agreement Payments.    Until Substantial Completion of the Stadium and North Garage, the CPD shall receive the amounts provided for under the Development Agreement in lieu of the 2003 Facility Per Game Fee and 2003 Parking Allotment Per Game Fee.

**14.3    Changes in Number of Bears Games in a Football Season.**  In the event that in any Football Season there shall be more than ten (10) Bears Games played at the Facility for any reason (including but not limited to a post-season Bears Games or an increase in the number of "home games" played by the Club), or in the event that in any Football Season (except for the year 2003) there shall be less than ten (10) Bears Games played at the Facility because of a breach of this Agreement by the CPD which reasonably prevents the playing of a Bears Game, the Total Permit Fee paid the CPD shall be increased or decreased, as the case may be, to reflect the increased or decreased Game Day expenses incurred or not incurred by the CPD.  Prior to the commencement of each Football Season, the Club and the CPD shall agree as to the estimated per game amount of direct operating expenses to be incurred by the CPD in connection with Bears Games for that Football Season.

## ARTICLE 15.
## TAXES

**15.1    CPD Responsibility.**  The CPD hereby agrees to pay when due, if any, all Property Taxes which are due or payable during the Term and to indemnify, defend and hold the Club and the Subsidiary from and against all such Property Taxes; provided the CPD's indemnification obligations to the Club and the Subsidiary under this Section are limited to those Property Taxes for which the CPD is obligated to pay or is responsible for under applicable Law.  The CPD hereby agrees to pay when due, if any, all Parking Allotment Taxes related to the Club's use of the Parking Allotment based on the Club's payment of the Parking Allotment Fee.

**15.2    Club Responsibility.**  The Club hereby agrees to pay when due, if any, all Amusement Taxes, Sales Taxes, Sports Team Taxes, Leasehold Taxes, if applicable, Use Taxes, Miscellaneous Taxes and any other taxes or charges which are

06298/00024/189933/20

due or payable during the Term and which relate to the exercise of the Club or the Subsidiary of their rights or licenses hereunder and their use or occupancy of the Facility, and to indemnify, defend and hold harmless the CPD from and against all such taxes; provided the Club's indemnification obligations to the CPD under this Section are limited to those taxes for which the Club or the Subsidiary is obligated to pay or is responsible for under applicable Law.

15.3  **CPD Cooperation.** In the event that any Property Tax or Leasehold Tax shall be assessed against the Club's rights or interests arising under this Agreement, the Club shall have the right to contest such tax if there is a reasonable basis for such contestation and, in such event, the CPD shall, at the Club's expense, cooperate fully with the Club in such defense. In the event that any such tax shall be incurred and in the opinion of counsel to the Club such tax may be avoided or minimized in future periods by making reasonable modifications or amendments to this Agreement that do not materially affect the CPD's "benefit of the bargain" with respect to this Agreement, then the CPD shall, in good faith, negotiate with the Club to effect such modifications or amendments to this Agreement.

15.4  **Club Cooperation.** In the event that any Property Tax or Leasehold Tax shall be assessed against the CPD's rights or interests in the Facility arising under this Agreement, the CPD shall have the right to contest such tax if there is reasonable basis for such contestation and, in such event, the Club shall, at the CPD's expense, cooperate fully with the CPD in such defense. In the event that any such tax shall be incurred and in the opinion of counsel to the CPD such tax may be avoided or minimized in future periods by making reasonable modifications or amendments to this Agreement that do not materially affect the Club's "benefit of the bargain" with respect to this Agreement, then the Club shall, in good faith, negotiate with the CPD to effect such modifications or amendments to this Agreement.

### ARTICLE 16.
### MARKETING RIGHTS

16.1  **Signage Rights.**

16.1.1    Rights. The Club, or at the direction of the Club the Subsidiary, shall have the following rights:

(a)    The right to display, place and affix Club Signage inside of the Facility (excluding the Colonnades);

(b)    The right to develop a Signage Plan;

(c)    The right to sell Signage Rights for inside of the Facility (excluding the Colonnades);

(d)    The right to oversee, control and implement a Signage Rights Program ("Signage Rights Program"); and

(e)    The right to negotiate and enter into all agreements to which the Club or the Subsidiary will be a party ("Signage Rights Agreements") related to the "Signage Rights Program".

