# EXHIBIT 1
# Part 3

CH1\ 4014096.1

Dockets.Justia.com

20.2.1    CPD Responsibilities.  In general, the CPD shall be obligated to perform and pay the cost of Capital Improvements; provided however, only to the extent of the Capital Improvement Fund.  The CPD shall use commercially reasonable efforts to ensure that all the Capital Improvements for which it is responsible are performed in a good and workmanlike manner, and are consistent with the design, materials and quality of the original Adaptive Reuse.

20.2.2    Club Responsibilities.  Notwithstanding the foregoing, the Club, at its own cost and expense, shall be obligated to perform and pay the cost of Capital Improvements which are (a) required or needed as a result of Club Misuse or (b) related to Club Capital Improvements.  The Capital Improvement Fund shall not be used to pay for any of the Capital Improvements made by the Club pursuant to this Section 20.2.2. The Club shall use commercially reasonable efforts to ensure that all the Capital Improvements for which it is responsible are performed in a good and workmanlike manner, and are consistent with the design, materials and quality of the original Adaptive Reuse.

**20.3    Capital Improvement Fund.**

20.3.1    Establishment.    Pursuant to the Operation Assistance Agreement, the Authority shall establish for the benefit of the CPD a segregated Capital Improvement Fund ("Capital Improvement Fund") to be used for the funding of Capital Improvements to the Project.

20.3.2    Source of Funding.  The Capital Improvement Fund shall be funded solely from the following sources ("Capital Improvement Fund Sources"):

(a)    The Authority Capital Improvements Subsidy;

(b)    Interest earned from time to time on amounts in the Capital Improvement Fund; and

(c)    All amounts to be deposited into the Capital Improvement Fund as contemplated by the Development Assistance Agreement.

**20.4    Limitation on CPD Financial Obligations.**  Except for funds in the Capital Improvement Fund, the CPD is not obligated to spend, allocate, commit, deposit or segregate any other funds or amounts for or in connection with Capital Improvements. In no event is the CPD required or obligated to spend, allocate, commit, deposit or segregate any of its general revenue or its assets for or in connection with the Capital Improvements.  Notwithstanding any other provision contained herein, the CPD is not obligated to perform or pay for any Capital Improvements except to the extent that the CPD receives funds from the Capital Improvement Fund.  The CPD agrees to diligently enforce the obligations of the Authority (i) to fund the Authority Capital Improvements Subsidy and (ii) to pay such funds to the CPD in accordance with the Operation Assistance Agreement, and in the event that the Club believes in good faith that the CPD is failing to do so, then the Club may submit the matter to Arbitration; provided however, the Club's only remedy against the CPD in Arbitration or otherwise with respect thereto shall be equitable remedies including but not limited to the specific

performance of the CPD's enforcement obligations. In no event shall the Club have the right or remedy to receive or recover monetary damages from the CPD as a result of or relating to the CPD's failure to diligently enforce the obligations of the Authority to fund the Capital Improvements Subsidy or to pay such funds to the CPD in accordance with the Operation Assistance Agreement.

**20.5  Capital Improvement Program and Prioritizing Capital Improvements.**

20.5.1    Priority.  Subject to Section 20.4, the CPD shall have the right and obligation to make Capital Improvements to the Project in the following order of priority:  First priority shall be the Health and Safety Capital Improvement, the second priority shall be Colonnade Capital Improvements, the third priority shall be Ordinary Capital Improvements, and the fourth priority shall be Other Capital Improvements.

20.5.2    Capital Improvements Program.  As soon as practical after Substantial Completion of the Stadium and North Garage and prior to the beginning of each Football Season, and once a month during each Football Season (or more or less often as the parties may agree), representatives of the CPD and the Club shall meet to discuss, and shall cooperate with each other in good faith to jointly approve, create, develop and modify the Capital Improvement Program and all modifications thereto. In approving, creating, developing and modifying the Capital Improvements Program, each party shall consider the reasonable Capital Improvement requests of the other party. The approval of the Capital Improvements Program and any modifications thereto shall not be unreasonably withheld.  Consistent with (i) the anticipated future Capital Improvement needs of the Project (including, but not limited to the 10 Year Upgrades), (ii) the availability of funds in the Capital Improvements Fund and (iii) the priorities of Capital Improvements set forth in Section 20.5.1, the Capital Improvements Program and the modifications thereto, shall include, without limitation, the Capital Improvements to the Project and the components thereof (x) which are necessitated by or resulting from deterioration, damage, destruction, casualty, failure and/or obsolescence, ordinary wear and tear, faults or defects in construction or design or the use of inadequate or inappropriate materials or supplies, (y) which are reasonably requested by the CPD or the Club and (z) which are required by Law. Notwithstanding the foregoing, the Capital Improvements Program and the implementation of the various components thereof shall be subject to the terms of Section 20.12.  The Club shall be entitled to financial information with respect to the Capital Improvement Fund such as balance, withdrawals and deposits of funds.

20.5.3    Guidelines.  In creating, developing and modifying the Capital Improvement Program, the CPD and the Club shall consider the following guidelines:

1.    The parties anticipate that approximately 72% of the Capital Improvement Fund shall be allocated to Capital Improvements to be made to the Facility.

2.    The parties anticipate that approximately 16% of the Capital Improvement Fund shall be allocated to Capital Improvements to

be made to the North Parking Structure, the Mid-South Parking Structure and the South Parking Lot.

3.    The parties anticipate that approximately 12% of the Capital Improvement Fund shall be allocated to Capital Improvements to be made to the remainder of the Project including the Parklands.

4.    It is the intention of the parties that commencing in the 2011 Football Season and each ten (10) year anniversary thereof, the CPD will make Capital Improvements to the Facility as reasonably required to make the Facility among the top twenty-five percent (25%) of all NFL facilities ("10 Year Upgrades").

5.    It is the intention of the parties that not all of the funds available for Capital Improvements in a given year will be spent in that year as funds will need to be accumulated for large Capital Improvement projects such as the 10 Year Upgrades.

The parties acknowledge and agree that the foregoing are only guidelines and that the Capital Improvement Program and the allocation of Capital Improvement Funds may differ from these guidelines. The parties also acknowledge that the Capital Improvement Program will be subject to the current and future availability of funds in the Capital Improvement Fund.

**20.6    Limitations on Capital Improvements.** Except for reasonable changes to accommodate soccer, the CPD agrees not to construct or permit to be constructed any additional facilities at the Facility or to make any changes or alterations to the Facility that would interfere in a material respect with the use of the Facility by the Club, without the Club's prior consent, which shall not be unreasonably withheld. Without limiting the foregoing, each and any of the following are deemed to interfere in a material respect with the Club's use of the Facility: (a) reduction in number of Facility seats, Club Seats or Suites; (b) a material reduction in square footage devoted to the Club Lounge Area, concession areas or restrooms; (c) change in the lines-of-sight within the Facility; and (d) a material reduction in square footage of or a material alteration of the dimensions of, or a material impediment in access to, the Facility, the concourses, or lounges or parking structures or lots. All future improvements or construction undertaken by the CPD shall be scheduled, staged and undertaken in a manner to create the least amount of interference with the Club's use of the Facility and the Club shall be consulted in advance regarding the same.

**20.7    Untenantable During Capital Improvements.**

20.7.1    If the Club is unable to play a Bears Game at the Facility as a result of the construction or making of any Capital Improvement, then (i) the Club shall make, at no cost or liability to the CPD, arrangements for an alternative site for such Bears Game, and (ii) the Club shall be relieved from its payment obligations hereunder with respect to such Bears Game unless either (y) the Club consented to the timing of the construction of such Capital Improvement, or (z) or the Club caused delays in the completion of such Capital Improvement and such delays resulted in the Club being unable to play the Bears Game at the Facility.

06298/00024/189933/20

- 64 -

20.7.2    If a substantial portion of the Facility is untenable as a result of the construction or making of a Capital Improvement but the Club is still able to play a Bears Game at the Facility, then (i) the Club shall play the Bears Game at the Facility, and (ii) the Club shall be equitably relieved of a portion of its payment obligation with respect to such Bears Game to the extent of such untenanability unless (y) the Club consented to the timing of the construction of the Capital Improvement, or (z) the Club caused delays in the completion of such Capital Improvements and such delays resulted in a substantial portion of the Facility being untenable for a Bears Game.

20.7.3    The CPD shall time the construction and the making of Capital Improvements so as to minimize any disruption or interference with the Club's use of the Facility for Bears Games.

**20.8    Future Team Areas.**  The Club may propose in the future, at its cost and expense, to add to and operate at the Facility a Bears Hall of Fame, Bears Retail Shop, Bears Sports Bar/Restaurant and other retail/commercial features, all of which, if added, shall be "Team Areas"; provided that any such Bears Sports Bar/Restaurant or other retail/commercial features shall be subject to approval of the CPD which may be withheld if the CPD determines, after consultation with the Club, that such Bears Sports Bar/Restaurant or other retail/commercial features will adversely affect the operation of the Club Lounge or other aspects of the Facility, and provided further, that any such other commercial/retail feature shall be subject to the approval of the CPD which may be withheld if the CPD determines, after consultation with the Club, that the proposed feature is inappropriate for a public facility or would conflict or interfere with other uses of the Facility.

**20.9    Club Capital Improvements.**

20.9.1    <u>Club Right</u>.    Subject to Section 20.9, the Club at its own expense may make Club Capital Improvements upon the satisfaction and completion of the following conditions:

(a)    The Club has presented plans and specifications for the Club Capital Improvements and such other information related thereto as the CPD may reasonably request;

(b)    The CPD has consented in writing to such plans and specifications for the proposed Club Capital Improvements, which consent will not be unreasonably withheld;

(c)    The Club has provided to CPD with reasonable assurances and protections that the Club Capital Improvements will be performed in a good and workmanlike manner and in compliance with all applicable Laws;

(d)    The Club has provided to the CPD copies of all necessary permits and approvals necessary to make the proposed Club Capital Improvements;

(e)    The Club and the CPD have agreed on a method by which the CPD may monitor the progress of the proposed Club Capital Improvements;

(f)    The Club has provided the CPD with evidence of appropriate insurance or bonding with respect to the making of the Club Capital Improvements; and

(g)    The Club has provided the CPD with evidence of its ability to pay for the Club Capital Improvements.

20.9.2    <u>No Reimbursement</u>.    The Club shall not be entitled to reimbursement from the CPD for any costs or expenses associated with Club Capital Improvements.

20.9.3    <u>Ownership</u>.    All Club Capital Improvements shall be deemed part of and incorporated into the Facility and shall be deemed for all purposes completely owned by the CPD.

