# EXHIBIT 2

CH1\ 4014096.1

03/27/2006 15:49 FAX 847 739 5869    CHICAGO BEARS    ⌀002/007



CHICAGOBEARS

December 8, 2005

Mr. Timothy Mitchell
General Superintendent
Chicago Park District
541 North Fairbanks
Chicago, Illinois 60611

Re:  **Provisional Agreement for Pat Down Security Checks at Chicago Bears Home Games**

Dear Tim:

The purpose of this letter is to set forth our understanding for the performance of "pat down" security checks on all patrons attending Chicago Bears home games at Soldier Field for the balance of the 2005 NFL season, including post season games, pending resolution of certain disagreements between the Chicago Bears and the Chicago Park District ("CPD") pursuant to Expedited Arbitration.

1. In response to the Bears request and without agreeing to the need for or legality of pat down security checks, the CPD agrees to allow the Bears' agent Monterrey Security to perform pat down security checks pursuant to the NFL Pat Down Policy (copy attached) on all patrons attending Chicago Bears home games at Soldier Field, commencing with the next Chicago Bears home game (scheduled for December 18, 2005). Monterrey Security will be hired for such pat down security checks by the Chicago Bears and will be acting as agent for the Chicago Bears insofar as its employees conduct pat down security checks at Chicago Bears home games. Monterrey Security engages in various other security activities at Soldier Field, some of which are conducted as agent for the Chicago Bears and others are conducted not as an agent for the Chicago Bears. The performance of pat down security by Monterrey Security is not to be viewed as an amendment to the provisions of the Permit and Operating Agreement between the parties ("POA"), which remains in full force and effect. The Chicago Bears are to advise their patrons by conspicuous signage and press announcements that the "pat downs" are being performed by the agents of the Bears and that the CPD is not involved in the pat downs. The implementation of the Pat Down Policy is subject to court orders.

2. The Chicago Bears shall be responsible for all costs actually and necessarily incurred by Monterrey Security in hiring personnel needed to perform such pat down security checks. The Chicago Bears and Monterrey Security shall

determine the number of personnel to be hired to implement the pat down security policy. Neither the CPD nor its agents have any responsibility for the terms of or implementation of the pat down policy.

3. The Chicago Bears shall cause Monterrey Security (i) to properly train employees to conduct pat down security checks in accordance with specifications provided by the Chicago Bears and the NFL, and (ii) to maintain the general liability insurance coverage at present coverage levels with the Chicago Bears and the Chicago Park District named as additional insureds providing coverage, among other customary risks, for any claims made by patrons at Chicago Bears home games for inappropriate conduct or touching by security personnel in connection with pat down security checks and for violation of any alleged constitutional and/or contract rights of Chicago Bears ticket holders.

4. The Chicago Bears will indemnify, defend and hold harmless the Chicago Park District, the Soldier Field manager and their agents, officers, employees and commissioners ("Indemnified Parties") but not Monterrey Security from and against any losses, claims, damages, liabilities, costs and expenses ("Losses" as defined in the POA) incurred in connection with or related to the performance of pat down security checks conducted pursuant to the Pat Down Policy to the extent that such losses are based upon (i) the denial of admission to the Stadium or the revocation of a patron's ticket; (ii) the unconstitutionality or illegality of the pat down searches and/or the Pat Down Policy, (iii) the violation of any personal, property, or contract rights of a Chicago Bears ticket holder arising out of the pat down policy or (iv) an action taken by an indemnified Party in compliance with the Pat Down Policy. As a condition to such indemnification, the Indemnified Parties seeking indemnification shall give the Chicago Bears prompt notice of any claims or occurrences that may give rise to a claim for Indemnification, shall tender to the Chicago Bears the defense of such claim should a claim be asserted, and shall cooperate with the Chicago Bears in all reasonable respects in the defense of such claim or claims. The Chicago Bears shall be released of its obligation to indemnify, defend and hold harmless an Indemnified Party to the extent that such Indemnified Party has received insurance proceeds to cover such Losses.