16.1.2    Scope.

(a)    Signage may be temporary (as to Bears Games, Club-Related Events and Sponsor-Related Events) or for longer periods (e.g. one or more Football Seasons);

(b)    No permanent exterior Signage shall be permitted except in connection with Naming Rights; and

(c)    Temporary exterior Signage, such as banners and portable signs, may be displayed during Bears Games, Club-Related Events and Sponsor-Related Events at locations and of a size and type acceptable to the CPD.

16.1.3    Signage Plan. The Signage Plan (and any amendments thereto) shall be developed by the Club but shall be subject to the prior approval and agreement of the CPD which shall not be unreasonably withheld.  The Signage Plan shall comply and be consistent with this Agreement and the Chicago Park District Code, as amended from time to time.

16.1.4    Limitation.  Any Signage Rights Agreement (i) shall require that the Signage be suitable for a public building, (ii) shall terminate upon the termination of this Agreement, (iii) shall terminate at the CPD's option, upon a Bears Terminating Default, and (iv) shall not contain any term or condition inconsistent or in conflict with this Agreement or the Signage Plan, and (v) shall specifically comply with the Chicago Park District Code, as amended from time to time.  Neither the Club nor the Subsidiary shall enter into any Signage Rights Agreement which does not specifically satisfy such requirements and any such agreement which does not satisfy such requirements shall be null and void.  Neither the Club nor the Subsidiary shall be entitled to any Signage Rights with respect to the Colonnades, the North Parking Structure, the Mid-South Parking Structure, the South Parking Lot or the Parklands.  All Signage to be displayed, placed or affixed by the Club or the Subsidiary (or under their direction or authorization) (x) shall be suitable for a public building, (y) shall comply and be consistent with this Agreement and the Signage Plan and (z) shall comply with the Chicago Park District Code, as amended from time to time.

16.1.5    Risk Allocation.  The CPD bears no risks as to the success of the Signage Rights Program.

16.1.6    Reservation of Signage Rights.  Except with respect to the Naming Rights Sponsor's Prohibition Rights, the CPD reserves all Signage Rights with respect to the Parklands, North Parking Structure, Mid-South Parking Structure and the South Parking Lot.

16.1.7    Exclusive Signage Product Categories. By June 1, 2003, the Club shall provide the CPD with the Club's proposed Exclusive Signage Product Categories. The CPD and the Club shall negotiate in good faith to agree upon the final six (6) Exclusive Signage Product Categories and the scope thereof. Such agreement shall not be unreasonably withheld. In determining the Exclusive Signage Product Categories and the scope thereof, the Club and the CPD shall consider the examples set forth on Exhibit D. From time to time, any party may propose a change, modification or amendment to the six (6) Exclusive Signage Product Categories. The parties shall discuss such proposal and negotiate in good faith with respect thereto.

**16.2    Naming Rights.**

16.2.1    Rights.  The Club, or at the direction of the Club, the Subsidiary shall have the following rights:

(a)    The right to sell Naming Rights to the Facility;

(b)    The right to oversee, control and implement a Naming Rights Program ("Naming Rights Program"); and

(c)    The right to negotiate and enter into all agreements to which the Club or the Subsidiary will be a party ("Naming Rights Agreements") related to the Naming Rights and the Naming Rights Program.

16.2.2    Consultation. The Club will consult the CPD and the CPD will cooperate with the Club with respect to the Club's retention of a marketing consultant in the development and implementation of a Naming Rights Program.

16.2.3    Approval Rights. The Naming Rights Sponsor and all Naming Rights Agreements shall be subject to the prior written approval of the CPD, which will not be unreasonably withheld. The Club and the Subsidiary agree not to enter into a Naming Rights Agreement without the prior written approval of the CPD. Any Signage on the exterior of the Facility relating to Naming Rights shall be specifically subject to the prior approval of the CPD and shall comply and be consistent with the Signage Plan, the Chicago Park District Code, as amended from time to time, and applicable Law.

16.2.4    Limitation. Any Naming Right's Agreement (i) shall require that the commercial name for the Facility retain "Soldier Field" as part thereof and that the term "Soldier Field" be no less prominent then any other part of the commercial name, (ii) shall require that the commercial name be suitable in the CPD's reasonable judgment for the Museum Campus and for a public building, (iii) shall terminate upon the termination of this Agreement, (iv) shall terminate at the CPD's option, upon a Bear's Terminating Default, (v) shall not contain any term or condition inconsistent or in conflict with this Agreement or the Signage Plan, (vi) shall specifically comply with the Chicago Park District Code, as amended from time to time, and (vii) shall not contain any term or condition inconsistent with or in conflict with the CPD's Constitutional

06298/00024/189933/20

Obligations.  Neither the Club nor the Subsidiary shall enter into any Naming Rights Agreement which does not specifically satisfy such requirements and any such agreement which does not satisfy such requirements shall be null and void.  Except with respect to the Naming Rights Sponsor's Prohibition Rights, neither the Club nor the Subsidiary shall be entitled to any Naming Rights with respect to the Colonnades, North Parking Structure, the Mid-South Parking Structure, the South Parking Lot, or the Parkland.