20.9.4    <u>Removal</u>.    The Club shall have no right to remove any Club Capital Improvements but shall have the obligation to remove any Club Capital Improvements at the end of the Term if reasonably requested by the CPD at the time such Club Capital Improvement was approved by the CPD pursuant to Section 20.12.

20.9.5    <u>No Liens</u>.    The Club shall ensure that all Club Capital Improvements are free and clear of all Liens.    Upon completion of the Club Capital Improvements the Club shall provide the CPD with sworn contractor statements, lien waivers and as-built drawings.

**20.10 Safety Inspections.**    In its reasonable judgment, the CPD may obtain structural safety reports and other similar reports as to the structural safety and the condition of the Facility for holding major sporting events.    If such reports indicate that Capital Improvements are needed, the parties agree that such Capital Improvements shall be the highest priority.    Any fees for such structural reports and similar reports shall be paid from the Capital Improvement Fund.

**20.11 Failure To Satisfy Capital Improvement Responsibilities.**

20.11.1    <u>Expedited Arbitration</u>.    In the event that the Club believes in good faith that the CPD has failed, or in the event the CPD believes in good faith that the Club has failed to fulfill its Capital Improvements responsibilities after written notice from the Club or the CPD, as the case may be, and a reasonable opportunity to cure, then the Club and the CPD, as the case may be, shall have the right to refer any such Capital Improvements dispute to the Expeditious Arbitrator for Expedited Arbitration.

**20.12 Approval of Capital Improvements.**

20.12.1   Health and Safety Capital Improvements.  The CPD in its sole discretion shall have the right of final approval with respect to Health and Safety Capital Improvements and the implementation thereof.

20.12.2   Colonnade Capital Improvements.   The CPD in its sole discretion shall have the right of final approval with respect to Colonnade Improvements and the implementation thereof.

20.12.3   Ordinary Capital Improvements.   After consultation with the Club, the CPD has the right of final approval with respect to Ordinary Capital Improvements and the implementation thereof, subject to the prior consent of the Club which will not be unreasonably withheld.

20.12.4   Other Capital Improvements.  After consultation with the Club, the CPD has the right of final approval with respect to Other Capital Improvements and the implementation thereof, subject to the prior consent of the Club which will not be unreasonably withheld.

20.12.5   Club Capital Improvements.  After consultation with the CPD, the Club has the right to final approval of the Club Capital Improvements, subject to the prior consent of the CPD which will not be unreasonably withheld.

## ARTICLE 21.
## OPERATING EXPENSES

**21.1   Scope of Operating Expenses.**

21.1.1   Definition.  "Operating Expenses" shall mean all operating costs and expenses associated with the Facility.

21.1.2   Examples.  The following is a non-exclusive list of examples of Operating Expenses:

(a)   All heat, water, electrical and all other utility costs associated with the use and operation of the Facility.

**21.2   Allocation of Operational Expense Responsibility.**

21.2.1   CPD Responsibilities.  In general, the CPD shall be responsible for the performance and payment of Operating Expenses.

21.2.2   Club Responsibilities.  Notwithstanding the foregoing, the Club shall be responsible for the performance and payment of all direct Operating Expenses associated with the following: (a) Club-Related Events (including but not limited to NFL Days), (b) Sponsor-Related Events, (c) Weekday Practices, (d) Team Areas except for all reasonable costs and expenses relating to providing heat, air conditioning, water and electrical to the non-revenue generating Team Areas, and (e) the use of the Suites by Bear Suite Licensees and their invitees on the dates for which no Events are held at the

Facility. Notwithstanding any other provision contained herein, the Club shall also be responsible for the performance and payment of fifty percent (50%) of the Operating Expenses and staffing associated with the Video Boards exclusive of the Operating Expenses incurred at Public Sector Events in connection with the use of the Video Boards.

## ARTICLE 22.
## GAME DAY COSTS, EXPENSES AND RESPONSIBILITY

**22.1    Scope of Game Day Expenses.**

22.1.1    Definition. "Game Day Expenses" shall mean all direct costs and expenses associated with operating the Facility on Game Days.

22.1.2    Examples. The following is a non-exclusive list of examples of Game Day Expenses:

(a) ushers, ticket will call, team security (locker rooms and Field), extra staffing for premium seating areas and club lounge area above levels provided by concessionaires, medical staffing, half-time entertainment, anthem singers, press box lunches, staff for fan give-aways, telephone services, information booth, chain gang press box runners, bench heating and cooling systems, marketing pre-game tents, supervisor premiums, catering press box and video board operations; and

(b) All items set forth on Exhibit C.

**22.2    Allocation of Game Day Responsibilities.**

22.2.1    CPD Responsibilities. In general, the CPD shall be responsible for the performance and payment of Game Day Expenses. As between the Club and the CPD, the CPD shall be responsible for Game Day Expenses relating to the medical needs of the general public and for one ambulance for Game Day needs.

22.2.2    Club Responsibilities. Notwithstanding the foregoing, the Club will be responsible for the payment and performance of the Game Day Expenses as set forth on Exhibit C. Notwithstanding any other provision contained herein, the Club shall also be responsible for the performance and payment of fifty percent (50%) of the Game Day Expenses associated with the staffing and maintenance of the Video Boards.

**22.3    Game Day Personnel.**

22.3.1    Personnel Hiring. All hiring of Game Day personnel shall be the prerogative of CPD after consultation with the Club, including but not limited to the following: manager selections, staffing levels, and Game Day operational controls. Notwithstanding the foregoing, all hiring of Game Day personnel paid for by the Club shall be the prerogative of the Club after consultation with the CPD.

22.4  **Video Board Operators.**  The CPD and the Club shall cooperate with each other in good faith to determine appropriate staffing requirements in connection with the operation of the Video Boards on Game Days and non-Game Days when the Club is entitled to use the Video Boards.  All hiring of personnel in connection with the operation of Video Boards on Games Days and on non-Game Days when the Club is entitled to use the Video Boards (including but not limited to Video Board operators, production personnel, camera operators and technicians) shall be by mutual agreement of the CPD and the Club.

## ARTICLE 23.
## FIELD MAINTENANCE, REPAIR AND REPLACEMENT

23.1  **Scope of Field Maintenance.**

23.1.1  <u>Definition</u>.  "Field Maintenance" shall mean the maintenance, repair and replacement of the Field.

23.2  **CPD Responsibilities.**  The CPD shall be responsible for the cost and performance of Field Maintenance in accordance with the reasonable directions given by the Club consistent with the repair, maintenance and replacement of playing fields in other NFL facilities similarly situated as to use, wear and weather.  Consistent with the foregoing, the Club shall have the right from time to time to specify the type and variety of Natural Turf, reasonably competitive in price, used for the playing field and the Natural Turf supplier and to specify the party or parties to be engaged by the CPD for the installation and removal of Natural Turf reasonably competitive in price.

23.3  **Club Rights.**  At any time the Club has the right (but not the obligation) to perform or cause to be performed Field Maintenance, provided that all costs and expenses incurred in connection therewith shall be borne by the Club with no right of reimbursement from the CPD.

23.4  **Natural Turf Suppliers.**  As part of its obligations hereunder, the CPD shall annually make arrangements with one or more Natural Turf suppliers specified by the Club, for such supplier(s) to have available replacement sod on a stand-by basis for Natural Turf replacement as may be reasonably anticipated for the current Football Season.

23.5  **Replacement.**

23.5.1  <u>General</u>.  The CPD shall replace the Natural Turf when and to the extent that the CPD and the Club mutually agree that such replacement is necessary; provided that in the event that the CPD and the Club are unable to reach an agreement as to when or to the extent that such replacement is necessary, then the CPD shall replace the Natural Turf as reasonably requested by the Club.

23.5.2  <u>Timing</u>.  If obligated to replace the Natural Turf, the CPD shall do so in a prompt and timely manner.

**23.6    Cooperation.** Prior to the beginning of each Football Season, and once a month during each Football Season (or more often at the request of any party), representatives of CPD and the Club shall meet to discuss Field Maintenance requirements and prioritize items in need of Field Maintenance.

**23.7    Expedited Arbitration.**    Each party shall be entitled to Expedited Arbitration with respect to any dispute arising under this Article 23.

**23.8    Artificial Turf.** The CPD may not change the Field from Natural Turf to Artificial Turf without the prior written consent of the Club which consent may be withheld in its reasonable discretion.

**23.9    Payment Obligations.**    The CPD acknowledges and agrees that its obligations with respect to Field Maintenance are in no way limited to the amount of the Authority Capital Improvements Subsidy or the Capital Improvement Fund.

## ARTICLE 24.
## INTENTIONALLY OMITTED

## ARTICLE 25.
## SECURITY AND CROWD CONTROL

**25.1    Game Day.** Except for locker rooms, Team Areas and the Field, the CPD shall be responsible for the performance and payment of security and crowd control on Game Days.  With respect to locker room, Team Areas and the Field, the Club shall be responsible for the performance and payment of security and crowd control on Game Days.

**25.2    Club-Related-Events and Sponsor-Related Events.**  The Club shall be responsible for performance and payment of security and crowd control on Club-Related Events, Sponsor-Related Events and Weekday Practices; provided at the request of the CPD, the Club shall use the security and crowd control personnel used by the CPD at the Facility and the Club shall reimburse the CPD for any additional cost or expense incurred by the CPD as a result thereof.

**25.3    Bears Suite Licenses.**    The Club shall be responsible for the performance or the payment of security which the CPD in its reasonable judgment, after due consideration of the circumstances, deems appropriate in connection with the Bears Suite Licensee's use and occupancy of Suites on non-Game Days and other days on which no Public-Sector Events are occurring; provided at the request of the CPD, the Club shall use the security and crowd control personnel used by the CPD at the Facility and the Club shall reimburse the CPD for any additional cost or expense incurred by the CPD as a result thereof.

## ARTICLE 26.
## CONCESSIONAIRES

**26.1    General.** The Club and the CPD shall cooperate with each other in the negotiation with and selection of the Concessionaires.  The Club and the CPD shall collectively contract with each Concessionaire.  The Concessionaires shall provide

Concessions for all Events held at the Facility and all other Concession opportunities which exist at the Facility.

**26.2  Terms.**

26.2.1    <u>Financial Arrangements</u>.  The financial and other arrangements applicable to each Concessionaire shall be mutually agreeable to the CPD and the Club.

26.2.2    <u>Insurance and Other Matters</u>.  Unless otherwise mutually agreed to by the Club and the CPD, each Concessionaire contract or agreement shall provide that the Concessionaire (a) obtain all appropriate licenses and approvals for the conduct of its operations, (b) equip, furnish, clean and maintain its Concession Area in an appropriate manner and required by applicable Law, (c) indemnify the CPD, PBC and the Club for its operations, and (d) obtain adequate insurance policies naming the Club, the CPD and the PBC as additional insured and providing coverage for personal injuries and physical damage to the Facility as a result of its operations.