5. The parties acknowledge that they are in disagreement as to whether the Chicago Park District must provide pat down security checks at Chicago Bears home games pursuant to the requirements of the POA and must bear the costs of said pat down security checks. The parties agree to continue negotiations in good faith and in the event that no resolution is reached then this disagreement may be submitted by either party during the 45 day period beginning on January 10, 2006 to resolution by Expedited Arbitration in accordance with the provision of the POA, even though the disagreement would not otherwise be subject to Expedited Arbitration under the POA, and

each party agrees to be bound by the results of such Expedited Arbitration and to not contest or oppose Expedited Arbitration in any respect. In any Expedited Arbitration (or any other proceeding between the parties in lieu thereof) the parties agree that the arbitrator or other trier of the disagreement shall be instructed to disregard the terms and effect of this Agreement in deciding the issues presented in the proceeding.

6. Neither party shall release or make any pubic statement regarding this Agreement or the Expedited Arbitration other than a statement that pat down security checks will be conducted by Chicago Bears at its expense for Chicago Bears home games for the balance of the 2005 NFL season, including post season games, that the CPD has been indemnified by the Chicago Bears for the terms and implementation of the pat down policy and that the CPD and the Bears may arbitrate the issue of implementing the pat down policy after the 2005 season.

7. This Agreement is without prejudice to the rights of either party under the POA. Except for the provisions hereof providing for Expedited Arbitration to resolve the disagreement over pat down security checks, nothing herein amends, modified or alters any of the provisions of the POA, and the POA shall remain in full force and effect.

8. Either party may terminate this Agreement and its obligations hereunder if Expedited Arbitration is not initiated within 45 days after January 10, 2006 as set forth above.

If you agree with the foregoing, please sign in the space provided below and return a copy of this letter to my attention.

CHICAGO BEARS FOOTBALL CLUB, INC.

*/s/ Theodore Phillips*

Theodore Phillips,
President and Chief Executive Officer

Agreed this _____ day of December, 2005

CHICAGO PARK DISTRICT

*/s/ Timothy Mitchell*

Timothy Mitchell
General Superintendent

12/5/2005/9:58 AM/10934/00001/378782/3

03/27/2006 15:50 FAX   847 739 5669         CHICAGO BEARS                              ☐005/007

## MEMORANDUM

**TO:**       Club Presidents
              General Managers
              Security Points of Contact

**FROM:**    Milt Ahlerich

**DATE:**    August 24, 2005

**SUBJECT:** Stadium Security
             Pat Downs Guidelines

    Per the Commissioner's memo to the Chief Executives and Club Presidents of August 18, pat down screening will be mandatory for fans attending our games by no later than week three of the regular season (September 25-26). This will follow up on the Commissioner's memo and provide detailed guidelines for implementing this screening procedure. Over the past few seasons a growing number of clubs have employed pat downs and we have benefited a great deal from the experience of these clubs and have a much better understanding of how to use the technique with minimal inconvenience to fans while accomplishing a much higher level of security effectiveness.

    We want to emphasize that the objective of this procedure is straightforward: _to keep our fans as safe as reasonably possible while enjoying games_. We believe pat downs further this objective in two important respects:

- _By locating and excluding_ improvised explosive devices and other large weapons from our games.
- _By deterring terrorists or others who would seek_ to introduce improvised explosive devices and other large weapons into our games. We are repeatedly told by the intelligence community that strong visible security deters terrorists away from their intended targets.

### Some guidelines to keep in mind as Pat Downs are implemented

- Training and close supervision is critical to using pat downs successfully. We strongly recommend that no security personnel conduct pat downs without thorough training. If any club needs assistance in securing trainers or other resources please contact the Security Department

- Physical inspections which involve touching or patting patrons, employees and others should only be conducted on a consensual basis. We suggest that clear signage be posted or audio loop announcements be made as fans approach the gates informing the patrons that entering the gate screening area constitutes their consent to the pat down screening. Patrons who do not wish to give their consent should not be given access to the game and their money refunded.