16.2.5   <u>References</u>.  With respect to the Naming Rights Agreement, the Club and the CPD agree to refer to the Facility by the selected name, including "Soldier Field," in all directional Signage and advertising referring to the Facility, descriptions of the Facility, public announcements and broadcasts, and to require the same from other parties who contract with the Club or the CPD.

16.2.6   <u>Risk Allocation</u>.  The CPD bears no risks as to the success of the Naming Rights Program.

16.2.7   <u>Reservation of Rights and Restrictions</u>.  Except with respect to the Naming Rights Sponsor's Prohibition Rights, the CPD reserves all "naming rights" with respect to the Parklands, North Parking Structure, Mid-South Parking Structure and the South Parking Lot.

16.2.8   <u>Veteran's Allocations</u>.  At the direction of the CPD, the Club shall donate annually (or shall cause the Naming Rights Sponsor to donate annually) an amount equal to three percent (3%) of the gross amount of proceeds the Club or the Subsidiary receives related to the sale of Naming Rights, not to exceed $200,000 in any one year, to a group, charity or organization which promotes the interest of veterans and which is selected by the CPD.  In the event that the Club does not receive proceeds from the sale of Naming Rights on an annual basis then equitable prorations shall be made over the term of the Naming Rights Agreement in determining the annual donation amount.

16.2.9   <u>Naming Rights Direct Competitors</u>.  In consultation with the Naming Rights Sponsor, the CPD and the Club shall negotiate in good faith to agree upon the Naming Rights Sponsor's Business and the list of Direct Competitors.  Such agreement shall not be unreasonably withheld.  The Club acknowledges the CPD's interest and the public's interest in maximizing the use of the Facility and North Parking Structure for Public Sector Events and other public events.

16.2.10   <u>Constitution</u>.  The Club and the Subsidiary acknowledge and agree that the CPD is a Governmental Authority subject to the Constitution of the United States and the Constitution of the State of Illinois and consequently all Naming Rights Sponsor's Prohibition Rights granted by the CPD hereunder shall be subject to and limited by the CPD's Constitutional Obligations.

**16.3   Entitlement Rights.**

06298/00024/189933/20

- 51 -

16.3.1    <u>Rights</u>.  In addition to Naming Rights or in lieu thereof, the Club, or at the Club's direction the Subsidiary, shall have the following rights:

(a)    The right to sell Entitlement Rights for inside the Facility (excluding Colonnades);

(b)    The right to oversee, control and implement a Entitlement Rights Program ("Entitlement Rights Program"); and

(c)    The right to negotiate and enter into all agreements to which the Club or the Subsidiary will be a party ("Entitlement Rights Agreements") related to the Entitlement Rights.

16.3.2    <u>Consultation</u>.  The Club will consult the CPD and the CPD will cooperate with the Club on the Club's retention of a marketing consultant or consultants, if any, on the developments and implementation of an Entitlement Rights Program.

16.3.3    <u>Approval Rights</u>.  All Entitlement Rights Agreements shall be subject to the approval of the CPD pursuant to Chapter VII of the code of the Chicago Park District which approval shall not be unreasonably withheld.  The Club and the Subsidiary agree not to enter into an Entitlement Rights Agreement without the prior written approval of the CPD.

16.3.4    <u>Limitation</u>.  Any Entitlement Rights Agreement (i) shall require that any Entitlement Rights granted thereunder be suitable in the CPD's reasonable judgment for the Museum Campus and for a public building, (ii) shall terminate upon the termination of this Agreement, (iii) shall terminate at the CPD's option upon a Bears Terminating Default, (iv) shall not contain any term or condition inconsistent or in conflict with this Agreement or the Signage Plan and (v) shall specifically comply with the Chicago Park District Code, as amended from time to time.  Neither the Club nor the Subsidiary shall enter into any Entitlement Rights Agreement, which does not satisfy such requirements and any such agreement, which does not satisfy such requirements, shall be null and void.  Neither the Club nor the Subsidiary shall be entitled to any Entitlement Rights with respect to the Colonnades, the North Parking Structure, the Mid-South Parking Structure, the South Parking Lot or the Parklands.