**26.3  Supervision.**  The Club shall have the right and responsibility to supervise and control the Concessionaires on Game Days and in the operation for the Bears Retail Shop, Bears Hall of Fame and Bears Sports Bar/Restaurant, if any.

**26.4  MBE/WBE Program.**  In selecting and contracting with Concessionaires, CPD's MBE/WBE Program shall be satisfied.

**26.5  Suites.**  The Club and the CPD acknowledge and agree that from time to time there may be different Concessionaires for the Suites and/or the Club Lounge than for the rest of the Facility.

**ARTICLE 27.**
**INSURANCE**

**27.1  CPD Insurance Requirements**  The CPD shall purchase and maintain at its own cost and expense, commencing as of the date of Substantial Completion of the Stadium and North Garage and continuing through the end of the Term, the following insurance coverage:

27.1.1    "All Risk" or "Highly Protected Risk" property insurance on the Facility, including coverage for sewer backup, pollution cleanup, utility interruption, flood and earthquake, and time element coverage of business interruption, loss of rents, and extra expense.  Coverage shall be written on a full replacement cost, with deductible to be determined by the CPD.  For purposes of valuation, the CPD shall have a cost appraisal completed for the property seven (7) years after the commencement date of coverage and every seven (7) years thereafter.

27.1.2    Boiler and Machinery coverage, on a repair and replacement cost basis, in an amount equal to the full replacement cost.

27.1.3   Workers Compensation insurance, including statutory Workers Compensation coverage for the State of Illinois, and Employer's Liability coverage in the amount of $1,000,000 each accident or disease.   The CPD may elect, at its own discretion, to self-insure its Workers Compensation exposures.

27.1.4   Automobile Liability insurance in the amount of $500,000 per occurrence bodily injury and property damage, for all owned, non-owned and hired vehicles.  The CPD may elect, at its own discretion, to self-insure its Automobile Liability exposures.

27.1.5   Employee Dishonesty insurance in the amount of $1,000,000. The CPD may elect, at its own discretion, to self-insure its Employee Dishonesty exposures.

27.1.6   General Liability insurance, Broad Form, including premises, operations, products, completed operations, and contractual liability coverage, in the amount of $1,000,000 per occurrence/aggregate for bodily injury, personal injury and property damage, and including CPD's contractual liability for indemnification under this agreement.  The CPD may elect, at its own discretion, to self-insure its General Liability exposures.

27.1.7   Liquor Liability and Contingent Liquor Liability insurance in the amount of $1,000,000 per occurrence and $5,000,000 aggregate.  The CPD may elect, at its own discretion, to self-insure its Liquor Liability exposures.

27.1.8   Umbrella Liability insurance coverage in the amount of $25,000,000 per occurrence/ aggregate for bodily injury, personal injury and property damage and providing excess limits over the primary general liability, automobile liability, liquor liability, and employer's liability policies or self-insured retentions.

27.1.9   Garage Keepers Legal Liability insurance coverage in the amount of $1,000,000 per occurrence and $100,000,000 aggregate, with deductible to be determined by the CPD.  The CPD, at its own discretion, may elect to self-insure its Garage Keepers Legal Liability exposure.

27.1.10   Pollution Liability insurance coverage in an amount not to exceed $25,000,000 aggregate.  The deductible shall be at the discretion of the CPD.

27.1.11   Additional Insureds.  All liability policies shall name the Club and ISFA as additional insureds.

### 27.2   The Club Insurance Requirements

27.2.1   The Club shall procure and maintain at its own costs and expense commencing as of the date of Substantial Completion of the Stadium and North Garage and continuing through the end of the Term, the following insurance coverage:

06298/00024/189933/20

27.2.2    "All Risk" or "Highly Protected Risk" property insurance against damage or destruction to Club's equipment and other personal property, including the Team Areas and Club Capital Improvements, on an "all risk" basis at full replacement cost of the property and include coverage for business interruption, flood, sewer backup, and earthquake.

27.2.3    General Liability insurance, Broad Form, including premises, operations, products, completed operations, and contractual liability coverage, in the amount of $1,000,000 per occurrence/aggregate for bodily injury, personal injury and property damage, and including the Club's contractual liability for indemnification under this Agreement.

27.2.4    Workers Compensation insurance, including statutory Workers Compensation coverage for the State of Illinois, and Employer's Liability coverage in the amount of $1,000,000 each accident or disease.

27.2.5    Automobile Liability insurance in the amount of $1,000,000 per occurrence bodily injury and property damage, for all owned, non-owned and hired vehicles.

27.2.6    Umbrella (Excess) Liability insurance in the amount of $25,000,000 per occurrence/ aggregate for bodily injury, personal injury and property damage and providing excess limits over the primary general liability, automobile liability, liquor liability, and employer's liability policies.

27.2.7    Liquor Liability and Contingent Liquor Liability insurance in the amount of $1,000,000 per occurrence with a $5,000,000 aggregate.

27.2.8    Employee Dishonesty coverage shall be based on annual receipts and no less than $1,000,000 coverage shall apply.  The CPD and the Club shall mutually determine deductible limits.

27.2.9    Additional Insureds.  All liability policies shall name the CPD and ISFA as additional insureds.

### 27.3    General Insurance Requirements.

27.3.1    All policies of insurance required hereunder shall be written by carriers which possess an A- policy holders rating or better and a minimum Class VII financial size category as listed at the time of issuance by AM Best Insurance Reports (the aforesaid rating classifications to be adjusted if and to the extent that A.M. Best adjusts its rating categories).

27.3.2    All policies shall provide that they may not be canceled, non-renewed or have coverage or limits reduced unless 90 days written notice of such cancellation, non-renewal or reduction has been provided to the named and additional insureds.

06298/00024/189933/20

27.3.3    <u>Certificates</u>.

(a)    The Club shall furnish evidence of insurance to the CPD in the form of Acord Certificates of Insurance prior to Substantial Completion of the Stadium and North Garage.  Such Certificates of Insurance shall evidence the specific insurance requirements set forth herein.

(b)    The CPD shall furnish evidence of insurance to the Club in the form of Acord Certificates of Insurance prior to Substantial Completion of the Stadium and North Garage.  Such Certificates of Insurance shall evidence the specific insurance requirements set forth herein.

27.3.4    The Club and the CPD shall jointly review applicable coverages every five (5) years, and will mutually agree upon appropriate coverages, limits and deductibles.  All coverages, limits and deductibles shall be at commercially reasonable levels.

**27.4    Waiver of Subrogation.**  The Club and CPD agree that all insurance against loss or damage to property and business interruption or rent loss shall be endorsed to provide that any release from liability or waiver of claim for, recovery from the other party entered into in writing by the insured thereunder prior to any loss or damage shall not affect the validity of said policy or the right of the insured to recover thereunder and providing further that the insurer waives all rights of subrogation which such insurer might have against the other party.  Without limiting any release or waiver of liability or recovery contained in any other section of this lease, but rather in confirmation and furtherance thereof, each of the parties hereto waives all claims for recovery from the other party for any loss or damage to any of its property or damages as a result of business interruption or rent loss insured under valid and collectible insurance policies to the extent of any recovery collectible under such insurance policies.

**ARTICLE 28.**
**<u>LIENS</u>**

**28.1    Club.**  Neither the Club nor the Subsidiary shall create or cause to exist any Lien on the Facility, Capital Improvements or the Club Capital Improvements. Except as provided for in Section 28.3, without the prior written consent of the CPD, neither the Club nor the Subsidiary shall create or permit to exist any Lien on their rights, licenses and interests granted hereunder, including but not limited to the Club Use Rights, PSL Rights, Signage Rights, Naming Rights and Entitlement Rights, provided, however, the Club and Subsidiary may create and permit to exist a Lien (i) on any revenue and income stream that they derive from the Facility including, but not limited to the revenue and income stream generated by the Marketing Rights, (ii) the Club's interest in any Suite License, and (iii) the visiting NFL team's share of Club Seat Premiums.

**28.2    CPD.**  The CPD shall not create or cause to exist any Lien on the Facility or the Capital Improvements which will disturb or interfere with the Club's rights or

interest under this Agreement or which would not be subordinate to the Club's rights and interests under this Agreement. The CPD will not allow a foreclosure or similar proceeding to occur on such Lien which will disturb or interfere with the Club's rights or interests under this Agreement.

**28.3    Permitted Liens.** The Club may grant a Lien on all but not less than all of its rights, title and interests hereunder to the NFL or any third party lender ("Lienholder"); provided however, such Lien shall not be enforceable against the CPD or the Project nor shall the Lienholder have any rights or remedies hereunder until and unless (a) the Lienholder satisfies the conditions set in clauses (i) through (v) of section 38.4.3(a) (as though the Lienholder was an Acquiror) and (b) the Lienholder cures or causes to be cured any and all Bears Defaults.

## ARTICLE 29.
## BEARS DEFAULT

**29.1    Definition of "Bears Terminating Default".** The occurrence of any one or more of the following events constitutes a "Bears Terminating Default" under this Agreement:

**29.1.1**    Failure by the Club or Subsidiary to pay when due the total Permit Fees or any other financial Obligations totaling in excess of $100,000 within five (5) days after written notice thereof from CPD to the Club;

**29.1.2**    An Improper Relocation;

**29.1.3**    The Club or the Subsidiary admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver of the Club or the Subsidiary or for the major part of their property;

**29.1.4**    A trustee or receiver is appointed for the Club or the Subsidiary or for the major part of their property and is not discharged within one hundred eighty (180) days after such appointment; or

**29.1.5**    Bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings for relief under any bankruptcy law, or similar law for the relief of debtors, are instituted by or against the Club or the Subsidiary and, if instituted against Club or Subsidiary, are allowed against it or are consented to by it or are not dismissed within sixty (60) days after such institution.

**29.2    Definition of Bears Non-Terminating Default.** The occurrence of any one or more of the following events (which is not a Bears Terminating Default) shall constitute a "Bears Non-Terminating Default" under this Agreement:

**29.2.1**    Material failure by Club or Subsidiary to observe or perform any other covenant, agreement, condition or provision of this Agreement if such failure shall continue for thirty (30) days after notice thereof from the CPD to the Club; provided,

however, that Club shall not be in default with respect to matters which cannot reasonably be cured within thirty (30) days so long as within thirty (30) days after such notice Club commences such cure and diligently proceeds to complete the same at all times thereafter;

29.2.2    Material breach by the Club or the Subsidiary of any representation or warranty of this Agreement if such breach shall continue for thirty (30) days after notice thereof from the CPD to the Club; provided, however that the Club shall not be in default with respect to such breach which cannot reasonably be cured within thirty (30) days so long as within thirty (30) days after such notice, the Club commences such cure and diligently proceeds to complete the same at all times thereafter.