- Physical pat down inspections should be conducted by like gender security screening personnel.

- In the instance of a patron wearing a zippered or buttoned outer garment, it should be opened and held away from the body by the patron. Inspect the clothing by touching, patting or squeezing the garment sufficiently to locate large or suspect foreign objects. Inspect blankets being carried in by squeezing thoroughly.

- Ask the person to be inspected to extend his or her arms to the side, parallel to the ground, with palms facing up. Gloves should be removed. Visually inspect the wrists and palms for switches, wires or push button devices.

- Security screeners should inspect the person by touching, patting or lightly rubbing the torso of the inspected person, confining the area to the belt line and a few inches above the belt. Following inspection of the complete circumference of the torso at the belt line, pat, touch or lightly rub the center of the patron's back from the belt line to collar line. Large trouser pockets should be inspected by patting or lightly squeezing. Large items discovered in the pockets should be displayed to the screener for visual inspection. The screener's hands remain fully open during the pat down screening and no skin-on-skin contact should occur during the pat down.

- Consistency is important and screening should be uniformly applied. On a very limited basis – and for a clearly defined and limited group of people, such as visiting teams and their coaches, staffs, etc. – alternative security screening can be employed. But this should be a limited exception, and not replace pat downs to any meaningful degree. Common sense must apply in certain instances where a pat down accomplishes nothing to advance our security objectives.

- To be consistent, we suggest all game day employees (security, food service and other event staff) undergo pat downs. The pat downs should be applied at suite and media gates as well.

- As a reminder, security screeners are urged to make full use of visual inspections. A great deal can be ascertained by careful visual inspections when screeners are vigilant, carefully trained, closely supervised and given regular breaks.

Pat down security screening now becomes an important part of the *Best Practices for Stadium Security*. There are other elements of gate screening and management that continue to be very important. These areas are: prohibiting certain items including any large containers, large backpacks and packages, consistent inspection of interior of all bags and purses and the posting of uniform police officers at all gates to support the security screening process and as a deterrent. In respect of the last point, we strongly recommend that clear lines of immediate communication be established between the uniformed police officers and the screening personnel in the event that prohibited items are discovered by screeners.

Security managers are encouraged to call the Security Department if we can be of any assistance in the implementation of pat downs security screening.

MA:gd

Indemnifying Party elects not to contest or defend such Action, or (b) if the interests of the Indemnified Party and the Indemnified Party are sufficiently adverse to prohibit the representation by the same counsel of both parties under applicable Law, ethical rules, or equitable principals. If within twenty (20) days following such notice from the Indemnified Party (or within such shorter time as may be necessary to give the Indemnified Party a reasonable opportunity to respond to service of process or other judicial or administrative action), the Indemnified Party has not received notice from the Indemnifying Party that such Action will be contested or defended by the Indemnifying Party, the Indemnified Party shall have the right to (i) authorize attorneys satisfactory to it to represent it in connection therewith; and/or (ii) at any time settle, compromise, or pay such action, in either of which events the Indemnified Party shall be entitled to indemnification therefor subject to this Section. Following any notice of an indemnification claim not based on an Action, the Indemnifying Party shall promptly reimburse the Indemnified Party for all amounts owed to it by reason of such indemnification obligation.

        31.5.1  In the event and so long as the Indemnifying Party is actively contesting or defending against an Action as hereinabove provided, the Indemnified Party shall cooperate with the Indemnifying Party and its counsel in such contest or defense, shall join in making any appropriate counterclaim or cross-claim in connection with the Actions, and shall provide such access to the books and records of the Indemnified Party as shall be necessary in connection with such defense or contest, all at the sole cost and expense of the Indemnifying Party. Notwithstanding that an Indemnifying Party is actively conducting such defense or contest, any Action may be settled, compromised, or paid by the Indemnified Party without the consent of the Indemnifying Party, provided however, that if such action is taken without the Indemnifying Party's consent, its indemnification obligations in respect of such claim shall thereby be nullified. Any such Action may be settled, compromised, or paid by the Indemnifying Party without the Indemnified Party's consent, so long as such settlement or compromise does not cause the Indemnified Party to incur any present or future cost, expense, obligation or liability of any kind of nature.