16.3.5    <u>Risk Allocation</u>.  The CPD bears no risk as to the success of the Entitlement Rights Program.

16.3.6    <u>Reservation of Rights</u>.  Except with respect to the Naming Rights Sponsor's Prohibition Rights, the CPD reserves all Entitlement Rights with respect to the Parklands, North Parking Structure, Mid-South Parking Structure and the South Parking Lot.

**16.4   Future Marketing Rights.**

16.4.1    Rights.    In addition to the Marketing Rights and not in lieu thereof, the Club, or at the direction of the Club, the Subsidiary shall have the following rights:

(a)    The right to sell Future Marketing Rights for inside the Facility (excluding the Colonnades);

(b)    The right to oversee, control and implement a Future Marketing Rights Program ("Future Marketing Rights Program"); and

(c)    The right to negotiate and enter into all agreements to which the Club or the Subsidiary will be a party ("Future Marketing Rights Agreements") related to the Future Marketing Rights.

16.4.2    Approval Rights.    All Future Marketing Rights Agreements shall be subject to the approval of the CPD pursuant to Chapter VII of the code of the Chicago Park District which approval shall not be unreasonably withheld.  The Club and the Subsidiary agree not to enter into a Future Marketing Rights Agreement without the prior written approval of the CPD.

16.4.3    Limitation.    Any Future Marketing Rights Agreement (i) shall require that any Future Marketing Rights granted thereunder be suitable in the CPD's reasonable judgment for the Museum Campus and for a public building, (ii) shall terminate upon the termination of this Agreement, (iii) shall terminate at the CPD's option upon a Bears Terminating Default, (iv) shall not contain any term or condition inconsistent or in conflict with this Agreement or the Signage Plan, and (v) shall specifically comply with the Chicago Park District Code, as amended from time to time. Neither the Club nor the Subsidiary shall enter into any Future Marketing Rights Agreement, which does not satisfy such requirements and any such agreement, which does not satisfy such requirements, shall be null and void.  Neither the Club nor the Subsidiary shall be entitled to any Future Marketing Rights with respect to the Colonnades, the North Parking Structure, the Mid-South Parking Structure or the South Parking Lot.

16.4.4    Risk Allocation.    The CPD bears no risk as to the success of the Future Marketing Rights Program.

16.4.5    Reservation of Rights.    Except with respect to the Naming Rights Sponsor's Prohibition Rights, the CPD reserves all Future Marketing Rights with respect to the Parklands, North Parking Structure, Mid-South Parking Structure and the South Parking Lot.

16.4.6    No Conflict.    Notwithstanding any other provision contained herein, the Club shall not be entitled to Future Marketing Rights to the extent that such Future Marketing Rights are in conflict with the CPD's rights and interests hereunder.

**16.5    Product Rights.**

16.5.1    Rights.  The Club or at the Club's direction the Subsidiary shall have the following rights:

(a)    The right to sell Product Rights;

(b)    The right to oversee, control and implement a Product Rights Program ("Product Rights Program"); and

(c)    The right to negotiate and enter into all agreements ("Product Rights Agreements") related to the Product Rights.

16.5.2    Scope.

(a)    Product Rights shall not apply to locker rooms, private parties, press box and the Field; and

(b)    Product Rights shall not apply to Public Sector Events except with respect to products sold by the Concessionaires.

16.5.3    Approval Rights.  All Product Rights Agreements shall be subject to the approval of the CPD which approval shall not be unreasonably withheld. The Club and the Subsidiary agree not to enter into an Product Rights Agreement without the prior written approval of the CPD.

16.5.4    Limitation.  Any Product Rights Agreement (i) shall require that any Product Rights granted thereunder be suitable in the CPD's reasonable judgment for the Museum Campus and for a public building, (ii) shall terminate upon the termination of this Agreement, (iii) shall terminate at the CPD's option upon a Bears Terminating Default, (iv) shall not contain any term or condition inconsistent or in conflict with this Agreement, (v) shall specifically comply with the Chicago Park District Code, as amended from time to time, and (vi) shall not contain any provision (without the prior consent of the CPD) that impairs the CPD's commission structure with its Concessionaires or that obligates the Concessionaire to purchase a concession product at a price greater than a Concessionaire would otherwise purchase such product as a result of the party receiving the Product Rights also receiving other Marketing Rights. Neither the Club nor the Subsidiary shall enter into any Product Rights Agreement, which does not satisfy such requirements and any such agreement, which does not satisfy such requirements, shall be null and void.  Neither the Club nor the Subsidiary shall be entitled to any Product Rights with respect to the North Parking Structure, the Mid-South Parking Structure, the South Parking Lot or the Parkland.