**29.3    Remedies of CPD.**    Subject to the right of either party to demand Arbitration pursuant to Article 33 hereof, if a Bears Default occurs, the CPD shall have the following rights and remedies which shall be distinct, separate and, to the extent not mutually exclusive, cumulative, and shall be in addition to and shall not operate to exclude or deprive the CPD of any other right or remedy allowed it by law or equity:

29.3.1    Advance Sums    CPD may advance any sums to be paid to third parties by the Club or the Subsidiary or otherwise remedy the Club's or the Subsidiary's Default and shall be entitled to be reimbursed by the Club and the Subsidiary for the CPD's costs and expense on account thereof:

29.3.2    Termination.    Upon and only upon a Bears Terminating Default, the CPD may terminate this Agreement ("CPD Termination Remedy") effective as of the end of the third Football Season following the occurrence of the Bears Terminating Default by providing the Club with prompt written notice of its intention to do so.  The CPD and the Club shall continue to perform and satisfy all of their duties and obligations under this Agreement until the end of such third Football Season.

29.3.3    Specific Performance.    CPD may enforce the provisions of this Agreement and may enforce and protect the rights of the CPD hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein or other equitable or injunctive remedy; without the need of posting bond or proving damages; and

29.3.4    Monetary Damages.    Without terminating this Agreement, the CPD may see monetary damages from the Club or Subsidiary.

29.3.5    Liquidated Damages – Improper Relocation.    In the event of an Improper Relocation, the CPD shall be entitled to collect from the Club, as liquidated damages, an amount equal to one-hundred fifty percent (150%) of the aggregate of all Financial obligations, without any present value adjustment, and for purposes of this calculation, the CPI adjustment shall be projected for the balance of the Term on the basis of the historical CPI change from January 1, 2003 to a date the Bears Game was

06298/00024/189933/20

first Improperly Relocated. The Club shall pay the liquidated damages provided for in this Section 29.3.5 within thirty (30) days of such Improper Relocation.

29.3.6    Liquidated Damages – Termination. In the event that the Club improperly terminates this Agreement or in the event that the CPD exercises the CPD Termination Remedy and terminates this Agreement, and such termination is not deemed an Improper Relocation, then the CPD shall be entitled to collect from the Club, as liquidated damages, an amount equal to one hundred percent (100%) of the aggregate of all Financial Obligations, without any present value adjust, and for purposes of this calculation the CPI adjustment shall be projected for the balance of the Term on the basis of the historical CPI change from January 1, 2003 to the date of the termination of this Agreement. The liquidated damages set forth in this Section shall not be subject to off set or reduction except to the extent of any net proceeds that the CPD receives as a result of another professional football team playing at the Facility during the Football Season. The Club shall pay the liquidated damages provided for in this Section 29.3.6 within thirty (30) days of such termination of this Agreement.

29.3.7    Self Help. In the event that (i) the CPD, in good faith believes (a) that the Club is materially failing to satisfy its obligations hereunder, and (b) that such failure will (w) endanger the public safety or health, (x) result in the Club's inability to hold a Bears Game at the Facility, (y) result in the Club's inability to use the Field for a Bears Game, or (z) result in the inability of the Club, a Major Corporate Sponsor or a Public Sector Event Sponsor to use the Facility (or any portion thereof) for, respectively a Club-Related Event, Sponsor-Related Event or a Public Sector Event; (ii) the CPD provides the Club with timely written notice of such alleged failure; and (iii) the Club does not promptly take reasonable actions to correct or cure such failure, then the CPD shall have the right to correct or cure such failure and seek reimbursement from the Club in arbitration for its reasonable costs and expenses incurred in correcting or curing such failure. The CPD shall only be entitled to such reimbursement from the Club if the Panel or Expeditious Arbitrator, as applicable, determines: (i) (a) that the Club did materially fail to satisfy its obligations hereunder, and (b) that such failure (w) would have or did endanger the public safety or health, (x) would have resulted in the Club's inability to hold a Bears Game at the Facility, or (y) would have resulted in the Club's inability to use the Field for a Bears Game, or (z) would have resulted in the inability of the Club, a Major Corporate Sponsor or a Public Sector Event Sponsor to use the Facility (or any portion thereof) for, respectively, a Club-Related Event, Sponsor-Related Event or a Public Sector Event; (ii) the CPD provided the Club with written notice of such alleged failure; and (iii) the Club did not promptly take reasonable actions to correct or cure failure.

29.4    **Surrender of Possession by the Club.** If the Club improperly terminates this Agreement or if CPD exercises the CPD Termination Remedy, and terminates this Agreement, the Club and the Subsidiary shall surrender possession and vacate the Facility on the effective date of termination and deliver possession thereof to the CPD, and CPD may then or at any time thereafter re-enter and take complete and peaceful possession of the Facility with or without process of law, full and complete license being hereby granted to the CPD, and CPD may remove all occupants and property therefrom

using such force as may be necessary, without being deemed in any manner guilty of trespass, eviction or forcible entry and detained and without relinquishing CPD's right to the satisfaction and payment of the Financial Obligations or any other right given to the CPD hereunder or by operation of law.

**29.5   Rights to Property After Default or Otherwise.**   All property removed from the Facility by CPD pursuant to any of its remedial rights hereunder or of law may be handled, removed or stored by the CPD at the cost and expense of the Club, and the CPD shall in no event be responsible for the value, preservation or safekeeping thereof. Club shall reimburse CPD for all costs and expenses incurred by CPD in such removal and storage charges against such property so long as the same shall be in CPD's possession or under CPD or under CPD's control.   All property not removed from the Facility or retaken from storage by Club within thirty (30) days after the end of the Term, however terminated, shall be conclusively deemed to have been conveyed by Club to CPD as by bill of sale without further payment or credit by CPD to Club and the Subsidiary.   At the end of the Term, whether by expiration or earlier termination, (i) the Club and the Subsidiary shall not have the right to remove from the Facility any property of the Club other than its movable personal property, and (ii) upon and only upon the written request of the CPD, the Club and the Subsidiary shall, at their cost and expense, promptly remove any Club Capital Improvements in a reasonable and workmanlike manner, and (iii) all property other than Club's and the Subsidiary's movable personal property and the Club Capital Improvements which the CPD requested be removed shall belong to CPD at the end of the Term.

**29.6   Tolling of Cure Period.**   Notwithstanding any other provision contained herein, in the event that (i) the Club shall in good faith dispute the CPD's assertion that an action or non-action by the Club would, if not cured or corrected within the applicable cure period would constitute a Bears Default hereunder; (ii) the Club notifies the CPD that the Club disputes that CPD's assertion within ten (10) days of the date that the Club receives notice of the CPD's assertion; and (iii) the Club submits such dispute to Arbitration no later than the later of (y) twenty (20) days from the date that the Club receives notice of the CPD's assertion, or (z) a date as mutually agreed upon by the Club and the CPD in writing, then the Club's obligation to remedy or cure such action or non-action shall be suspended and CPD shall not be entitled to exercise any remedy herein provided on account thereof, pending the final decision of the Panel or Expeditious Arbitrator, as applicable, except that nothing herein shall be deemed to limit or restrict the CPD's cure rights or other rights or remedies in the event that the public health or safety is at risk or as required by Law.   If the final decision of the Panel or the Expeditious Arbitrator is that such action or non-action by Club would, if not cured or corrected, constitute a Bears Default hereunder, then the applicable cure period shall begin to run as of the date on which the Club receives notice of the final decision of such Panel or Expeditious Arbitrator, as applicable.

**29.7   Post Performance Challenge.**   Notwithstanding any other provision contained herein, in the event (i) that the Club in good faith objects to the CPD's assertion that an action or non-action by the Club, if not cured or corrected within the applicable cure period, would constitute a Bears Default hereunder, and (ii) the Club provides the CPD with prior written notice of its objection, then the Club may take such

action or not take such non-action as applicable without prejudicing its right to challenge and submit such dispute to Arbitration.

**29.8   Notice of Default.**  The Club shall promptly inform the CPD and the NFL of any occurrence which constitutes a Bears Default or which, with the giving of notice or the lapse of time, or both, would constitute such a Bears Default and of any other occurrence that materially affects the Club's or the Subsidiary's ability to perform and satisfy their obligations and duties hereunder.

## ARTICLE 30.
## CPD DEFAULT

**30.1   Definition of CPD Terminating Default.**  Subject to Section 30.2, the occurrence of any one or more of the following events shall constitute a "CPD Terminating Default" under this Agreement:

30.1.1   A breach of this Agreement by the CPD which results in the Club not being able to play two or more Bears Games at the Facility in any Football Season.

30.1.2   A willful breach of this Agreement by the CPD which results in the Club not being able to play a Bears Game at the Facility.

**30.2   Limitations.**  A CPD Terminating Default shall not be deemed to have occurred if the cause or reason that the Club cannot play a Bears Game at the Facility is the occurrence of a Force Majeure.

**30.3   Definition CPD Non-Terminating Default.**  The occurrence of any one or more of the following events (which is not a CPD Terminating Default) shall constitute a "CPD Non-Terminating Default" under this Agreement:

30.3.1   Failure by the CPD to observe or perform in any material respect any covenant, agreement, condition, or provision of this Agreement, if such failure shall continue for thirty (30) days after notice thereof from the Club; provided however, that the CPD shall not be in default with respect to matters which cannot reasonably be cured within thirty (30) days so long as within thirty (30) days after such notice the CPD commences such cure and diligently proceeds to complete the same at all times thereafter; or

30.3.2   Material breach by the CPD of any representation or warranty of this Agreement if such breach shall continue for thirty (30) days after notice thereof from the Club to the CPD; provided however, that the CPD shall not be in default with respect to such breach which cannot be reasonably cured within thirty (30) days so long as within thirty (30 days after such notice, the CPD comments such cure and diligently proceeds to complete the same at all times thereafter.

**30.4   Remedies.**  Subject to the right of any party to demand Arbitration under Article 33, if a CPD Default occurs, the Club shall have the following rights and remedies which shall be distinct, separate and, to the extent not mutually exclusive,

cumulative, and shall be in addition to and shall not operate to exclude or deprive the Club of any other right or remedy allowed to it by law, or equity;

30.4.1    Advance Sums. The Club shall have the right to advance sums to be paid to third parties by the CPD or otherwise remedy the CPD's default and shall be entitled to be reimbursed by the CPD for the Club's costs and expenses on account thereof; provided that the Club provides the CPD with ten (10) days prior written notice of the Club's intention to advance such sums.