        31.5.2  In the event any Action involves matters partly within or partly outside the scope of the indemnification by the Indemnifying Party hereunder, then the attorneys' fees, costs, and expenses of contesting or defending such Action shall be allocated between the Indemnified Party and the Indemnifying Party as they shall agree. If such an allocation cannot be agreed upon, then the dispute shall be submitted to Expedited Arbitration.

    31.6  **Survivability.**  The indemnification obligations of each of the parties hereto shall survive the termination or cancellation of this Agreement.

## ARTICLE 32.
## EXPEDITED ARBITRATION

    32.1  **General.**  With respect to disputes between the parties regarding any provision contained in Article 19 or Article 23, a party shall request that the dispute be

submitted to an Expeditious Arbitrator for arbitration ("Expedited Arbitration") in accordance with the provision of this Article 32. The "Expeditious Arbitrator" shall have exclusive control over the location and rules of such Expedited Arbitration.

32.2  **Selection of Expeditious Arbitrator.**  Unless otherwise agreed to by the parties, the Expeditious Arbitrator shall be selected by the parties from a list of twenty (20) persons furnished by the Chicago Chapter of the American Arbitration Association. Upon delivery of the Expedited Arbitration Request, the parties shall in good faith attempt to mutually agree upon a Expeditious Arbitrator. In the event that the parties cannot agree within five (5) days after receipt of the Expedited Arbitration Request, then representatives of the parties shall meet promptly and the following procedures shall be applicable: The Club shall strike a name of a person on the list. Within one (1) hour thereafter, the CPD shall strike a name from the list. At one-hours intervals thereafter, each party shall strike a name from the list. If any party fails to strike a name within the allotted time period, it shall forgo its turn to strike a name. The last name on the list shall be the Expeditious Arbitrator.

32.3  **Expedited Arbitration Process.**  To request Expedited Arbitration, a party shall provide written notice thereof to the other party ("Expedited Arbitration Request"). Such notice shall provide in detail the nature of the dispute, the basis of the dispute and the proposed remedy of the dispute. An Expeditious Arbitrator shall be selected as provided in Section 33.2. Within ten (10) days after the selection of the Expeditious Arbitrator, the Expeditious Arbitrator shall arbitrate a meeting between the CPD and the Club. Within ten (10) days of such meeting, the Expeditious Arbitrator shall make his ruling ("Expedited Ruling") which shall be binding upon the parties subject to the following sentence. A party may challenge any Expedited Ruling through Standard Arbitration or as disputes may otherwise be resolved herein; provided however, until such Expedited Ruling is overruled or nullified, the parties shall fully comply and abide by such Expedited Ruling.

32.4  **Fees and Costs.**  If the Expeditious Arbitrator shall find in favor of one of the parties and shall find that the other party either (i) had no reasonable basis for its position in the dispute; or (ii) acted willfully or in bad faith, then the Expeditious Arbitrator shall order the non-prevailing party to pay all of the prevailing party's reasonable costs and expenses incurred in bringing the dispute to Expedited Arbitration. In all other cases, the parties shall share equally the costs of such arbitration and shall pay their own attorney's fees and costs.

32.5  **Discovery Rights.**  Each party shall be entitled to such discovery rights as determined by the Expeditious Arbitrator.

## ARTICLE 33.
## STANDARD ARBITRATION

33.1  **General.**  In the event of any dispute between the parties hereto regarding any provision of this Agreement, a party shall request that the matter be submitted to arbitration in accordance with the provisions of this Article 33 ("Standard Arbitration") unless such dispute shall be handled through Expedited Arbitration in accordance with the terms of this Agreement. All such arbitration shall be conducted before a "Panel"

06298/00024/189933/20

- 85 -