16.5.5    Risk Allocation.  The CPD bears no risk as to the success of the Product Rights Program.

16.5.6    Reservation of Rights.  Except with respect to the Naming Rights Sponsor's Prohibition Rights, the CPD reserves all Product Rights with respect to the Parklands, North Parking Structure, Mid-South Parking Structure and the South Parking Lot.

**16.6  General Restrictions.**

16.6.1    <u>Club</u>.  The implementation and exercise of Signage Rights, Naming Rights, Entitlement Rights, Product Rights and Future Marketing Rights by the Club, the Subsidiary or other parties (including but not limited to those parties to any Signage Rights Agreement, Naming Rights Agreement, Entitlement Rights Agreement, Product Rights Agreement or Future Marketing Rights Agreement) shall be subject to any applicable Law, and shall be in accordance with guidelines, standards and other criteria developed by the Club with the concurrence of the CPD and any material exceptions thereto shall be subject to the approval of the CPD, not to be unreasonably withheld.

**16.7  General Reservation of CPD Rights – Inside the Facility.**

16.7.1    Subject to the limitations set forth in Section 16.7.2, the CPD specifically reserves the following rights with respect to inside the Facility:

(a)    The right to sell or to authorize others to sell sponsorships for Public-Sector Events but only in relation thereto;

(b)    The right to sell, display, place or affix, or authorize others to sell, display, place or affix <u>temporary</u> Signage and advertising inside and outside the Facility in connection with a Public-Sector Event;

(c)    The right to cover up, displace, electronically superimpose over or authorize others to cover up, displace or electronically superimpose over Club Signage during a Public-Sector Event; and

(d)    The right to use portions of the concourses and other interior areas of the Facility for non-commercial uses such as informational displays or exhibits, displays relating to activities of the CPD, the City and other Chicago area governmental organizations, and other uses that do not interfere with the Club's use of the Facility for Bears Games, subject to the prior approval of the Club, not to be unreasonably withheld.

16.7.2    <u>Limitation</u>.  Notwithstanding 16.7.1 unless consented to by the Club, which consent shall not be unreasonably withheld, the CPD shall not, nor shall the CPD, authorize any Public-Sector Event Sponsor to take any of the following actions.

(a)    Sell, display, place or affix any Signage, advertising or sponsorships in the Facility or the North Parking Structure which violates the Naming Rights Sponsor's Prohibition Rights.

(b)    Sell, display, place or affix any Signage, advertising or sponsorship in the Facility which promotes, markets or advertises a product or service which falls within the Exclusive Signage Product Categories; provided however this limitation shall not apply at or to (i) National Public Sector Events, or National Public Sector Event Sponsors, (ii) Local Media, and (iii) Ethnic Marketers.

(c)    Remove, cover up, displace, electronically superimpose over Signage in the Facility which is not Club Signage.

**16.8    Major Events.**

16.8.1    Negotiation.  In the event that the CPD seeks to attract a Major Event to the Facility, the Club and if applicable, the Subsidiary, agree to take reasonable actions and to negotiate with the CPD in good faith with respect to waiving or modifying the Club's Marketing Rights and Future Marketing Rights to accommodate such Major Event given the positive impact on the City, if such a Major Event can be booked.

16.8.2    Waiver.  In the event that the CPD seeks to attract a Major Event, the Club and the Subsidiary specifically agree in advance to waive the CPD obligations set forth in Section 16.6.3(c) and (d), and to allow the CPD to remove and cover up Signage at such Major Event and to permit the telecast or other transmissions of the Major Event in which Signage is displaced or superimposed by electronically generated Signage.

**16.9    Signage Costs.**  The Club shall be responsible for all costs and expenses in connection with Club Signage and Signage related to Naming Rights including but not limited to the directional Signage contemplated by Section 16.2.5 located within the Project Site and the Museum Campus.  The CPD shall not be obligated to incur any cost or expense related to the directional Signage contemplated by Section 16.2.5.