30.4.2    Termination. If and only if (i) a CPD Terminating Default occurs, and (ii) the Club provides the CPD a Club Termination Notice no later than the later of (a) sixty (60) days following the occurrence of the CPD Terminating Event, or (b) thirty (30) days following the decision by the Arbitrator that a CPD Terminating Event has occurred, then the Club may terminate this Agreement ("Bears Termination Remedy") effective as of the end of the third Football Season following such CPD Terminating Default. The CPD and the Club shall continue to perform and satisfy all of their duties and obligations under this Agreement until the end of such third Football Season.

30.4.3    Specific Performance. The Club may enforce the provisions of this Agreement and may enforce and protect the rights of the Club hereunder by a suit or suits in equity or at law for specific performance of any covenant or agreement contained herein without the need for posting bond or proving damages;

30.4.4    Monetary Damages – Generally. Without terminating this Agreement, the Club may seek monetary damages against the CPD.

30.4.5    Monetary Damages – Bears Games. In the event of a CPD Default which prevents the Club from playing a Bears Game at the Facility, the Club shall be entitled to collect from the CPD as follows:

(a)    Net Club Revenue Loss for the missed Bears Game at the Facility;

(b)    Amount of any visiting NFL team's share of the Club Seat premiums which would otherwise be payable to the NFL with respect to any missed Bears Game; and

(c)    The amount of any refunds or other payments made by the Club in respect to such missed Bears Game to advertisers, sponsors, broadcasters and others who have a claim against the Club for non-performance of such game.

All amounts which the Club may be entitled to recover in the event that a CPD Default prevents the Club from playing a Bears Game at the Facility shall be offset by any revenues or other economic benefits which the Club directly or indirectly receives from playing such Bears Game at another facility or location.

30.4.6    Self Help. In the event that (i) the Club, in good faith believes (a) that the CPD is materially failing to satisfy its obligations hereunder, and (b) that

such failure will (w) endanger the public safety or health, (x) result in the Club's inability to hold a Bears Game at the Facility, (y) result in the Club's inability to use the Field for a Bears Game, or (z) result in the inability of the Club or a Major Corporate Sponsor to use the Facility (or a portion thereof) for a Club-Related Event or a Sponsor-Related Event; (ii) the Club provides the CPD with timely written notice of such alleged failure; and (iii) the CPD does not promptly take reasonable actions to correct or cure such failure, then the Club shall have the right to correct such failure and seek reimbursement from the CPD in Arbitration for its reasonable costs and expenses incurred in correcting such failure.   The Club shall only be entitled to such reimbursement from the CPD if the Panel or Expeditious Arbitrator, as applicable, determines (i) (a) that the CPD did materially fail to satisfy its obligations hereunder, and (b) that such failure (w) would have or did endanger the public safety or health, (x) would have resulted in the Club's inability to hold a Bears Game at the Facility, (y) would have resulted in the Club's inability to use the Field for a Bears Game, or (z) would have resulted in the inability of the Club or a Major Corporate Sponsor to use the Facility (or a portion thereof) for a Club-Related Event or a Sponsor-Related Event; (ii) the Club provided the CPD with written notice of such alleged failure; and (iii) the CPD did not promptly take reasonable actions to correct or cure failure.

   **30.5   Rights to Property After Default.**  Upon a CPD Terminating Default, the Club shall have the right to remove all of its personal property from the Facility except to the extent that such personal property has become a fixture of the Facility.

   **30.6   Tolling of Cure Period.**  Notwithstanding any other provision contained herein, in the event that (i) the CPD in good faith disputes the Club's assertion that an action or non-action by the CPD would, if not cured or corrected within the applicable cure period would constitute a CPD Default hereunder; (ii) the CPD notifies Club that the CPD disputes the Club's assertion within ten (10) days of the date the CPD receives notice of the Club's assertion; and (iii) the CPD submits such dispute to Arbitration no later than the later of [twenty (20)] days from the date that the CPD receives notice of the Club's assertion or a date as mutually agreed upon by the Club and the CPD in writing, then the CPD's obligation to remedy or cure such action or non-action shall be suspended and, the Club shall not be entitled to exercise any remedy herein provided on account thereof, pending the final decision of the Panel or the Expeditious Arbitrator, as applicable.   If the final decision of the Panel or the Expeditious Arbitrator, as applicable, is that such action or non-action by CPD would, if not cured or corrected, constitute a CPD Default hereunder, then the applicable cure period provided in this Article 30 shall begin to run as of the date on which the CPD's receives notice of the final decision of such Panel or the Expeditious Arbitrator, as applicable.

   **30.7   Post Performance Challenge.**   Notwithstanding any other provision contained herein, in the event that (i) the CPD in good faith objects to the Club's assertion that an action or non-action by the CPD, if not cured or corrected within the applicable cure period, would constitute a CPD Default hereunder, and (ii) the CPD provides the Club with prior written notice of its objection; then the CPD may take such action or not take such non-action as applicable without prejudicing or waiving its right to challenge and submit such dispute to Arbitration.

30.8  **Notice of Default.**  The CPD shall promptly inform the Club and the NFL of any occurrence which constitutes a CPD Default or which, with the giving of notice or the lapse of time, or both, would constitute such a CPD Default and of any other occurrence that materially affects the CPD's ability to perform and satisfy its obligations and duties hereunder.

30.9  **Limitation on Remedies.**

30.9.1  <u>No Termination</u>.  Notwithstanding any provision contained herein or any right or remedy which the Club or Subsidiary may have at law or equity, a CPD Non-Terminating Default does not entitle the Club or the Subsidiary to terminate this Agreement prior to the expiration of the Term.

30.9.2  <u>No Set Off</u>.  Notwithstanding any other provision contained herein or any rights or remedies that the Club may have at law or equity, neither the Club nor the Subsidiary may offset, set off or deduct amounts which the CPD owes to them against amounts that they owe to the CPD except as specifically provided in the Development Agreement.

## ARTICLE 31.
## INDEMNIFICATION

31.1  **Club and Subsidiary Indemnification – General.**  The Club and the Subsidiary hereby jointly and severally agree to indemnify, defend and hold harmless the CPD, the CPD Affiliates, the PBC and the PBC Affiliates from and against any Losses incurred or suffered by any of them arising out of or related to any breach or threatened breach of this Agreement by the Club or the Subsidiary.

31.2  **Club and Subsidiary Indemnification – Personal Injury, Death or Property Damage.**  The Club and the Subsidiary hereby jointly and severally agree to indemnify, defend and hold harmless the CPD, the CPD Affiliates, the PBC and the PBC Affiliates from and against any Losses incurred or suffered by them arising out of or relating to any personal injury, death or property damage occurring in or about the Team Areas; provided however, that this obligation of the Club and the Subsidiary to indemnify, defend and hold harmless set forth in this Section 31.2 shall not apply to any Loss arising out of or relating to any of the following events and occurrences ("Club Excluded Occurrences"):

(a)  The grossly negligent or willfully wrongful acts or omissions of the CPD or the CPD Affiliates; and

(b)  The breach of or threatened breach of, this Agreement by the CPD.

31.3  **CPD Indemnification – General.**  To the extent permitted by Law, the CPD hereby agrees to indemnify, defend and hold harmless the Club, the Club Affiliates, the Subsidiary and the Subsidiary Affiliates from and against any Loss incurred or suffered by them arising out of or related to any breach, or threatened breach of, this Agreement by the CPD.  To the extent the CPD maintains the insurance policies as required by Article 27, such indemnification obligations shall be limited to the

proceeds from the insurance policies set forth in Article 27 and the deductibles associated with such insurance policies.

**31.4    CPD Indemnification – Personal Injury, Death or Property Damage.** To the extent permitted by Law, the CPD hereby agrees to indemnify, defend and hold harmless the Club, the Club Affiliates, the Subsidiary and the Subsidiary Affiliates from and against any Loss incurred or suffered by them arising out of or related to any personal injury, death or property damage occurring in or about the Facility (except for Team Areas) or the Game Day Site, provided, however, that this obligation of the CPD to indemnify, defend and hold harmless set forth in this Section 31.4 shall not apply to any Loss arising out of or related to any of the following events or occurrences ("CPD Excluded Occurrences"):

      (a)    The grossly negligent or willful or wrongful acts or omissions of the Club, the Subsidiary, the Club Affiliates, the Subsidiary Affiliates, the Club Invitees, or the Subsidiary Invitees; and

      (b)    The breach of, threatened breach of this Agreement by the Club or the Subsidiary.

To the extent the CPD maintains the insurance policies required by Article 27, such indemnification obligations shall be limited to the proceeds from the insurance policies set forth in Article 27 and the deductibles associated with such insurance policies.

**31.5    Procedure Regarding Indemnification.**    If any party entitled to indemnification hereunder ("Indemnified Party") shall discover or have actual notice of facts giving rise to or which may give rise to a claim for indemnification under this Article 31, or shall receive notice of any demand, assertion, claim, action, or proceeding, judicial or otherwise ("Action"), with respect to any matter for which indemnification may be claimed, the Indemnified Party shall, within twenty (20) days following service of process (or within such shorter time as may be necessary to give the party required by the terms hereof to provide indemnification therefor ("Indemnifying Party") a reasonable opportunity to respond to such service of process) or within twenty (20) days after any other such notice, notify the Indemnifying Party in writing thereof together with a statement of such information respecting such matter as the Indemnifying Party then has; it being understood and agreed that any failure or delay of the Indemnifying Party shall not relieve the Indemnifying Party from liability hereunder except and solely to the extent that such failure or delay shall have materially adversely affected the Indemnifying Party's ability to defend against, settle or satisfy any such Action. Following such notice, the Indemnifying Party shall have the right, at its sole cost and expense, to contest or defend such Action through attorneys, accountants, and others of its own choosing (the choice of such attorneys, accountants, and others being subject to the approval of the Indemnified Party, such approval not to be unreasonably withheld) and in the event it elects to do so, it shall promptly notify the Indemnified Party of such intent or contest or defend such Action. The Indemnified Party, shall have the right to engage its own attorneys, accountants and others and participate in the defense of any Action; provided, however the fees and costs incurred by the Indemnified Party as a result of such participation shall not be included as part of any Losses unless, (a) the

Indemnifying Party elects not to contest or defend such Action, or (b) if the interests of the Indemnified Party and the Indemnified Party are sufficiently adverse to prohibit the representation by the same counsel of both parties under applicable Law, ethical rules, or equitable principals.  If within twenty (20) days following such notice from the Indemnified Party (or within such shorter time as may be necessary to give the Indemnified Party a reasonable opportunity to respond to service of process or other judicial or administrative action), the Indemnified Party has not received notice from the Indemnifying Party that such Action will be contested or defended by the Indemnifying Party, the Indemnified Party shall have the right to (i) authorize attorneys satisfactory to it to represent it in connection therewith; and/or (ii) at any time settle, compromise, or pay such action, in either of which events the Indemnified Party shall be entitled to indemnification therefor subject to this Section.    Following any notice of an indemnification claim not based on an Action, the Indemnifying Party shall promptly reimburse the Indemnified Party for all amounts owed to it by reason of such indemnification obligation.