**ARTICLE 17.**
**PROMOTION AND BROADCASTING RIGHTS**

**17.1    Promotion.**  The Club, at its sole costs and expense, shall have sole, exclusive and complete control over all advertising, promotion and publicity aspects of or related to the Bears Games.

**17.2    Broadcast and Recording Rights.**  All Media Rights are hereby reserved to, and shall be the property of, the Club.  "Media Rights" shall mean: (i) with respect to radio, television, cable, Internet, world wide web (including video streaming), and any and all other communications media or methods, whether presently existing or hereafter developed, the exclusive right to broadcast, transmit, retransmit or disseminate all or any part of all Bears Games and all activities related thereto; (ii) the non-exclusive, royalty-free license to use the name, likeness and historical material of Soldier Field solely in connection with the rights enumerated in clause (i); (iii) the exclusive right of electronic insertion and deletion with respect to the broadcast, transmission, retransmission or other dissemination of Bears Games and activities related thereto; (iv) the exclusive right to photograph, film, televised tape, radio broadcast and record in analog, digital or other forms of recording, whether presently existing or hereafter developed, the Bears Games and related activities; and (v) the right to license to others all rights described in clauses (i) through (iv).

**17.3    Copyrights.**  The CPD claims no copyright or similar ownership interest pursuant to this Agreement in photographing, filming, television taping, radio

broadcasting or recording in analog, digital or other forms of recording, whether presently existing or hereinafter developed, of Bears Games and related activities.

**17.4 Filming and Taping.** The CPD shall neither film, tape, broadcast, or otherwise record the Bears Games nor shall it authorize any third party to do so, without the express prior written approval of the Club, except to the extent that any television broadcast may be used in the Soldier Field for "in-house feed" at no charge and that any Bears Game is videotaped for internal documentation purposes of CPD.

**17.5 Broadcaster Access.** The CPD shall provide Designated Broadcasters with reasonable access to the Facility.

**17.6 Installations** Subject to the prior approval of the CPD, Designated Broadcasters may, on or in the Facility, without additional charge, install, operate, maintain and remove such broadcast and associated production equipment as they may require (including cameras, cables, platforms, announcer booths, sound equipment, graphic units, microphones, and lighting) and shall have the right to utilize their own employees or employees of their contractors for such activities without being required to utilize or pay any employees, agents or contractors of CPD in connection with such work; provided that CPD shall be reimbursed by the Designated Broadcasters (and if not by the Designated Broadcasters, then by the Club) for all reasonable costs and expenses associated with work which is requested to be performed. The Club agrees to require the Designated Broadcasters to remove all their broadcast and associated equipment from the Soldier Field promptly following the completion of the Bears Game and to fix any damage they may have caused.

**17.7 Accreditation of Media.** The Club shall have sole, exclusive and complete control over all aspects of Club Use Rights relating to the accreditation of qualified members of the media and the Designated Broadcasters.

**17.8 Copyright and Trademark Law.** The Club will comply with all applicable copyright and trademark law in the exercise of its Media Rights or otherwise.

**17.9 Name and Likeness.** The Club shall have the non-exclusive commercial right to use the name, likeness and historical material of Soldier Field and the Facility for normal and customary uses which are incidental to the Club's football activities. The Club's rights set forth in this Section are in addition to the Club's Media Rights.

**17.10 Drawings, Specifications and Construction Documents.** CPD hereby grants and conveys to the Club a non-assignable, non-exclusive license to use and reproduce the Drawings, Specifications, Construction Documents, renderings, reports (and the electronic methods of reproducing such documents, including, but not limited to, computer tapes or disks), other documents prepared by or for Developer and by or for the Architect and its sub-consultants and the "Architectural Works " (as defined in the Federal Architectural Works copyright Protection Act) of the Project for purposes incidental to the Club's business including without limitation promotions and marketing. CPD further acknowledges and agrees that the Construction Manager and Architect shall, have the non-assignable, non-exclusive right to reuse such materials in accordance with the GMAX Agreement and Design Agreement specifically.

06298/00024/189933/20

17.11 **Consent by Club.** Subject to the prior written consent of the Club which will not be unreasonably withheld, the CPD shall have the non-exclusive right to take photographs of a Bears Game and use such photographs or derivative products therefrom for marketing purposes or for maintaining a historical record of Soldier Field and the Facility. Such photographs may not be used contrary to this Section or contrary to any restrictions or prohibitions imposed by the NFL or the National League Players Association, or contrary to the protectible rights of other parties. The CPD shall not use such photographs to market other professional sporting events at the Facility without the prior written consent of the Club which will not be unreasonably withheld.