31.5.1    In the event and so long as the Indemnifying Party is actively contesting or defending against an Action as hereinabove provided, the Indemnified Party shall cooperate with the Indemnifying Party and its counsel in such contest or defense, shall join in making any appropriate counterclaim or cross-claim in connection with the Actions, and shall provide such access to the books and records of the Indemnified Party as shall be necessary in connection with such defense or contest, all at the sole cost and expense of the Indemnifying Party.  Notwithstanding that an Indemnifying Party is actively conducting such defense or contest, any Action may be settled, compromised, or paid by the Indemnified Party without the consent of the Indemnifying Party, provided however, that if such action is taken without the Indemnifying Party's consent, its indemnification obligations in respect of such claim shall thereby be nullified.  Any such Action may be settled, compromised, or paid by the Indemnifying Party without the Indemnified Party's consent, so long as such settlement or compromise does not cause the Indemnified Party to incur any present or future cost, expense, obligation or liability of any kind of nature.

31.5.2    In the event any Action involves matters partly within or partly outside the scope of the indemnification by the Indemnifying Party hereunder, then the attorneys' fees, costs, and expenses of contesting or defending such Action shall be allocated between the Indemnified Party and the Indemnifying Party as they shall agree. If such an allocation cannot be agreed upon, then the dispute shall be submitted to Expedited Arbitration.

31.6  **Survivability.**   The indemnification obligations of each of the parties hereto shall survive the termination or cancellation of this Agreement.

## ARTICLE 32.
## EXPEDITED ARBITRATION

32.1   **General.**  With respect to disputes between the parties regarding any provision contained in Article 19 or Article 23, a party shall request that the dispute be

submitted to an Expeditious Arbitrator for arbitration ("Expedited Arbitration") in accordance with the provision of this Article 32. The "Expeditious Arbitrator" shall have exclusive control over the location and rules of such Expedited Arbitration.

**32.2   Selection of Expeditious Arbitrator.**  Unless otherwise agreed to by the parties, the Expeditious Arbitrator shall be selected by the parties from a list of twenty (20) persons furnished by the Chicago Chapter of the American Arbitration Association. Upon delivery of the Expedited Arbitration Request, the parties shall in good faith attempt to mutually agree upon a Expeditious Arbitrator.  In the event that the parties cannot agree within five (5) days after receipt of the Expedited Arbitration Request, then representatives of the parties shall meet promptly and the following procedures shall be applicable:  The Club shall strike a name of a person on the list.  Within one (1) hour thereafter, the CPD shall strike a name from the list.  At one-hours intervals thereafter, each party shall strike a name from the list.  If any party fails to strike a name within the allotted time period, it shall forgo its turn to strike a name. The last name on the list shall be the Expeditious Arbitrator.

**32.3   Expedited Arbitration Process.**   To request Expedited Arbitration, a party shall provide written notice thereof to the other party ("Expedited Arbitration Request").  Such notice shall provide in detail the nature of the dispute, the basis of the dispute and the proposed remedy of the dispute.  An Expeditious Arbitrator shall be selected as provided in Section 33.2.  Within ten (10) days after the selection of the Expeditious Arbitrator, the Expeditious Arbitrator shall arbitrate a meeting between the CPD and the Club.  Within ten (10) days of such meeting, the Expeditious Arbitrator shall make his ruling ("Expedited Ruling") which shall be binding upon the parties subject to the following sentence.  A party may challenge any Expedited Ruling through Standard Arbitration or as disputes may otherwise be resolved herein; provided however, until such Expedited Ruling is overruled or nullified, the parties shall fully comply and abide by such Expedited Ruling.

**32.4   Fees and Costs.**  If the Expeditious Arbitrator shall find in favor of one of the parties and shall find that the other party either (i) had no reasonable basis for its position in the dispute; or (ii) acted willfully or in bad faith, then the Expeditious Arbitrator shall order the non-prevailing party to pay all of the prevailing party's reasonable costs and expenses incurred in bringing the dispute to Expedited Arbitration. In all other cases, the parties shall share equally the costs of such arbitration and shall pay their own attorney's fees and costs.

**32.5   Discovery Rights.**  Each party shall be entitled to such discovery rights as determined by the Expeditious Arbitrator.

### ARTICLE 33.
### STANDARD ARBITRATION

**33.1   General.**  In the event of any dispute between the parties hereto regarding any provision of this Agreement, a party shall request that the matter be submitted to arbitration in accordance with the provisions of this Article 33 ("Standard Arbitration") unless such dispute shall be handled through Expedited Arbitration in accordance with the terms of this Agreement.  All such arbitration shall be conducted before a "Panel"

designated in the manner hereinafter provided.  Except as specifically provided for herein, all such arbitration shall be conducted in Chicago, Illinois in accordance with the rules of the American Arbitration Association, and the decision of each Panel shall be final and binding upon the parties and shall be enforceable by a court of competent jurisdiction.

**33.2  Composition of Panel.**  Each Panel shall consist of three (3) persons selected by the parties from a list of twenty (20) persons furnished by the Chicago Chapter of the American Arbitration Association.  The Panel shall consist of persons who are acceptable to CPD and the Club.  In the event that within fifteen (15) days after the occurrence of a dispute, the parties have been unable to agree on a Panel, then representatives of the parties shall meet promptly and the following procedures shall be applicable:  The Club and the CPD shall conduct a coin toss.  Immediately following the coin toss and at one-hour intervals thereafter, the parties shall alternately, starting with the winner of the coin toss, strike a name from the list.  If any party fails to strike a name within the allotted time period, it shall forego its turn to strike a name.  The last 3 names on the list shall constitute the Panel.

**33.3  Fees and Costs.**  If a panel shall find in favor of one of the parties and shall find that the other party either (i) had no reasonable basis for its position in the dispute; or (ii) acted willfully or in bad faith, then the panel shall order the non-prevailing party's reasonable costs and expenses incurred in bringing the dispute to Standard Arbitration, including the costs and fees of the Panel, fees to the American Arbitration Association and other costs of such arbitration otherwise payable by such party in the arbitration proceedings.  In all other cases, the parties shall share equally the costs of such arbitration and shall pay their own attorneys' fees and costs.

**33.4  Discovery Rights.**  Each party shall be entitled to such discovery rights as determined by the Panel.

**ARTICLE 34.**
**EFFECT OF FORCE MAJEURE, ACTS OF GOD,**
**STRIKES, LOCK-OUTS AND LABOR TROUBLE**

**34.1  CPD.**  To the extent and during the period that a Force Majeure shall prevent the CPD from performing or satisfying its obligations and duties hereunder, then such CPD duties or obligations shall be deemed abated and no CPD Default shall be deemed to have occurred with respect thereto.  In the event that the Force Majeure renders unfit or unavailable the Facility for a Bears Game, then the Club shall be entitled to play such Bears Games at another location during such period and shall not be obligated to pay the appropriate pro rata portion of the Total Permit Fee during this period.

**34.2  Club.**  To the extent and during the period that a Force Majeure shall prevent the Club from performing its obligations and duties hereunder, then such Club duties and obligations shall be deemed abated and no Club Default shall be deemed to have occurred with respect thereto; provided that this sentence shall not apply to the Club's Financial Obligations, but such obligations shall be reduced by the estimated

amount of Game Day Costs which the CPD will save as a result of any Bears Game not being played at the Facility.

**34.3   General.** Except as specifically provided above, all of the parties rights and obligations shall remain in effect during the period of a Force Majeure.

## ARTICLE 35.
## JOINT AND SEVERAL LIABILITY OF CLUB AND CLUB'S SUBSIDIARY

**35.1   Club.** The obligations and liabilities of the Club hereunder are the joint and several obligations and liabilities of the Club and the Subsidiary.

**35.2   Subsidiary.** The obligations and liabilities of the Subsidiary hereunder are the joint and several obligations and liabilities of the Club and the Subsidiary.

## ARTICLE 36.
## CONDEMNATION AND EMINENT DOMAIN

**36.1   Permanent Condemnation.** In the event that any Material Part (as defined below) of the Facility shall at any time during the Term be permanently taken by Condemnation, this Agreement shall terminate on the date on which possession is required to be delivered to the condemning authority, except as provided for in Section 36.5. As used herein, a "Material Part" shall include any of the following:

36.1.1    Any part of the Facility which, in Club's and CPD's reasonable determination, would materially and adversely effect the ability of the Club to use the Facility as contemplated herein or would cause the Club to experience a material loss of revenue (specifically including, without limitation, any loss of seating in excess of a number of seats having a face ticket price equal to ten percent (10%) or more of the aggregate face ticket price of all seats in the Facility, or loss of any material portion of the concourse areas);

36.1.2    Any part of the area between the Facility and a public street or highway and the condemnation of which would cause the Club to become unable to provide reasonable access to the Facility; or

36.1.3    Any part of the Facility which would cause the Club to be unable to provide its Invitees with 2000 parking spaces;

unless the Club elects in its sole discretion to treat any of the foregoing as not a "Material Part" of the Facility. If this Agreement terminates as a result of Condemnation (including a Temporary Taking), all rights, obligations and liabilities of the parties hereto shall end as of the effective date of such termination, without prejudice to any rights which have accrued prior to such termination.

**36.2   Temporary Taking.** In the event that the Condemnation is a temporary taking ("Temporary Taking") of a Material Part of the Facility, this Agreement shall not terminate by reason thereof, except as hereinafter provided, and the rights and

obligations of the parties shall continue in full force and effect as provided herein except that:

    36.2.1   Upon termination of such Temporary Taking and upon receipt of the Condemnation Award, the CPD shall restore the Facility to the extent that funds are available from any Condemnation Award received by the CPD.

    36.2.2   During any period of a Temporary Taking, Club shall be entitled, at no cost or expense to the CPD, to make arrangements for an alternate site for playing the Bears Games and shall not be obligated to pay to the CPD any portion of the Total Permit Fee incurred during the occurrence of such Temporary Taking.

    36.2.3   The Club shall have the right to terminate this Agreement if the remaining period of a Temporary Taking of a Material Part of the Facility will be for a period of more than two (2) years following the date of the termination, as evidenced by the issuance by a duly authorized official of the condemning authority of any written statement to the effect that such condemnation will be for such period of time.