17.12 **Trademark.** The CPD will not use, display or reproduce, in any manner or media, any registered or unregistered trademarks owned by or licensed to the Club, the NFL, NFL Properties, Inc. or any member Club of the NFL, including without limitation the Chicago Bears and Bears marks, the stylized "C" mark, any Club logos that incorporate images of a bear, and any Club helmet or uniform designs, without prior written permission from the Club, or as provided for herein, or as permitted by Law. Notwithstanding the foregoing, the CPD may use the terms "Chicago Bears" and "Bears" in non-stylized formats for informational and communications purposes, provided that such use does not indicate or suggest any affiliation between the CPD and the Club or any sponsorship or approval by the Club of the CPD or its activities. The CPD will not reproduce or display any photographic or other images or the Club's players or coaches, whether individual or group, without prior written permission from the Club and such person, or as provided for herein, or as permitted by Law.

## ARTICLE 18.
## BOX OFFICE, TICKETS, AND ATTENDANCE

18.1 **General.** The Club shall at all times, maintain control and direction of the box office, box office personnel and revenue from ticket sales with respect to Bears Games.

18.2 **Reserved Seating.** All tickets and admission to Bears Games shall be on a reserved seating basis except for those Club Invitees which are entitled to watch the Bears Game from the Field in accordance with NFL rules and regulations.

18.3 **Disabled Patrons.** The Club shall designate and reserve a reasonable number of seats for Disabled Patrons. In no event shall the number of reserved seats for the Disabled Patrons be less than is required by applicable law, statute, rule, regulation or Law. The Club or its designated ticket agent shall make tickets available to Disabled Patrons at the same time that tickets first go on sale to the general public.

18.4 **Ticket Prices and Manner of Sale.** The Club shall determine in its sole discretion the prices for tickets for Bears Games, the manner in which such tickets are to be sold, and the terms and conditions of such ticket; provided the manner in which such tickets are to be sold, and the terms and conditions of such ticket shall be consistent with and not violation of the terms and conditions of this Agreement.

18.5 **Records.** The Club will maintain appropriate records to demonstrate attendance, ticket prices and other related information. Upon the written request of the

CPD, the Club shall provide the CPD with general information regarding attendance, ticket prices and related information.

18.6    **Box Office and Printing Charges.**  The Club shall be responsible for the cost, expense and commissions directly or indirectly relating to the sale of tickets for Bears Games.

18.7    **Maximum Number.**  The maximum number of tickets to be issued for a Bears Games shall not exceed the maximum number of tickets allowed to be issued by Law for a Bears Game at the Facility.

18.8    **Attendance.**  The maximum attendance at a Bears Game including but not limited to Invitees, Club personnel, opposing team personnel, media, Designated Broadcasters shall not exceed the maximum attendance allowed by Law for a Bears Game at the Facility.

### ARTICLE 19.
### ROUTINE MAINTENANCE

19.1    **Scope of Routine Maintenance.**

19.1.1    <u>Definition</u>.  "Routine Maintenance" shall mean the cleaning, maintenance and ordinary repairs relating to the Facility, the North Parking Structure, the Mid-South Parking Structure, the South Parking Lot and the Parklands.

19.1.2    <u>Examples of Routine Maintenance</u>.  The following in a non-exclusive list of examples of Routine Maintenance:

(a)    Regular performance of all preventive or routine maintenance which is stipulated in operating manuals as regular, periodic maintenance procedures;

(b)    Maintenance and ordinary repairs of all plumbing, electrical systems, gas lines, elevators, HVAC and telecommunications;

(c)    Maintenance and ordinary repairs of any roofs;

(d)    Field Maintenance;

(e)    Changing of isolated light bulbs, fuses and circuit breakers as they burn out;

(f)    Touch-up painting;

(g)    Washing the interior and exterior glass of the Facility; and

(h)    Those items set forth on <u>Exhibit B</u>.

19.2    **Allocation of Routine Maintenance Responsibilities.**

19.2.1    <u>CPD Responsibilities</u>.  In general, the CPD shall be obligated to perform and pay the cost of all Routine Maintenance.