    **36.3   Representation.**  The Club shall be entitled to be represented by counsel of its own choosing in any Condemnation proceeding to the extent allowed by law or judicial rules.

    **36.4   Allocation of Award.**  The amount of any award for or on account of any Condemnation ("Condemnation Award") shall belong to the CPD and shall not be reduced by any claim of the Club or the Subsidiary, and the Club or the Subsidiary shall not be entitled to any award or any part thereof for its rights, interest, or estates hereby granted which are so condemned or effected by such eminent domain proceedings, except to the extent of the following:

    36.4.1   The court in which the award is made shall be requested to make and does so make a separate award determination for the then current value of Club's Use Rights for the balance of the Term.

    36.4.2   If the court fails or refuses to make such separate determination, then the parties shall negotiate in good faith to make their own determination and if the parties are unable to agree on such value within thirty (30) days after the payment of said award, the parties shall submit the dispute to Standard Arbitration.

    36.4.3   In no event shall the Club and the Subsidiary be entitled to more than the following percentage of any Condemnation Award:  (i) two hundred (200) divided by (ii) five hundred fifty five (555) multiplied by (iii) the number of years remaining on the Original Term plus any Extension Terms divided by (iii) fifty (50) multiplied by (iv) one hundred.

    **36.5   Performance of Work.**  If there shall be a Condemnation and this Agreement shall not terminate as a result thereof in accordance with the provisions of Section 36.2, CPD shall be required to perform any and all work necessary to restore

the Facility to a condition suitable for the Club to exercise its Club Use Rights, to the extent that funds are available from any Condemnation Award received by the CPD.

## ARTICLE 37.
## COVENANT OF QUIET ENJOYMENT

CPD covenants that if, and so long as Club and Subsidiary keep and perform each and every covenant, agreement, term, provision and condition of this Agreement, the Club and the Subsidiary shall quietly enjoy its rights under this Agreement without hindrance or molestation by CPD or by any other person lawfully claiming the same by, through or under CPD, subject to the covenants, agreements, terms, provisions and conditions of this Agreement.

## ARTICLE 38.
## MISCELLANEOUS

**38.1  Amendments.**  No amendment, modification, termination, discharge or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by each of the parties hereto, and then such waiver or consent shall be effective only for the specific purpose for which given.  In the event that the CPD has actual knowledge that an amendment, modification, termination, discharge or waiver of this Agreement or the provisions herein requires NFL consent, the Club shall be responsible for obtaining such consent and such amendment, modification, termination, discharge or waiver shall not be effective until NFL consent is obtained.

**38.2  Applicable Law.**  This Agreement shall be governed by, and construed and enforced in accordance with the internal laws of the State of Illinois, without regards to the choice of law provisions of the State of Illinois.

**38.3  Appointment as Agent.**  The Subsidiary hereby irrevocably appoints the Club as its agent and attorney in fact for all purposes hereunder with power and authority to bind and obligate the Subsidiary with respect to all matters relating hereto. The Subsidiary shall not limit, modify or terminate such agency relationship without the prior written consent of the CPD which may be withheld in its sole and absolute discretion.

**38.4  Assignment.**

38.4.1    Generally.  This Agreement may not be assigned or transferred by any party hereto without the other parties' prior written consent which may be withheld in their sole and absolute discretion.

38.4.2    CPD Rights.

(a)    Notwithstanding any other provision contained herein, the CPD may at any time assign or transfer its rights, interests, and remedies hereunder to any party; provided however, such assignment or transfer does not relieve or release the CPD from any of its obligations or duties hereunder.

06298/00024/189933/20

(b) Notwithstanding any other provision contained herein, the CPD may at any time assign or transfer this Agreement to another governmental entity including but not limited to a governmental entity which acquires or merges with the CPD.

38.4.3    <u>Club Rights</u>.

(a) Notwithstanding any other provision contained herein, the Club may assign or transfer this Agreement to an Acquiror; provided that prior to such assignment and transfer, (i) the Acquiror assumes all of the obligations and liabilities of the Club and the Subsidiary hereunder and under the Tax Agreement and under other related agreements pursuant to an assumption agreement reasonably satisfactory to the CPD and its counsel, (ii) the Acquiror provides satisfactory evidence to the CPD that it has the financial resources to fully perform and satisfy the obligations and liabilities of the Club and Subsidiary, (iii) the CPD and its financial advisors in their reasonable judgment determine that the Acquiror has the financial resources to fully perform and satisfy the obligations and liabilities of the Club and Subsidiary, (iv) the Acquiror is a member of the NFL or any successor league, (v) the Acquiror (and its controlling person or persons) are of a high moral character and reputation as determined in the reasonable judgment of the CPD, (vi) no Bears Default has occurred and is continuing and no event has occurred which with the passage of time, or the giving of notice, or both, would constitute a Bears Default.  Any assignment or transfer of this Agreement by the Club or the Subsidiary which does not comply or is inconsistent with subclasses (i) through (vi) shall be null and void and of no effect.  In the event the CPD has actual knowledge that an assignment or other transfer of this Agreement requires NFL consent, the Club shall be responsible for obtaining such consent and such assignment or other transfer shall not be effective until NFL consent is obtained.

(b) No assignment or transfer of this Agreement by the Club shall relieve or release the Club or the Subsidiary from any of its obligations hereunder.

**38.5    Attorneys Fees.**  Subject to the provisions in Article 32 and Article 33, in the event any legal proceeding is commenced for the purpose of interpreting, construing, enforcing or claiming under this Agreement, the prevailing party, as determined by the court, shall be entitled to recover reasonable attorneys fees and costs in such proceeding or any appeal therefrom.

**38.6    Compliance with Laws.**  The Club, the Subsidiary and the CPD shall at all times fully comply with any and all applicable laws, rules, regulations and ordinances of the City, the State and the United States.

**38.7  Construction.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**38.8  Confidentiality.** The parties agree that all financial and operating information exchanged by each party in fulfilling its obligations under this Agreement shall be treated as confidential, and should only be disclosed as required by law or court order or upon the written consent of the non-disclosing party hereto. The provisions of this Section do not include information which is publicly available or is obtained from third parties unrelated to the transactions contemplated by this Agreement, provided that information contained in news and media articles purporting to cover details of the Adaptive Reuse shall not mean that confidential information otherwise subject to this Agreement is publicly available.

**38.9  Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same instrument. A telecopy or facsimile signature of any party shall be considered to have the same binding effect as an original signature.

**38.10  Cumulative Rights and Remedies.** The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Such rights and remedies are given in addition to any other legal rights the parties may have.

**38.11  Late Payments.** All amounts payable hereunder by any party shall, from and after the date on which such amount is due until the date that such amount is paid, bear interest at the rate of two percent (2%) per annum in excess of the corporate base (or equivalent) rate charged from time to time by Bank One or its successor.

**38.12  Drafting.** The parties acknowledge and confirm that each of their respective attorneys have participated jointly in the review and revision of this Agreement and that it has not been written solely by counsel for one party. The parties hereto stipulate and agree that the rule of construction to effect any ambiguities are to be or may be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor any party against another.

**38.13  Entire Agreement.** Except for the other agreements contemplated by the Development Assistance Agreement and except for agreements entered into contemporaneously herewith, this Agreement contains the entire agreement between the parties hereto, and there are no promises, agreements, conditions, undertakings or warranties or representations, oral or written, express or implied, between them or other than as herein set forth or as specifically referred to herein. This Agreement, the other agreements contemplated by the Development Assistance Agreement and the agreements entered into contemporaneously herewith are intended to be an integration of all prior or contemporaneous promises or agreements, conditions or undertakings between the parties including the MOU and supercedes all previous written or oral agreements regarding the subject matter hereof, including the MOU.

**38.14  Expenses.** Each party hereto shall bear its own costs and expenses with respect to the preparation, negotiating, execution and delivery of this Agreement.

06298/00024/189933/20

**38.15 Facsimile Signatures.** Each Party is hereby authorized to rely upon and accept as an original any document or other communication which is sent to such party by facsimile, telegraphic or other electronic transmission (each, a "Communication") which such party in good faith believes has been signed by the other party and has been delivered to such party by a properly authorized representative of the sending party, whether or not that is in fact the case. Notwithstanding the foregoing, no party shall be obligated to accept any such Communication as an original and may in any instance require that an original document be submitted to it in lieu of, or in addition to, any such Communication.

**38.16 Further Assurances.** Each party shall execute and deliver such other documents, instruments and agreements, and take such actions as are necessary or desirable to effectuate the transactions contemplated herein or as required by law.

**38.17 Good Faith Dispute Resolution.** Prior to requesting Expedited Arbitration or Standard Arbitration or otherwise taking steps or actions to enforce its rights and remedies hereunder, each party agrees to attempt to resolve any such dispute in good faith with the other parties hereto.

**38.18 Headings.** The captions and headings throughout this Agreement are for convenience and reference only and the words contained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provisions of this Agreement or the scope or intent thereof, nor in any way affect this Agreement.

**38.19 Jurisdiction, Venue and Forum.** Subject to Article 32 and Article 33, each party irrevocably agrees that all judicial actions or proceedings in any way, manner or respect, arising out of or from or related to this Agreement shall be litigated only in courts having sites within the City, State of Illinois. Each party hereby consents to the jurisdiction of any local, state, or federal court located within the City and hereby waives any objections each party may have based on improper venue or forum non conveniens to the conduct of any proceeding instituted hereunder.

**38.20 Jury Trial.** To the extent applicable, each party irrevocably waives any right to trial by jury in any judicial action or proceeding (i) to enforce or defend any rights or any arbitration ruling under or in connection with this Agreement or any amendment, instrument, document or other agreement delivered or which may in the future be delivered in connection herewith or therewith, or (ii) arising from any dispute or controversy in connection with or related to this Agreement or any such amendment, instrument, document or other agreement.

**38.21 Knowledge.** The term "knowledge" or words of similar import shall mean the actual (as distinguished from implied, imputed or constructive) knowledge of the officers of any party with respect to the matter in question as to the date with respect to which such representation or warranty is made, without having any obligation to make an independent inquiry or investigation.

**38.22 Mutual Cooperation.** It is the intent of this Agreement that the parties will cooperate fully with each other in order to achieve the mutual objective of providing the public, in person or through the media, with well-managed and well-presented Bears

Games. The parties shall use their mutual reasonable efforts to obtain any necessary approvals or permits from any governmental authority necessary to stage the Bears Games or to carry out the purposes of this Agreement.