06298/00024/189933/20

- 59 -

19.2.2   Club Responsibilities.  Notwithstanding the foregoing, the Club shall be obligated to perform and pay the cost of all Routine Maintenance (a) required or needed as a result of Club Misuse, (b) required or needed for any Club Capital Improvement, or (c) required or needed for the Team Areas, except for Basic Repair and Maintenance for the Bears Administrative Offices, Bears Locker Room and the Bears Storage Area.   The Club shall also be responsible for the performance or payment for the washing of the interior and exterior glass (which faces the Field) of the Suites, and for fifty percent (50%) of all Routine Maintenance associated with the Video Boards and LCDs.

**19.3   Cooperation.**  Prior to the beginning of each Football Season, and once a month during each Football Season (or more often at the request of any party), representatives of CPD and the Club shall meet to discuss Routine Maintenance requirements and prioritize items in need of Routine Maintenance.

**19.4   Failure To Satisfy Routine Maintenance Responsibilities.**

19.4.1   Expedited Arbitration.  In the event that the Club believes in good faith that the CPD has failed, or in the event the CPD believes in good faith that the Club has failed to fulfill its Routine Maintenance responsibilities after written notice from the Club or the CPD, as the case may be, and a reasonable opportunity to cure, then the Club and the CPD, as the case may be, shall have the right to refer any such Routine Maintenance dispute to the Expeditious Arbitrator for Expedited Arbitration.

**19.5   Video Boards.**  The CPD and the Club shall cooperate with each other in good faith to determine the appropriate staffing and maintenance needs in connection with the Routine Maintenance of the Video Boards.   All hiring of personnel or maintenance providers in connection with the Routine Maintenance of the Video Boards shall be by mutual agreement of the CPD and the Club.

**19.6   Consultation.**  The CPD shall consult with the Club in connection with the hiring of Routine Maintenance providers who provide Routine Maintenance in Team Areas.

**ARTICLE 20.**
**CAPITAL IMPROVEMENTS**

**20.1   Scope of Capital Improvements.**

20.1.1   Definitions.   "Capital Improvements" shall mean all work, improvements, modifications, changes, enhancements, additions, replacements, restorations, upgrades, and non-ordinary repairs to be made to the Project or any part or component thereof, which are necessitated by or resulting from deterioration, damage, destruction, casualty, failure and/or obsolescence, ordinary wear and tear, faults or defects in construction or design, or the use of inadequate or inappropriate materials or supplies, or which are reasonably requested by the Club, or which are necessary or desirable in the judgment of the CPD, or which are required by Law.

20.1.2   Examples of Capital Improvements.

06298/00024/189933/20

- 60 -

The following is a non-exclusive list of examples of Capital Improvements:

(a)  Repairs, replacements, restorations, improvements, changes or modifications to the Project which are necessary to ensure the structural soundness of the Project or are necessary to ensure the public safety or health as determined by the CPD or as recommended in any Engineering Report, or which are required by applicable Law (collectively, the "Health and Safety Capital Improvements");

(b)  Repairs, replacements, restorations, improvements, changes and modifications to the Colonnades to maintain their structure soundness or condition as determined by the CPD or as recommended in any Engineering Report (collectively, the "Colonnade Capital Improvements");

(c)  Repairs, replacements, restorations, improvements, changes, or modifications to the Project which are necessary to permit the Project to be used for its intended purposes ("Ordinary Capital Improvements");

(d)  Replacements, restorations and non-ordinary repairs necessitated by wear and tear;

(e)  Replacement of all or significant portions of scoreboard bulbs necessitated by wear and tear, damage from the elements or other cause;

(f)  Repair or replacement of an HVAC compressor;

(g)  Replacement of carpeting which wears out as a result of ordinary wear and tear;

(h)  Repair or replacement of cracked or disintegrated concrete, broken pipes or leaking or damaged roof or section thereof;

(i)  Replacement of a seat which wears out or replacement of a seat standard or the concrete into which the seat is affixed;

(j)  Re-application of protective materials, such as paint or weather-proofing, after original application wears out;

(k)  Changes or improvements required by any insurance carrier to enable the CPD or Club to obtain insurance coverage at commercially reasonable rates provided that in lieu of effectuating such change or improvement, CPD may agree to pay the increased insurance premiums; and

(l)  Modification of, or addition to the Facility to provide new or upgraded features as they become available if such features are incorporated in not less than twenty-five percent (25%) of all other NFL Facilities.

**20.2  Allocation of Capital Improvements Responsibilities.**