**38.23 No Agency or Partnership Relationship**

    (a)    Nothing in this Agreement is intended nor shall be deemed to create an agency, relationship, partnership, or joint venture between the CPD, on the one hand and the Club and the Subsidiary, on the other hand.

    (b)    Nothing in this Agreement is intended nor shall be deemed to grant to the CPD any power, right or authority to bind or otherwise contractually obligate the Club or the Subsidiary.

    (c)    Nothing in this Agreement is intended nor shall be deemed to grant to either the Club or the Subsidiary any power, right or authority to bind or otherwise contractually obligate the CPD.

**38.24 Notices.** All notices, requests, demands and other communications provided for hereunder shall be in writing, sent by certified or registered mail, postage prepaid, by facsimile, telegram or nationally recognized overnight carrier or delivered in person, and addressed as follows:

| | |
|---|---|
| If to the Club or Subsidiary: | Chicago Bears<br>Halas Hall at Conway Park<br>1000 Football Drive<br>Lake Forest, Illinois 60046<br>Attention: Theodore P. Phillips |
| with cc to: | Schiff, Hardin & Waite<br>660 Sears Tower<br>Chicago, Illinois 60606<br>Attention: Gary L. Mowder, Esq. |
| If to the CPD: | Chicago Park District<br>541 North Fairbanks Court<br>Chicago, Illinois 60611<br>Attention: General Superintendent |
| with cc to: | Chicago Park District<br>541 North Fairbanks Court<br>Chicago, Illinois 60611<br>Attention: General Counsel |

or, as to each party, at such other address as shall be designated by such party in a written notice to each other party complying as to delivery with the terms of this subsection. Any notice of default from either the CPD or the Club shall also be simultaneously sent by certified or registered mail, postage prepaid, by facsimile,

06298/00024/189933/20

- 93 -

telegram or nationally recognized overnight carrier or delivered in person to the NFL at the following address:

> National Football League
> 280 Park Avenue
> New York, New York 10017
> Attention: Senior Vice President-Business Affairs

**38.25 Registered Agent.** The Club shall be required to notify the CPD, in writing, of any change in either name or address of its registered agent for service of process. The Subsidiary shall be required to notify the CPD, in writing, of any change in either the name or address of its registered agent for service of process.

**38.26 Service of Process.** Each party hereby waives personal service of any and all process and consents that all such service of process may be made by certified mail, return receipt requested, directed to such party as set forth herein in the manner provided by applicable statute, law, rule of court or otherwise.

**38.27 Severability.** In the event that any provision of this Agreement or the application thereof is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement and the application thereof shall not be affected.

**38.28 Successor Bound.** The covenants, terms, provisions and conditions of this Agreement shall be binding upon and inure to the benefit of the CPD, the Club and the Subsidiary and their respective successors and, to the extent permitted herein, assigns. References to any party shall include the party's successors and permitted assigns.

**38.29 Third Party Beneficiaries.** This Agreement is not intended to confer upon any person or entity other than the parties hereto, any rights or remedies hereunder except for the PBC and the Affiliates. The parties intend that the PBC be granted enforceable rights and remedies against the Club and the Subsidiary with respect to Article 31.

**38.30 Time of Essence.** Time is of the essence in making payments of all amounts due each party under this Agreement and in the performance and observance by the parties of each covenant and provision of this Agreement.

**38.31 Waivers.** The failure of either party hereto to insist at any time upon the strict performance of any covenant or provision or to exercise any option, right, power or remedy contained in this Agreement shall not be construed as a waiver or relinquishment thereof for the future. The waiver of redress for any violation of any term, covenant, agreement or condition contained in this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. No expressed waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated.

**38.32 Adaptive Reuse.** The parties agree that the CPD shall have no liability under this Agreement for any delays in the completion of the Adaptive Reuse, and that

the CPD shall not be deemed in breach of or default under this Agreement in the event of any delays in the completion of the Adaptive Reuse. The parties agree that neither the Club nor the Subsidiary shall have liability under this Agreement for any delays in the completion of the Adaptive Reuse, and neither the Club nor the Subsidiary shall be deemed in breach of or default under this Agreement in the event of any delays in the completion of the Adaptive Reuse.

**38.33 Recordation.** Each party may make the appropriate filing and recordation of this Agreement to protect their rights and interests hereunder, and the other party shall cooperate in such filings and recordation.

**38.34 NFL Approval.** This Agreement shall not be deemed effective and no party shall have any obligations or liabilities hereunder until the NFL approves this Agreement. This Agreement shall be deemed for all purposes approved by the NFL on August 9, 2001 unless prior to such time the Club provides the CPD with written notice that the NFL disapproves of this Agreement. Nothing in this Section 38.34 is intended nor shall be construed as granting the NFL any approval rights with respect to any amendments, modifications or supplements to this Agreement in the future.

[Signature Page to Follow]

IN WITNESSETH WHEREOF, the parties hereto have executed and delivered this Permit and Operating Agreement as the date first above written.

CHICAGO PARK DISTRICT

By: _____

Name:  David Doig

Title:  General Superintendent

CHICAGO BEARS FOOTBALL CLUB, INC.

By: _____

Name: _Theodore P. Phillips_

Title: _President_

CHICAGO BEARS STADIUM, LLC

By: _____

Name: _Theodore P. Phillips_

Title: _Manager_

06298/00024/189933

## EXHIBIT A

Depiction of the Game Day Site

06298/00024/189933/20

Exhibit A

COLUMBUS DR.

ROOSEVELT RD.

FIELD MUSEUM

SHEDD AQUARIUM

SOLIDARITY DR.

① McFETRIDGE DR.

CHILDREN'S GARDEN

NORTH PARKING STRUCTURE

SOLDIER FIELD STADIUM

④ MUSEUM CAMPUS DRIVE

LAKE SHORE DRIVE

② WALDRON DRIVE

SLEDDING HILL

③ 18TH STREET

LEGEND

GAME DAY SITE BOUNDARY
■I■I■I■

N

LOHAN ASSOCIATES
WOOD and ZAPATA, INC.
DATE: ####

GAME DAY SITE
0  100'    300'        600'

NOTE: THE FOUR (4) ROADWAYS INCLUDED WITHIN THE BOUNDARIES (McFETRIDGE DRIVE, WALDRON DRIVE, 18TH STREET & MUSEUM CAMPUS DRIVE) ARE NOT UNDER THE CONTROL OF THE CHICAGO PARK DISTRICT AND ARE NOT INCLUDED IN THE GAME DAY SITE.

**EXHIBIT B**

A Non-exclusive list of Routine Maintenance

| | |
|---|---|
| Stadium | Elevator maintenance |
| Stadium | Field Maintenance |
| Stadium | Stadium Cleanup |
| Stadium | Garbage Removal |
| Stadium | Restroom Supplies/Maintenance |
| Stadium | Shuttle bus/parking part time help |
| Stadium | Snow removal |
| Suites/Clubs | Cleaning |
| Suites/Clubs | HVAC maintenance |
| Suites/Clubs | Suite Telephones |
| Suites/Clubs | Suite Maintenance |
| Suites/Clubs | Window cleaning – Lakeside |
| Video boards | Maintenance Agreements |

06298/00024/189933/20

Exhibit B

## EXHIBIT C

A Non-exclusive list of Club Game Day Expenses

| | |
|---|---|
| Entertainment | Anthem Singers |
| Entertainment | Game Day Music |
| Entertainment | Game Day Staff |
| Entertainment | Half Time entertainment |
| Sideline | Referees |
| Sideline | Chain Gang |
| Sideline | Rental/labor field heaters |
| Sideline | Rent cooling units |
| General | Information Booth |
| Marketing | Premium Giveaway Staff |
| Marketing | Tailgates Labor |
| Marketing | Tailgates Staff |
| Marketing | Tailgate Setup/Breakdown |
| Marketing | Tailgates/Setup Interactive helmet |
| Medical | Team Physicians |
| Medical | X-ray rental |
| Phones | Communication sideline/coachbox/press box |
| Phones | Ameritech technician |
| Phones | Headset technician |
| Phones | Communications Technician |
| Press Box | Head statistician |
| Press Box | Public Address announcer |
| Press Box | Lunches/Catering |
| Press Box | Runner/hostesses |
| Security | Field, Locker room Security |
| Security | Locker room security/visiting club attend |
| Security | Tailgates Security |
| Security | Suite Security |
| Stadium | Ushers |
| Stadium | Ticket booths/Ticket Sellers |

06298/00024/189933/20

Exhibit C

## EXHIBIT C (continued)

A Non-exclusive list of Club Game Day Expenses

| | |
|---|---|
| Suites/Clubs | Suite staffing |
| Suites/Clubs | Club Seats Attendants |
| Suites/Clubs | Club Security |
| Suites/Clubs | Window Cleaning – Field side |
| Video boards | Clock operator        NFL pays |
| Video boards | Game day Producers |
| Videoboards | Gameday Camera operations |
| Videoboards | Gameday sound system production |
| Videoboards | Gameday Control Room Technicians |
| Videoboards | Gameday Scoring & Messaging Technicians |
| Videoboards | Gameday Miscellaneous |

## EXHIBIT D

Examples for Product Categories

For the purpose of determining the Exclusive Signage Product Categories, the following examples are intended to provide the CPD and the Club with guidance so that the Exclusive Signage Product Categories are not too broad or too narrow in scope. The Exclusive Signage Product Categories will be determined in accordance with Section 16.1.7.

| PRODUCT CATEGORY | EXAMPLES | EXCLUSIONS |
|---|---|---|
| 1. Non-Alcoholic Cold Beverages | Colas (i.e., Pepsi Cola, Coke), Root Beer (i.e., Dads, A&W), other sodas, water and juice | Alcoholic beverages (i.e., beer, wine, distilled spirits), non-carbonated sports drinks (i.e., Gatorade) |
| 2. Fast Food Restaurants | Hamburger fast food restaurants (i.e., McDonalds, Burger King), chicken fast food restaurants (i.e., KFC), other fast food restaurants (i.e., Taco Bell, Hardees) | Denny's, Olive Garden, Starbucks |
| 3. Air transportation | National and international airlines (i.e., United Airlines, American Airlines), Regional Airlines | Rail Transportation (i.e., Amtrak) Parcel Delivery (i.e., Federal Express) |
| 4. Breakfast Cereals | Cornflakes, Rice Krispies, oatmeal | Pop tarts, waffles |
| 5. Home Improvement Stores | Home Depot, Menards | Discount Stores (i.e., Wal-Mart, K-Mart), Department Stores (i.e., Marshall Fields, Carsons), Grocery Stores (Jewel, Dominick's) |
| 6. Candy | Chocolate, hard candy, soft candy, gum | Cakes, ice cream, brownies, pies |

Exhibit D