IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE CHICAGO PARK DISTRICT, an<br>Illinois Municipal Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 06 C 3957 |
| v. | ) ) | Hon. Blanche M. Manning |
| THE CHICAGO BEARS FOOTBALL<br>CLUB, INC., a Delaware Corporation, and<br>THE CHICAGO BEARS STADIUM LLC,<br>a Delaware Limited Liability Company, | ) ) ) ) ) | Magistrate Judge Schenkier |
| Defendants. | ) ) ) | |

**APPENDIX OF EXHIBITS IN SUPPORT OF THE CHICAGO
PARK DISTRICT'S EMERGENCY MOTION TO STAY ARBITRATION**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| A | Johnston v. Tampa Sports Authority<br>No. 8:05-CV-21-T-27MAP (M.D. Fla. July 28, 2006) |
| B | Johnston v. Tampa Sports Authority<br>No. 05-09-09151 (Fla. Cir. Ct. Nov. 2, 2005) |
| C | Bears' Demands for Arbitration |
| D | Arbitrator's Curriculum Vitae |

Richard W. Burke
George J. Lynch
Aaron H. Stanton
Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-3607
(312) 840-7000 (Telephone)
(312) 840-7900 (Facsimile)
Attorney No. 41904

**Counsel for Plaintiff, The Chicago Park District**

10934/00018/405095

# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GORDON JOHNSTON,

               **Plaintiff,**

vs.                                  **Case No. 8:05-CV-2191-T-27MAP**

TAMPA SPORTS AUTHORITY and
HENRY G. SAAVEDRA, in his official
capacity as Executive Director of the
TAMPA SPORTS AUTHORITY,

               **Defendants.**

_____/

## ORDER

    **BEFORE THE COURT** is Defendants' Motion to Reconsider, Vacate, and Dissolve the

Preliminary Injunction (Dkt. 7) and Plaintiff's Response in Opposition (Dkt. 23). Argument on

Defendant's motion was heard on July 13, 2006. After careful consideration of the parties' briefs

and the record before the state court, Defendants' Motion to Reconsider, Vacate and Dissolve the

Preliminary Injunction is **DENIED**. The mass suspicionless pat-downs implemented by the Tampa

Sports Authority ("TSA") for NFL games at Raymond James Stadium ("Stadium") constitute

unreasonable searches under the Florida Constitution and the Fourth Amendment to the United

States Constitution.[1]

    The TSA has not established that its concern for public safety is based on a substantial and

---

[1] Article I, Section 12 of the Florida Constitution affords the same protections against unreasonable searches and seizures as the Fourth Amendment to the United States Constitution. *See State v. Peterson*, 739 So. 2d 561, 564 (Fla. 1999).

real risk which would justify a "special needs" exception to the well-established rule that suspicionless searches of one's person are *per se* unreasonable. Moreover, the TSA has not demonstrated that this case presents one of the very limited instances where the Plaintiff's privacy interest is minimal and the TSA's public safety interest would be jeopardized by prohibiting mass suspicionless pat-downs at the Stadium.

Before embarking upon a complex constitutional analysis, it is important to emphasize what this case is *not* about. It is not about the wisdom of the pat-down policy, whether the average Buccaneers fan supports or objects to the pat-down searches, or whether a judge believes the pat-downs are wise.[2] The Eleventh Circuit has cautioned that "[c]onducting an *ad hoc* analysis of the reasonableness of the search based on the judge's personal opinions about the governmental and privacy interests at stake, instead of applying the Supreme Court's well-established *per se* rules regarding warrants, prior judicial scrutiny of proposed searches, probable cause, and individualized suspicion ignores [ ] crucial Fourth Amendment principles." *Bourgeois v. Peters*, 387 F.3d 1303, 1314 (11th Cir. 2004) (citations omitted).

"The Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on *evidence*-rather than potentially effective, broad prophylactic dragnets-as the constitutional norm." *Bourgeois*, 387 F.3d at 1312 (emphasis added). The constitutionality

---

[2] The TSA implemented pat-downs after the NFL and the Buccaneers "mandated" them. The NFL's concern over potential terrorist attacks at its stadiums was the reason for the NFL's mandate. The NFL's concern for the safety and well being of its patrons and the good intentions behind the pat-down policy cannot reasonably be criticized. The Fourth Amendment, however, requires a constitutional analysis that may or may not be consistent with the NFL's rationale for mandating pat-downs. Moreover, and most importantly from a constitutional perspective, it is the action of the TSA, a public agency created by Florida law that is subject to Fourth Amendment scrutiny, not that of the NFL.

-2-

of the pat-down searches is determined by a careful and considered analysis of the evidence presented in justification of the pat-downs, specifically an analysis of whether that evidence demonstrates a "substantial and real" risk of a terrorist attack on an NFL stadium. *Chandler v. Miller*, 520 U.S. 305, 323 (1997). Only under this very limited circumstance has the Supreme Court authorized an exception to the general rule that suspicionless searches, such as the pat-down searches implemented by the TSA, are *per se* unconstitutional. *See id.*

### Procedural and Factual Background

This case was originally filed in the Circuit Court of Hillsborough County, Florida by Plaintiff, a Tampa Bay Buccaneers season ticket holder, against the TSA and its Executive Director, Henry G. Saavedra. In his initial lawsuit, Plaintiff sought declaratory and injunctive relief, contending that the mass suspicionless pat-downs of patrons attending Buccaneers games at the Stadium implemented by the TSA violate his constitutional rights under Article 1, Section 12 of the Florida Constitution. The state court conducted an evidentiary hearing on Plaintiff's emergency motion for preliminary injunction and thereafter granted an injunction prohibiting the pat-downs.[3] (App. 7, 8).

The Tampa Bay Buccaneers, a NFL franchise, plays its home football games at the Stadium pursuant to the Buccaneers' Stadium Agreement with the TSA. (App. 7, p. 32). The Stadium hosts other events as well, including University of South Florida Bulls football games, high school events and "monster truck pulls." (App. 7, p. 25). In August 2005, the NFL declared that all persons attending NFL games be physically searched before entering NFL stadiums. (App. 4, Hast Aff., ¶

---

[3] Record citations are to the Appendix filed in the TSA's interlocutory appeal of the preliminary injunction order.

9; App. 8, p. 44). The pat-downs were implemented to address the perceived risk of detonation of an "improvised explosive device" ("IED").[4]  (App. 4, Hast Aff., ¶ 9).

The TSA is a public entity created by the Florida legislature. Pursuant to that authority, the TSA operates the publicly-owned Stadium. (App. 7, pp. 21-22).  During its September 13, 2005 board meeting, at the request of representatives of the NFL and Buccaneers, the TSA authorized pat-down searches of every person who enters the Stadium to attend Buccaneers games. (App. 8, pp. 111-12). Recognizing the constitutional implications of mass suspicionless searches, on advice of counsel, the TSA also voted to recommend that the Buccaneers refund ticket prices to any fan who objected to the pat-downs. (App. 17, pp. 10-11, 26)

At the TSA's expense, private "screeners" were hired to physically pat down each patron as he or she enters the gate.  (App. 7, p. 34;  App. 8, pp. 60-61, 126-27, 131).  Generally, the pat-down is performed above the patron's waist.  If the security personnel observe suspicious bulges, the screener may pat the pockets and instruct the patron to empty them.  (App. 8, pp. 60-61; App. 4, ¶¶ 11-14).  The screener "conducts a visual inspection of the person by asking the person to extend his arms sideward and upward, parallel to the ground, with palms facing up, and then visually inspect[s] the person's wrists and arms for switches, wires, or push-button devices."  The screener then conducts a "physical inspection by touching, patting, or lightly rubbing the person's torso, around his waist, along the belt line" and "touches, pats, or lightly rubs the person's back along the spine from the belt line to the collar line."  (App. 4, Hast Aff., ¶¶ 11-13).  Anyone found to be carrying contraband is detained while the police are summoned.  (App. 7, p. 99; App. 8, pp. 89-92, 129-30). Anyone who refuses to be patted down is denied entry into the Stadium.

---

[4] Examples of IEDs include "suicide bomber" belts and vests.  (App. 4, Hast Aff., ¶ 8).

Plaintiff has been a Buccaneers season ticket holder since the 2001-2002 season. (App. 7, p. 54). To become a season ticket holder, he was required to pay a seat deposit in addition to the annual price of his tickets. (App. 7, pp. 54-55). Plaintiff renewed his season tickets for the 2005-2006 season. At that time, he was not given notice that he would be subjected to a pat-down search before entering the Stadium.[5] (App. 7, pp. 56-58). After the TSA adopted the pat-down policy, Plaintiff contacted the Buccaneers to complain. He was told that the Buccaneers would not refund his season ticket price. (App. 7, pp. 62, 77-78). Even if Plaintiff were permitted to return his 2005-2006 tickets for a refund, he would lose the remainder of his seat deposit and would be relegated to the bottom of a long waiting list in the event he desired to purchase season tickets in the future. (App. 7, pp. 77-78). During the 2005-2006 season, Plaintiff attended several Buccaneers games. (App. 7, pp. 55, 63). Prior to being patted down, he stated that he "do[es] not consent to the search." (App. 7, pp. 63-64).

In granting Plaintiff's motion for an emergency temporary injunction, the state court concluded that Plaintiff was likely to succeed on his constitutional claim. (App. 12). The court issued a preliminary injunction enjoining Defendants from conducting "mass suspicionless pat-down searches of every person attending Bucs games at [the Stadium]."[6] (App. 12). In November 2005, Plaintiff amended his complaint, adding claims that the pat-down searches violate the Fourth

_____

[5] During the hearing on July 13, 2006, counsel represented that Plaintiff renewed his season tickets for the 2006-2007 season. According to counsel, at the time Plaintiff renewed his tickets, he was not certain that the pat-down searches would be implemented because the preliminary injunction was in effect.

[6] Defendants appealed the state court's decision to the Florida Second District Court of Appeal. Pursuant to Fla. R. App. P. 9.310(b)(2), the preliminary injunction was automatically stayed pending appeal. On Plaintiff's motion, the appellate court vacated the automatic stay. *Tampa Sports Authority v. Johnston*, 914 So. 2d 1076, 1084 (Fla. 2d DCA 2005). The injunction, therefore, remains in effect. *Id.*

Amendment to the United States Constitution and 42 U.S.C. § 1983. On November 30, 2005, Defendants removed the case to federal court, asserting federal question jurisdiction. (Dkt. 1). Pursuant to Fed. R. Civ. P. 59(e), Defendants request that this Court reconsider, vacate and dissolve the preliminary injunction issued by the state court. (Dkt. 8).

### Applicable Standards

After removal, orders issued by the state court are considered orders of the district court. *See Jackson v. Am. Sav. Mortgage Corp.*, 924 F.2d 195, 198 (11th Cir. 1991) ("[a]fter removal, state court proceedings are treated as those of the district court and the district court naturally is able to reexamine its own proceedings") (citations omitted). "A federal district court may dissolve or modify injunctions, orders, and all other proceedings which have taken place in state court prior to removal." *Id.* Reconsideration ensures that any alleged errors brought to the federal appeals court "*are in fact* as well as in theory *the considered products of a district judge.*" *Resolution Trust Corporation v. Bakker*, 51 F.3d 242, 244-45 (11th Cir. 1995) (citations omitted).

Rule 59(e), which permits motions to alter or amend a judgment, is the proper procedural vehicle by which the district court may entertain a motion to reconsider an order entered by the state court prior to removal. *Id.* The district court "should evaluate and resolve a Rule 59 motion in these circumstances just as it would a motion to vacate a judgment originating in federal court . . ." *Bakker*, 51 F.3d at 245. Rule 59(e) gives the court broad discretion to reconsider an order. *See O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992) ("[t]he decision to alter or amend a judgment is committed to the sound discretion of the district court"). _____

The purpose of a preliminary injunction is to protect against irreparable injury and preserve the *status quo* until the district court renders a meaningful decision on the merits. *See Canal Auth.*

*of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).[7]  A district court may grant a preliminary injunction only if the moving party shows that: (1) he has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).

### Discussion

Defendants seek reconsideration of the preliminary injunction, arguing Plaintiff failed to establish that he is likely to succeed on the merits of his constitutional claims.  Defendants contend Plaintiff is not likely to prevail because: (1) the TSA's role in implementing the pat-down policy does not constitute "state action"; (2) the pat-down searches are not unreasonable because the TSA demonstrated a "special need" and because the Plaintiff has no reasonable expectation of privacy at the NFL games; (3) Plaintiff impliedly consented to the pat-down search; and (4) the equities weigh in favor of public safety and against issuance of an injunction.

1.    **State Action**

The Fourth Amendment to the United States Constitution and Article 1, Section 12 of the Florida Constitution guarantee the right to be free from "unreasonable searches and seizures . . . ." *State v. Iaccarino*, 767 So. 2d 470, 475 (Fla. 2d DCA 2000); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "Implicit in that guarantee is the requirement that an agent of the government perform those searches and seizures." *Iaccarino*, 767 So. 2d at 475 (citing *Burdeau v. McDowell*,

---

[7]  The Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit made prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

-7-

256 U.S. 465, 475 (1921)). A variety of tests have been employed to determine whether conduct constitutes state action. At the heart of each test is the requirement that "the conduct allegedly causing the deprivation of a federal right" be "fairly attributable to the State." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). A plaintiff must demonstrate that the alleged deprivation of constitutional rights was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." [8] *Id.*

Defendants contend the pat-downs were not performed by state actors because the TSA was not "acting in a governmental capacity" and was "not performing a governmental function" when it voted to implement the pat-down searches. According to Defendants, the TSA was acting as a "managing agent" pursuant to the Stadium Agreement it executed with the Buccaneers. Defendants maintain the TSA instituted the pat-downs because the Buccaneers requested that it do so, pointing out that the policy was "reasonably consistent" with rules for similar NFL stadiums" and therefore, the TSA was contractually obligated to implement the policy. Defendants' arguments are unpersuasive.

The TSA is a public agency created by the Florida legislature "for the purpose of planning, developing, and maintaining a comprehensive complex of sports and recreation facilities for the use and enjoyment of the citizens of Tampa and Hillsborough County, as a public purpose." *State v. Tampa Sports Authority*, 188 So. 2d 795, 796 (Fla. 1966) (citing Ch. 65-2307, Laws of Fla., Acts of 1965). The TSA cannot transform its actions as a public agency into that of a private actor simply

---

[8] Conduct that constitutes "state action" under the Fourth Amendment necessarily constitutes conduct "under color of law" for purposes of determining § 1983 liability. *Gallagher*, 49 F.3d 1447 (citing *Lugar*, 457 U.S. at 935)). Accordingly, cases analyzing whether a party acted "under color of law" pursuant to § 1983 are instructive.

because it has a contractual obligation to provide security for the Buccaneers games under the terms

of the Stadium Agreement.  When the TSA decided to implement the pat-down searches, it acted in

its capacity as a public agency entrusted with the responsibility of maintaining the Stadium.  Simply

put, the TSA cannot contract away its public status.  Likewise, it cannot contractually obligate itself

to perform its responsibility to maintain the Stadium in an unconstitutional manner.[9]

Similarly, that the pat-downs are conducted by a private security company does not insulate

the searches from state action status. Contrary to the TSA's contention, the evidence demonstrates

that the screeners who performed the searches were acting as instruments of the TSA for purposes

of a state action analysis.  The TSA voted to implement the pat-down policy, hired the security

company to perform the pat-down searches, dictated the security company's duties, and paid the

security company with taxpayer dollars.  The alleged constitutional deprivation was caused by the

exercise of a policy created and imposed by the TSA and implemented by people for whom the TSA

was responsible.  There is, therefore, a sufficiently close nexus between the TSA and the challenged

conduct such that the conduct may be fairly treated as that of the TSA itself.  *See Gallagher*, 49 F.3d

at 1450 (recognizing that if appellants "could demonstrate that the pat-down searches directly

resulted from the University's policies then the required nexus" and in turn, state action, "would be

established"); *Iaccarino*, 767 So. 2d at 475 (off-duty police officers, hired by private concert

promoter to provide security, are state actors where sheriff's office had discretion to assign officers

---

[9] The TSA provides no authority to support its argument that its contract with a private entity or its contractual obligation to provide security absolves it from traditional constitutional limitations and restraints placed on state actors. TSA's reliance on cases involving preemption, tax exemption, the market-participant doctrine, and the dormant commerce clause are simply misplaced and unpersuasive.

and officers had "complete discretion" as to how to conduct the searches).[10]

Finally, Defendants contend the pat-down searches are not state action because they were conducted for the purpose of maintaining security and not for law enforcement purposes. Defendants point out that the "mere fact that police are able to observe the screeners conduct the pat-down searches does not render the searches 'state action.'" (Dkt. 8, p. 10).[11]

Whether and to what extent law enforcement participated in the pat-down searches and whether TSA's public safety and security interests are independent of a general interest in law enforcement is not determinative to the state action analysis, however. As discussed, the pat-down searches constitute state action because the TSA, acting as a public entity fulfilling its public

---

[10] The cases Defendants rely on in support of their argument that the TSA's actions in connection with the pat-down searches do not constitute state action are inapposite. *See Gallagher*, 49 F.3d 1442; *National Broadcasting Co. v. Communications Workers of America, AFL-CIO*, 860 F.2d 1022 (11th Cir. 1988). In both *Gallagher* and *NBC*, a private entity either made the decision that allegedly deprived the plaintiffs of their constitutional rights or exercised control over the conduct that allegedly deprived the plaintiffs of their constitutional rights. *See Gallagher*, 49 F.3d at1445 (no state action where private concert promoter made decision to hire security company that performed pat-down searches and discussed procedures for pat-down searches with security personnel); *National Broadcasting Co.*, 860 F.2d at 1027-28 (no state action where private entity renting City of Miami Convention Center made decision to exclude plaintiff from event; City of Miami did not dictate, control or participate in alleged unconstitutional conduct).

[11] The evidence presented at the preliminary injunction indicates that the police officers were prepared to do more than just observe the pat-down searches. Robert Hast, the NFL's Director of Event Security, testified that "[w]e requested that stadiums place a law-enforcement officer at each of the gates to support the private security because they don't have authority to make arrests. . .." (App. 8, p. 91). According to Hast, the screeners were trained to call law enforcement over to detain or arrest any individual found to have contraband. (App. 8  pp. 90-94, 129-31).

Similarly, Mickey Farrell, TSA's Director of Operations, testified that police officers are strategically positioned near the screeners and have discretion to conduct "extended searches," if necessary. At the September 15, 2005 TSA board meeting, Farrell testified:

> [F]or every eight lines we have out there, there will be three officers behind, and there will be two sentry supervisors behind. So you will have five people between basically the entrance gate and the actual person conducting the pat-down. . . . if you find something or you want to do an extended search, I guess, for lack of a better term, we will bring you over to the side and bring you over to the police officer, if we suspect something. Say you come up and you've got these big baggy pants and you have this big thing sticking out and you don't want to take it out of your pocket, we will bring you over to the side and we will have a wand there and the officer can decide what to do with you next.

(App. 17, p. 17).

purpose, implemented the pat-down policy, hired and supervised the security personnel and paid for the searches with public funds. Under such circumstances, the pat-down searches constitute state action for purposes of a Fourth Amendment search and seizure analysis. *See e.g., Stroeber v. Commission Veteran's Auditorium*, 453 F. Supp. 926, 931 (S.D. Iowa 1977) (state action where Commissioners "purported to act in a capacity made possible by virtue of state statutes and were acting to provide security for a public facility financed by public monies").

**2.      The Reasonableness of the Pat-Down Searches**

"The Fourth Amendment requires government to respect the right of the people to be secure in their persons . . . against unreasonable searches and seizures. This restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion." *Chandler*, 520 U.S. at 308 (citations and quotations omitted). The sanctity of one's person is, therefore, the starting point for the requisite Fourth Amendment analysis.

The Supreme Court, in scrutinizing a stop and frisk of an individual suspected of being involved in criminal activity, found the frisk to be a "serious intrusion upon the sanctity of the person . . . not to be undertaken lightly." *See Terry v. Ohio*, 392 U.S. 1, 17 (1968). The Court rejected the argument, one that might be made here, that a frisk was a mere "petty indignity." *Id.* While the frisk in *Terry* was arguably more intrusive than the pat-downs conducted by the TSA at the Stadium, the Court's analysis in *Terry* is instructive, as the Court reasoned that "the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security" and that "the scope of the particular intrusion, in light of all the exigencies of the case" is the "central element in the analysis of reasonableness." *Id.* at 19. *Terry* requires, therefore, that a search of an individual must be premised on "specific and articulable facts which, taken together with rationale

-11-

inferences from those facts, reasonably warrant that intrusion." *Id*. at 21. "[A]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulable hunches, a result this Court has consistently refused to sanction." *Id*. at 22. Consistent with the Court's analysis in *Terry*, mass suspicionless searches have been uniformly prohibited, absent certain narrow exceptions.

### The "Special Needs" Exception

Recognizing that there are circumstances in which a compelling governmental interest will outweigh an individual's right to be free from suspicionless searches, the Supreme Court has carved out a narrow exception in instances where suspicionless searches are implemented "to further 'special needs' beyond the normal need for law enforcement." *Bourgeois*, 387 F.3d at 1312 (citations omitted). In order to justify the "special needs" exception, however, the risk to public safety must be "substantial and real." *Chandler*, 520 U.S. at 323. Accordingly, the "proffered special need . . . must be *substantial* – important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id*. at 318 (emphasis added). There must also be a "*concrete danger* demanding departure from the Fourth Amendment's main rule," such that the hazard or threat is "*real and not simply hypothetical.*" *Id*. at 318-19 (emphasis added). A "special need" cannot be demonstrated by the "gravity of the threat" alone or the "severe and intractable nature of the problem." *See City of Indianapolis v. Edmond*, 531 U.S. 32, 42-43 (2000). In cases applying the "special needs" exception, some evidentiary justification for the suspicionless searches has been

demonstrated.[12]

"When such 'special needs'. . . are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler*, 520 U.S. at 314. In doing so, "the Court must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue." *Edmond*, 531 U.S. at 43-44.

Defendants contend the "special needs" exception justifies mass suspicionless pat-downs of NFL patrons because of the need to protect patrons against potential terrorist attacks. One cannot seriously dispute the magnitude of the threat of terrorism to this country or the Government's interest in eradicating it. In this regard, the TSA's "special need" to prevent terrorist attacks is "substantial," as that requirement is defined in *Chandler*. Likewise, any reasonable person appreciates the potential harm that would result from a terrorist attack at the Stadium. However, the gravity of the threat cannot alone justify the intrusiveness of a suspicionless search of Plaintiff's person. *See Edmond*, 531 U.S. at 42-43 (gravity of drug problem alone insufficient to justify canine and visual

---

[12] *See Board of Ed. of Independence 92 v. Earls*, 536 U.S. 822, 835-36 (2002) (suspicionless drug testing program for students engaged in extracurricular activities upheld where Government presented specific evidence of drug use at particular school, including teachers' testimony of witnessing students under the influence and where police found drugs or drug paraphernalia in vehicle driven by extracurricular club member); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 650 (1995) (suspicionless drug testing program for high school students engaged in interscholastic athletic competitions upheld where the district court's findings included an "immediate crisis" caused by "a sharp increase in drug use" and that student athletes were not only "among the drug users" but also "leaders of the drug culture"); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 447 (1990) (sobriety checkpoint upheld where court found "[d]runk drivers cause an annual death toll of over 25,000 and in the same span cause nearly one million personal injuries and more than five billion dollars in property damage"); *Skinner v. Railway Labor Executives Assn.*, 489 U.S. 602, 607-08 (1989) (upholding Federal Railroad Administration's adoption of drug testing of employees involved in train accidents and employees who committed certain safety rules where testing was adopted in response to evidence of drug and alcohol abuse by some railroad employees, the obvious safety hazards posed by such abuse, and the documented link between drug and alcohol impaired employees and the incidence of train accidents); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 669 (1989) (drug testing for Customs employees seeking promotion upheld even though Government did not demonstrate an existing problem of drug abuse but where it was demonstrated that Customs' officers "ha[d] been the targets of bribery by drug smugglers on numerous occasions" and several had succumbed to the temptation).

inspections of vehicles). To warrant the intrusion on Plaintiff's fundamental right to be free from suspicionless pat-down searches, the specific threat that the TSA seeks to prevent, that of a terrorist attack on the Stadium, must be a "concrete danger," "real," and "not hypothetical." A generalized threat of a terrorist attack will not suffice. *Bourgeois*, 387 F.3d at 1311 (rejecting general evidence of a threat of terrorism, such as the Department of Homeland Security's elevated threat advisory level, as insufficient to justify a "special needs" exception to a suspicionless search). Although the record demonstrates a generalized threat of terrorism to large gatherings, the TSA has not met its burden of establishing a "substantial and real" risk of a terrorist attack at an NFL stadium.

During the preliminary injunction hearing, Roland Manteiga, a TSA board member, testified that prior to the TSA vote adopting the NFL's pat-down policy, there was no testimony or evidence of a particularized threat to NFL games or to the Stadium. (App. 7, pp. 24-25). The minutes of the September 13, 2005 board meeting confirm that although concerns of an attack were discussed, no evidence of a threat to NFL stadiums was presented. Moreover, in the aftermath of September 11, 2001, the TSA rejected pat-downs on two separate occasions, finding them unnecessary.[13] (App. 7, pp. 22-23). According to Manteiga, the "biggest difference" between the two votes against the pat-downs and the third vote to implement the pat-downs was that the NFL "mandated" implementation of the pat-downs prior to the third vote. (App. 7, pp. 31-32).Likewise, Mickey Farrell, TSA's Director of Operations, testified that the pat-downs were "mandated" by the NFL and the Buccaneers. (App. 8, p. 112). The minutes of the September 13, 2005 board meeting confirm that the TSA adopted the pat-down policy solely because of the NFL's mandate. (App. 17).

---

[13] Mickey Farrell, TSA's Director of Operations, testified that the TSA had received a telephone threat two years prior to its vote to implement the pat-down policy. The telephone threat was investigated and determined to be a false alarm. (App. 8, pp. 128-129). The TSA choose not to implement pat-down searches in response to the threat. *Id.*

-14-

During the preliminary injunction hearing, the TSA presented testimony describing what the NFL relied on in mandating pat-downs at all NFL games. The information dealt primarily with threats to the transportation industry rather than sports or stadium events. Robert Hast, the NFL's Director of Event Security, testified that the NFL decided to implement the pat-down policy after the alert to the "transportation industry" was heightened. (App. 8, p. 44).

While Hast testified that the NFL relied on information from "government agencies, the State Department, the FBI, the Secret Service, the New York Police Department, as well as the joint terrorist task force," he identified only two specific reports of terrorist threats.[14] The first and most troubling report was a CBS news report from July 2002 that persons associated with terrorist groups had downloaded images from the internet of NFL stadiums in Indianapolis and St. Louis. (App. 8, pp. 52-53; App. 24). However, according to the report, the FBI investigated that incident and determined that it presented no threat, "not even a perceived or implied threat." (App. 8, pp. 84-85; App. 24). The FBI field director was quoted as saying there was no need to alter attendance policies at NFL games. (App. 8, pp. 84; App. 24).[15]

The second report relied on by the NFL was issued in April 2005 by the U.S. Department of State in its "Country Reports on Terrorism 2004." (App. 23). The Report included a summary of terrorist threats in Spain, which included an incident in March 2004 when a bomb was detonated on

---

[14] Hast testified that "a great deal of [the] information [the NFL relied on] . . . is public information," but that "some of it is law-enforcement sensitive." (App. 8, p. 46). If that statement suggests that the NFL relied on sensitive law enforcement evidence demonstrating a "substantial and real" threat to NFL games in addition to what was presented, it was incumbent upon the TSA to present that evidence, perhaps *in camera*.

[15] Notwithstanding the age of the report and the FBI's determination that the incident did not require any change in attendance policies at NFL games, Hast intimated in his testimony that he was privy to sensitive law enforcement intelligence that provided more specific information about the individuals involved and their alleged ties to Al Qaeda. If that information exists, it was likewise incumbent upon the TSA to present it, particularly given the inference Hast draws from the information, that "[i]t tells you that people in Al Qaeda were interested in our stadiums."

-15-

a commuter train and the arrest in November 2004 of individuals linked to a radical Islamic organization. (App. 8, p. 53; App. 23, p. 52). The arrest reportedly disrupted "apparent plans" to bomb Spain's High court, Madrid's largest soccer stadium, office buildings and other public landmarks. (App. 8, p. 55; App. 23, p. 52).

The TSA also submitted a Joint Information Bulletin issued by the Department of Homeland Security (DHS) on October 4, 2005 identifying "tourist facilities" as "potentially attractive [terrorist targets.]" (App. 3, Ex. B, p. 2). Notably, the Bulletin was issued after the TSA voted to implement the pat-down policy. In the Bulletin, tourist attractions such as the Washington Monument, Statue of Liberty, Empire State Building, and Golden Gate Bridge, among others, were listed as potential targets. (App. 3, Ex. B, p. 2). The TSA contends the Bulletin is relevant despite its focus on tourist attractions because within the Bulletin, the DHS acknowledged that the list of facilities provided was not exhaustive and did not preclude "other facilities where people gather for leisure, entertainment, or vacation – such as sporting events or shopping destinations – as potential targets for terrorist attack." Significantly, however, the DHS expressly stated that "there is currently no credible or specific intelligence regarding the possibility of such attack in the United States." (App. 3, Ex. B, p. 1). Notably absent from the DHS's "suggestive protective measures" was a recommendation that suspicionless pat-down searches be conducted on patrons visiting any of the identified tourist facilities. (App. 3, Ex. B, pp. 3-7)

The only additional evidence presented by the TSA was evidence of a general concern that public events at which large crowds gather could be potential targets of terrorism. Christopher Ronay, President of the Institute of Makers of Explosives (a safety and security association representing the commercial explosives industry) testified that in his opinion NFL games "could be

-16-

a very attractive target for terrorists, *as could any large venue or venue where people gather in great numbers . . .,*" which in his opinion would include "churches, transportation venues, stadiums" and "shopping malls." (App. 7, pp. 153, 166-67) (emphasis added). Ronay testified that he was not aware of any specific threat to an NFL stadium.[16] (App. 7, p. 153).

In summary, the evidence establishes that the NFL implemented a pat-down policy as a broad prophylactic measure in response to a general threat that terrorists might attack any venue where a large number of Americans gather. The TSA adopted that policy because it was "mandated" by the NFL and the Buccaneers and because the TSA believed it had a contractual obligation to do so. While the intentions underlying the pat-down policy are commendable, the evidence the TSA presented in support of a "special needs" exception is not sufficient to demonstrate the requisite "real" and "concrete danger" to public safety at the Stadium. *See Chandler*, 520 U.S. at 323.

The relatively dated and largely non-specific evidence presented by the TSA stands in contrast to the quantity and quality of evidence which has been found sufficient to justify mass suspicionless container searches, a search unquestionably less intrusive than the pat-downs. *See Downing v. Kunzig*, 454 F.2d 1230, 1231-32 (6th Cir. 1972) (mass suspicionless searches of packages and briefcases in federal building held constitutional where "threat to federal property as

---

[16] Defendants also contend that the "Federal Government, including Congress, considers sports stadiums at risk of terrorist attack" because the Federal Aviation Administration issued a no-fly zone over "any major professional or collegiate sporting event or any other major open air assembly of people unless authorized by [air traffic control]." (Dkt. 8, pp. 2-3, 12); *see also Cleveland Nat'l Air Show, Inc. v. U.S. Dep't of Transp.*, 430 F.3d 757, 758 (6th Cir. 2005) (recognizing the no-fly zone as an enhanced security restriction issued after the air attacks on the Pentagon and World Trade Center)).

One cannot question, particularly in the aftermath of September 11, 2001, the wisdom of implementing a no-fly zone over NFL stadiums. All of the experts agree that NFL stadiums and large public venues are attractive targets. That is not to say, however, that Congress' recognition of NFL stadiums as potential terrorist targets demonstrates a "special need" to conduct mass suspicionless pat-downs of NFL patrons. As discussed, general evidence of a threat of terrorism does not satisfy the requisite need for a "substantial and real" risk justifying relinquishment of fundamental Fourth Amendment protections based on "special needs."

-17-

well as to the safety of federal personnel . . . was *direct and immediate* and likely to materialize into

acts of violence and destruction in any part of the nation"; search was implemented only after "an

outburst of acts of violence, bombings of federal buildings and hundreds of bomb threats, resulting

in massive evacuations of federal property and direct financial loss to the Government") (emphasis

added); *Macwade v. Kelly*, 2005 WL 3338573 (S.D.N.Y. Dec. 7, 2005) (random subway container

search held constitutional under "special needs" exception where Commissioner testified that 40 to

50 percent of terrorist attacks around the world are directed against transportation systems, NYC's

mass transit system, including the subway system, had been targeted by terrorists in the past, and

within the last year terrorists had bombed commuter trains in Madrid, the subway system in Moscow

and had attempted to bomb the London subway system).[17]

   A finding of "special needs" based on evidence that supports only a general fear of terrorist

attacks would essentially condone mass suspicionless searches of every person attending any large

event, including, for example, virtually all professional sporting events, high school graduations,

indoor and outdoor concerts, and parades.  While a generalized threat of terrorism in this country and

around the world is well documented, on this record, the TSA has not presented evidence that the

threat of a terrorist attack on an NFL stadium is "concrete" or "real." [18]

---

[17] *Compare Wilkinson v. Forst*, 832 F.2d 1330, 1340 (2d Cir. 1987), *cert. denied,* 485 U.S. 1034 (1988) (upholding magnetometer searches at KKK rally as constitutional, but finding pat-down searches excessive and unconstitutional even though evidence demonstrated a history of violence at KKK rallies, including reliable information from undercover agent that some attendees would be armed and ready to attack).

[18] As it has been applied, *Chandler's* "substantial and real" standard does not require that the TSA establish that an attack on an NFL stadium is certain or imminent.

*Plaintiff's Privacy Interest*

Putting aside that the TSA failed to demonstrate a "substantial and real" threat to NFL stadiums, the TSA has likewise not established that Plaintiff enjoys only a diminished expectation of privacy when attending an NFL game or that the TSA's interest in protecting patrons against terrorist attacks would be placed in jeopardy by a requirement of individualized suspicion. The Supreme Court has cautioned that only "[i]n limited circumstances, *where the privacy interests implicated by the search are minimal,* and where an important governmental interest furthered by the intrusion *would be placed in jeopardy by a requirement of individualized suspicion,* may a search be reasonable despite the absence of such suspicion." *Chandler,* 520 U.S. at 314 (citations omitted) (emphasis added).

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry,* 392 U.S. at 9 (citations omitted). "[T]he Fourth Amendment protects people, not places . . . and wherever an individual may harbor a reasonable 'expectation of privacy' . . . he is entitled to be free from unreasonable governmental intrusion." *Id.* (internal citations and quotations omitted). "In their persons and property . . . individuals are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks." *Bourgeois,* 387 F.3d at 1315 (citations and quotations omitted).

Defendants have presented no persuasive authority establishing that Plaintiff had a minimal expectation of privacy simply because he attends NFL games. To the contrary, the Eleventh Circuit has held that "[t]he text of the Fourth Amendment contains no exception for large gatherings of

-19-

people." *Bourgeois*, 387 F.3d at 1311. "The need to apply [the Supreme Court's well-established *per se* rules regarding warrants, probable cause and individualized suspicion] reaches all searches, whether of the home, office, person, or other location." *Id.* at 1314. Defendants' assertion that Plaintiff enjoyed a diminished or minimal expectation of privacy because he attended a Buccaneers game is contrary to Eleventh Circuit precedent and otherwise unpersuasive.

Also important to a comprehensive Fourth Amendment analysis is consideration of the degree of the intrusion imposed by the pat-down search on Plaintiff's privacy right. "[A] frisk is considered a gross invasion of one's privacy." *United States v. Albarado*, 495 F.2d 799, 807 (2d Cir. 1974) (recognizing that airport "frisks" of individuals who set off a magnetometer "may be more in the nature of a 'pat-down'"). Pat-downs or searches of an individual's person have been regarded as far more intrusive than container searches, sniff searches performed by canines, and magnetometer searches applied to the public at large. *See e.g., Wilkinson*, 832 F.2d at 1337-38, 1340 (holding mass suspicionless pat-downs searches unconstitutional despite reliable evidence that violence at rally was likely, but upholding magnetometer searches as reasonable and less intrusive); *Jensen v. City of Pontiac*, 317 N.W.2d 341, 347 (Mich. Ct. App. 1981) (recognizing that a "physical pat-down search by a guard is more intrusive than a limited visual search"); *U.S. v. Cintro-Segarra*, 1993 WL 150307, at *3 (D. PR. 1993) (recognizing that "hand held magnetometer [ ] is much less intrusive [ ] than a pat-down or frisk"). Moreover, airport searches conducted with magnetometers and courtroom searches that generally employ a brief stop and visual examination of packages, are far less intrusive than the pat-down searches the TSA seeks to implement. *See Jacobsen v. City of Seattle*, 658 P.2d 653, 656-57 (Wash. 1983) (citing *Downing*, 454 F.2d at 1233; *Edwards*, 498 F.2d at 496); *see also Wilkinson*, 832 F.2d at 1339 (recognizing that "the airport and courtroom cases have sanctioned only

magnetometer searches" despite unprecedented evidence of the potential harm to hundreds of persons posed by airplane hijackings and bombings).

Finally, relevant but not determinative to the constitutionality of the pat-downs is the TSA's failure to present convincing evidence that prohibiting the pat-down searches would preclude the TSA from averting the danger it seeks to prevent or that security measures already in place do not adequately protect the patrons. While the reasonableness of the search does not turn on an evaluation of the effectiveness of the search or the existence of less intrusive means, consideration of the evidence presented in this regard is one factor to consider in the Fourth Amendment analysis. *See Wilkinson*, 832 F.2d at 1340 n. 13 (recognizing that reasonableness of search does not invariably turn on existence of alternative, less intrusive means but finding that consideration of alternative means remains a legitimate factor in Fourth Amendment analysis).

While the TSA presented expert testimony that the pat-down searches are the most effective means of detecting IEDs, the TSA did not institute pat-down searches until two years after it received the only specific threat to the Stadium, a telephone call later determined to be a false alarm. The evidence suggests that the TSA decided to implement the policy in large part, if not exclusively, because of its perceived contractual obligation to do so. When the TSA finally voted to implement the pat-down procedure, it chose to apply the policy only to Buccaneers games. These circumstances undermine the TSA's argument that the pat-down searches are an essential aspect of terrorism protection. In conclusion, the TSA has not demonstrated that this case presents one of the very limited instances where the Plaintiff's privacy interest is "minimal" and the TSA's public safety interest "would be placed in jeopardy by a requirement of [individualized] suspicion." *See Chandler*, 520 U.S. at 314. Simply put, the intrusiveness of the pat-downs cannot be constitutionally justified under these circumstances.

### 3.     Implied Consent

Defendants contend the pat-down search is constitutional because Plaintiff consented to the search by repeatedly attending NFL games knowing in advance that he would either be subjected to a pat-down search or denied entry to the Stadium.  (Dkt. 8, p. 18).  In other words, Defendants contend that Plaintiff was not compelled to submit to the pat-down search, but rather consented to the search by choosing to attend the Buccaneers games.

This type of implied consent, where the government conditions receipt of a benefit (attending the Stadium event) on the waiver of a constitutional right (the right to be free from suspicionless searches), has been deemed invalid as an unconstitutional condition. *See Bourgeois*, 387 F.3d at 1324 (rejecting city's argument that participants at a demonstration consented to search because they were not compelled to submit to search, but rather choose to participate in the protest) (citing *Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986)) ("[t]he doctrine of unconstitutional conditions prohibits terminating benefits, though not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe").

Plaintiff's property interest in his season tickets and his right to attend the games and assemble with other Buccaneers fans constitute benefits or privileges that cannot be conditioned on relinquishment of his Fourth Amendment rights. *See Bourgeois,* 387 F.3d at 1324 (citing *Boykins v. Fairfield*, 399 F.2d 11, 13 (5th Cir. 1968)); *see also Nakamoto v. Fasi*, 635 P.2d 946, 951-52 (Haw. 1981) (search of patron's personal effects as condition to entry of the City arena for a rock concert held unconstitutional; a citizen should not be "required to relinquish his constitutional right to be free from unreasonable searches and seizures, in order to be allowed to exercise a privilege for which, incidentally . . .  he has paid for").

Regardless of the unconstitutional condition imposed on Plaintiff's admission to the Stadium, Plaintiff's conduct does not constitute implied consent because it was not voluntarily given, free from constraint. A "[v]alid consent legitimizes an otherwise unconstitutional search." *See Lenz v. Winburn*, 51 F.3d 1540, 1548 (11th Cir. 1995). "Searches conducted by means of consent are valid so long as the consent is voluntary." *United States v. Chrispin*, 2006 WL 1457689, at *3 (11th Cir. May 26, 2006) (citations omitted). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Id.* (citations omitted); *see also Shapiro v. State of Florida*, 390 So. 2d 344, 348 (Fla. 1980) ("consent must be free and unconstrained, and the question of voluntariness is a question of fact to be determined from the totality of the circumstances"). The following factors are relevant in determining the issue of implied consent: (1) whether the individual was aware that his conduct would subject him to a search (2) whether a vital interest supports the search; (3) the apparent authority of the officer to conduct the search; (4) whether the individual was advised of his right to refuse; and (5) whether refusal would result in a deprivation of a benefit or right. *Iaccarino*, 767 So. 2d at 476 (internal citations and quotations omitted).

The evidence at the preliminary injunction hearing establishes that Plaintiff was not notified of the pat-down policy prior to purchasing his 2005-06 season tickets. After the TSA adopted the pat-down policy, Plaintiff was informed that the Buccaneers would not refund the cost of his season tickets. Plaintiff was faced with the choice of either subjecting himself to the pat-down searches or losing the value of his tickets, parking pass, seat deposit and the opportunity to attend the Buccaneers games. Moreover, if he was refunded his ticket price and relinquished his tickets, he would have been placed at the bottom of a long waiting list if he desired to purchase season tickets in the future.

It is undisputed that at each game he attended, Plaintiff clearly expressed his objection to submitting to the pat-down. Therefore, in view of the totality of the circumstances and the factors delineated in *Iaccarino*, this Court cannot conclude that Plaintiff's consent to the searches was voluntarily given, free of constraint. *See Iaccarino*, 767 So. 2d at 479 (finding no implied consent where the "failure to acquiesce in a search would result in a deprivation of a patron's right to attend the concert, if not their ticket cost as well").

### 4.    The Equities

Defendants contend the state court erred in issuing the injunction because the equities weigh against a preliminary injunction and in favor of public safety. (Dkt. 8, p. 19).    While there is unquestionably a compelling public interest in preventing terrorist attacks, the public likewise has a compelling interest in preserving the constitutional right to be free from unreasonable governmental intrusion.    This principled and cherished Fourth Amendment right has long been recognized as fundamental to the maintenance of a free society. *See Camara v. Municipal Ct. of City and County of San Francisco*, 387 U.S. 523, 528 (1967).

Public policy does not and cannot justify mass suspicionless searches of those who choose to attend an NFL game at the Stadium.    Utilizing mass suspicionless pat-downs simply goes too far. Moreover, enforcing the injunction leaves the TSA in the same posture it chose to maintain in the years before the pat-downs were implemented. The TSA will continue to utilize the same effective security measures to protect its patrons as it did before the NFL directed the use of pat-down searches.    Those same procedures have been and continue to be used for non-Buccaneer events at the Stadium.    While this Court recognizes a compelling public interest in preventing terrorism, the TSA has not justified the intrusion on Plaintiff's fundamental Fourth Amendment rights it seeks to impose.

**Conclusion**

Particularly after September 11, 2001, Americans are justifiably more sensitive to the need

to protect against acts of terrorism. Many Americans have become more tolerant of protective

measures such as magnetometers, container searches and pat-downs, rationalizing that the

inconvenience is worth the added protection.  In fact, pat-downs may not bother the average

Buccaneers fan. However, the constitutionality of mass suspicionless searches does not turn on

popular opinion. A generalized fear of terrorism should not diminish the fundamental Fourth

Amendment protections envisioned by our Founding Fathers.  Our Constitution requires more.

> While the threat of terrorism is omnipresent, we cannot use it as the basis for
> restricting the scope of the Fourth Amendment's protections in any large gathering
> of people.  In the absence of some reason to believe that international terrorists would
> target or infiltrate this protest, there is no basis for using September 11 as an excuse
> for searching the protestors. . . . We cannot simply suspend or restrict civil liberties
> until the War on Terror is over, because the War on Terror is unlikely ever to be truly
> over.  September 11, 2001, already a day of immeasurable tragedy, cannot be the day
> liberty perished in this country.

*Bourgeois*, 387 F.3d at 1311-12.

Defendants have failed to demonstrate that the preliminary injunction was issued in error.

Specifically, Plaintiff has met his burden of establishing entitlement to a preliminary injunction,

including a substantial likelihood of success on the merits of his constitutional claim.  The purpose

of the injunction is to preserve the *status quo* until this Court can render a meaningful decision on

the merits of Plaintiff's constitutional claims.[19] *See Callaway*, 489 F.2d at 572. Accordingly, it is

---

[19] This determination may change, however, should evidence demonstrating a "substantial and real" threat to
the Stadium materialize.  In that event, it would be incumbent upon the TSA to present that evidence to the Court
immediately and move to dissolve the injunction.

**ORDERED AND ADJUDGED:**

1.    Defendants' Motion to Vacate and Dissolve the Preliminary Injunction (Dkt. 7) is

**DENIED**.

2.    The TSA is enjoined from conducting mass, suspicionless pat-down searches of every

person attending Buccaneers games at Raymond James Stadium.[20]

**DONE AND ORDERED** in chambers this __28th__ day of July, 2006.

_____

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

---

[20] The $21,000 bond required by the state court's preliminary injunction order has not been challenged.

# EXHIBIT B

IN THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

GORDON JOHNSTON,

      Plaintiff,

vs

TAMPA SPORTS AUTHORITY and
HENRY G. SAAVEDRA, in his official
Capacity as Executive Director of the
TAMPA SPORTS AUTHORITY,

      Defendants.

Case No. 05-09151
Division: E

## ORDER GRANTING PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

This matter came before the Court on Plaintiff's Emergency Motion for Preliminary Injunction on October 19 and 27, 2005, and for a hearing to determine the amount of the bond on November 1, 2005. The Court after considering the evidence, the arguments of counsel, and the written memoranda of the parties, makes the following findings of fact and conclusions of law:

Plaintiff Gordon Johnston, a Tampa Bay Buccaneers season ticket holder, moved this Court to enter a preliminary injunction preventing the Defendants from performing suspicionless pat-down searches upon all persons entering Raymond James Stadium during National Football League games. The evidence reveals that the four factors warranting entry of a preliminary injunction are all shown here: 1) the likelihood of irreparable harm, 2) the lack of an adequate remedy at law, 3) the substantial likelihood of success on the merits, and 4) that the public interest is served by granting the injunction *Charlotte County v. Vetter* 863 So. 2d 465, 468 - 69 (Fla 2d DCA 2004) (citing *Snibbe v. Napoleonic Soc. of Am. Inc.* 682 So. 2d 568, 570 (Fla

**EXHIBIT A**

2d DCA 1996)). These factors are discussed in more detail below.

1. *Irreparable Harm*   First, irreparable harm to Plaintiff will occur if a preliminary injunction is not granted. Plaintiff alleges a violation of his constitutional right to be free from government-directed searches of his person at Raymond James Stadium ("RJS"). RJS is a sports stadium where the National Football League ("NFL") team the Tampa Bay Buccaneers ("Bucs") play their home games. RJS is operated by defendant Tampa Sports Authority ("TSA"), a governmental entity created pursuant to Florida law. Plaintiff Johnston has been a season ticket holder with the Bucs for several years. To become a season ticket holder, he had to pay a seat deposit that is being repaid in annual increments. If Mr. Johnston cancels his season tickets this year, he will forfeit a substantial portion of his seat deposit.

Mr. Johnston renewed his tickets for the 2005 season the early spring of 2005 at a cost of $869.20 plus $250.00 for stadium parking. When Mr. Johnston paid for his tickets, he received no notice that the TSA would conduct pat-down searches of patrons entering RJS. On September 13, 2005, the TSA, at the request of the Bucs and after the NFL issued a mandate, voted to require all persons attending Bucs games at RJS to submit to a pat-down search from the waist up.[1] Mr. Johnston must either permit this pat-down search or he will be denied entry to RJS to see the Bucs' games. Mr. Johnston will be irreparably harmed if TSA continues its policy of requiring these pat-down searches because (as explained later), he will be forced to undergo a search in violation of his Florida constitutional right to be free from unreasonable government-directed searches. Injunctive relief is proper to protect persons from such searches and unwanted intentional touching. *See, e.g., Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) (enjoining magnetometer searches); *Stroeber v. Commission Veteran's Auditorium*, 453 F. Supp. 926 (S.D.

---

[1] The TSA does not require persons attending University of South Florida football games at RJS to submit to pat-down searches.

2

Iowa 1977) (enjoining searches of arena patrons); *see also Wilkinson v. Forst*, 832 F.2d 1330, 1340 (2d Cir. 1987) (enjoining mass pat-down searches, even in light of history of weapons being brought to past rallies).

2. *No Adequate Remedy at Law*  Second, Mr Johnston has no adequate remedy at law. Specifically, money damages cannot compensate Mr. Johnston for a violation of his constitutional right to be free from the TSA required searches. *Cf State v. Iaccarino*, 767 So 2d 470 (Fla. 2d DCA 2000) (ruling that state cannot force patrons to forego right to enjoy event if they do not consent to pat-down search). *See also Bourgeois*, 387 F.3d 1303; *Wilkinson*, 832 F.2d 1330; and *Stroeber*, 453 F Supp 926 (all enjoining mass searches).

3. *Substantial Likelihood of Success on the Merits*  Third, Mr. Johnston has a substantial likelihood of success on the merits. The Constitution prohibits governmental entities from conducting searches without any cause for individualized suspicion. *See Sosa-Leon v. State*, 848 So. 2d 342, 343 (Fla. 2d DCA 2003) (officer must have "articulatible suspicion" that person being searched was armed). *See also State v. Iaccarino*, 767 So. 2d 470 (Fla. 2d DCA 2000) (rejecting pat-down searches at rock concert); *North Dakota v Seglen*, 700 N.W 2d 702 (N D 2005) (finding unconstitutional a pat-down search of a hockey fan).

The TSA argues that the Constitution is not implicated because the TSA is not acting as a governmental actor when conducting the searches  The evidence and the law, however, show that the TSA performs the pat-down searches as a state actor. The Tampa Sports Authority is a public agency, created by the state legislature in 1965 "'for the purpose of planning, developing, and maintaining a comprehensive complex of sports and recreation facilities for the use and enjoyment of the citizens of Tampa and Hillsborough County,' as a public purpose." *State v Tampa Sports Authority*, 188 So.2d 795, 796 (Fla 1966). Although the TSA hires a private

security company to perform the searches, that company operates at the direction of the TSA, pursuant to TSA policy; the searches are performed under the visual observation of uniformed police officers; and they are paid for with taxpayer dollars. Although the TSA argues the searches are done for a private function and do not implicate law enforcement purposes, this argument is contradicted by the evidence. The TSA's own witnesses established that individuals performing the pat-downs are trained to get the attention of law enforcement if any contraband is found, and that if anyone were found attempting to bring contraband into the stadium, they would be subject to arrest, not allowed to walk away freely

Under such circumstances, the searches constitute state action for purposes of search-and-seizure analysis. *See Barton Protective Services, Inc v Faber*, 745 So 2d 968, 973 (Fla. 4th DCA 1999); *State v Iaccarino*, 767 So.2d 470 (Fla. 2d DCA 2000) (off-duty officers, hired by and for the benefit of the interests of a private concert promoter, are state actors) [2]

---

[2] *See also Nakamoto v Fasi*, 635 P 2d 946 (Hawaii 1981)(searches by private security guards hired by rock concert promoter at city owned auditorium violate constitution when conducted pursuant to city policy); *Jensen v. City of Pontiac*, 317 N.W.2d 619 (Mich. App. 1982)(visual searches by unarmed stadium security guards at city owned NFL football stadium subjected to constitutional analysis); *Stroeber v Commission Veteran's Auditorium*, 453 F.Supp. 926, 931 (S.D. Iowa 1977)(holding warrantless and suspicionless searches at rock concert violate Fourth Amendment: "Here, where the commissioners purported to act in a capacity made possible by virtue of state statutes and were acting to provide security for a public facility financed by public monies, the requisite 'state action' is present."); *Gaioni v Folmar*, 460 F.Supp 10 (M.D. Ala. 1978)(random, warrantless searches of patrons attending rock concerts at municipally owned civic center unconstitutional); *State v Carter*, 267 N.W 2d 385 (Iowa 1978)

4

The City's position would effectively eviscerate the Fourth Amendment. It is quite possible that both protestors and passersby would be safer if the City were permitted to engage in mass, warrantless, suspicionless searches. Indeed, it is quite possible that our nation would be safer if police were permitted to stop and search anyone they wanted, at any time, for no reason at all. *Cf. Terry v. Ohio*, 392 U.S. 1, 88 S Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring that police demonstrate individualized suspicion that a suspect is armed before frisking him). Nevertheless, the Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on evidence — rather than potentially effective, broad, prophylactic dragnets — as the constitutional norm … We cannot simply suspend or restrict civil liberties until the War on Terror is over, because the War on Terror is unlikely ever to be truly over. September 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country.

Accordingly, it is hereby ordered, adjudged, and decreed:

1.  The Emergency Motion For Preliminary Injunction is hereby GRANTED.

2.  TSA is hereby enjoined from engaging in mass, suspicionless pat-down searches of every person attending Bucs games at RJS, upon posting of the bond set forth below.

3.  Mr. Johnston shall post a bond in the amount of $21,000 in case this injunction is later determined to be wrongly entered. This bond may be posted as cash or through a surety.

DONE and ORDERED in Chambers at Tampa, Hillsborough County, Florida this ____ day of November, 2005.

ORIGINAL SIGNED

NOV - 2 2005

_____
PERRY A. LITTLE

_____
Judge Perry A. Little  CIRCUIT JUDGE
Circuit Court Judge

Copies to:
John D. Goldsmith
Rebecca H. Steele
Richard Zabak

I:\RED  Granting Injunction Concepted change 11241005ad]

8

# EXHIBIT C

American Arbitration Association
*Dispute Resolution Services Worldwide*

### COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent<br>Chicago Park District | | | Name of Representative (if known)<br>Richard W. Burke | | |
|---|---|---|---|---|---|
| Address<br>541 North Fairbanks Court | | | Name of Firm (if applicable)<br>Burke, Warren, MacKay & Serritella, P.C. | | |
| | | | Representative's Address<br>330 North Wabash Avenue | | |
| City<br>Chicago | State<br>IL | Zip Code<br>60611- | City<br>Chicago | State<br>IL | Zip Code<br>60611- |
| Phone No.<br>(312) 742-7529 | | Fax No.<br>(312) 742-5314 | Phone No.<br>(312) 840-7000 | | Fax No.<br>(312) 840-7900 |
| Email Address:<br>jessica.faulkner@cpp.com | | | Email Address:<br>rburkesr@burkelaw.com | | |

The named claimant, a party to an arbitration agreement dated August 1, 2001_____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

See Attached

| Dollar Amount of Claim $75,000/150,000.00 | Other Relief Sought: ☐ Attorneys Fees   ☐ Interest<br>☐ Arbitration Costs  ☐ Punitive/ Exemplary ☒ Other Declatory |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $1,800.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Hearing locale Chicago, IL_____    (check one) ☒ Requested by Claimant   ☐ Locale provision included in the contract

| Estimated time needed for hearings overall:<br>_____ hours or 1_____ days | Type of Business:  Claimant ___professional football club____<br>Respondent governmental entity_____ |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☒ Dallas, TX  ☐ East Providence, RI  ☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)    Date:<br>*John Scholnick by GMM* | Name of Representative<br>Gary Mowder John Scholnick |
|---|---|
| Name of Claimant<br>Chicago Bears Football Club, Inc. | Name of Firm (if applicable)<br>SCHIFF HARDIN LLP |
| Address (to be used in connection with this case)<br>Halas Hall at Conway Park, 1000 Football Drive | Representative's Address<br>6600 Sears Tower |

| City<br>Lake Forest | State<br>IL | Zip Code<br>60046- | City<br>Chicago | State<br>IL | Zip Code<br>60606- |
|---|---|---|---|---|---|
| Phone No.<br>(847) 295-6600 | | Fax No.<br>(847) 295-8986 | Phone No.<br>(312) 258-5500 | | Fax No.<br>(312) 258-5600 |
| Email Address:<br>do not have e-mail | | | Email Address:<br>gmowder@schiffhardin.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

## NATURE OF THE DISPUTE

Pursuant to Article 32 of the Permit and Operating Agreement between the Chicago Park District and the Chicago Bears Football Club, Inc., dated as of August 1, 2001, (which Agreement shall hereinafter be referred to as the "POA") and the further agreements of the parties regarding resolution of the dispute described herein, the Chicago Bears Football Club, Inc. (hereinafter the "Bears") request that the dispute described herein be decided by Expedited Arbitration. A copy of Article 32 of the POA, together with the Provisional Agreement for Pat Down Security Checks at Chicago Bears Home Games and the February 16, 2006 letter confirming the extension for initiating this arbitration, are enclosed for your convenience.

The POA is the agreement between the Bears and the Chicago Park District that, among other things, allocates between the parties the responsibilities and costs for operations in connection with the Bear's use of Soldier Field for home games.

This dispute relates to which of the parties is required under the terms of the POA to pay for the costs of certain security measures mandated by the National Football League (hereinafter the "NFL") to be performed at all NFL games.

On or about August 18, 2005, the Commissioner of the NFL issued a mandate to all member clubs requiring them to have instituted at all NFL games a pat down procedure. A copy of the memorandum to all clubs dated August 18, 2005 issuing the mandate is attached hereto as Exhibit 1. All NFL clubs were to have instituted pat down procedures for all games no later than September 25, 2005.

The pat down policy was instituted by the NFL in light of the events of September 11, 2001 and the recognition that sporting events taking place in large stadiums could be potential targets of terrorist attacks. Therefore, the NFL mandated that pat down screening be undertaken at all football games to ensure the safety of the people attending those games.

Following the NFL Commissioner's issuance of the August 18, 2005 memorandum the Bears notified the Chicago Park District that under the terms of the POA the Chicago Park District was responsible for making arrangements for, establishing procedures for (consistent with the NFL's requirements) and paying for the costs of pat down procedures that were mandated for games by the NFL Commissioner. The Chicago Park District has denied any responsibility for the costs of establishing and implementing pat down procedures at Soldier Field for Bears home games.

Although the parties entered into a provisional agreement for the 2005-2006 football season for the implementation of the NFL's pat down policy, there has been no permanent resolution of the dispute over which party is responsible under the terms of the POA for the payment of costs for pat down screening. The parties have, therefore, agreed to submit this dispute to Expedited Arbitration under Article 33 of the POA, subject to such additional arbitration procedures as the parties may agree to.

In general, the Chicago Park District is obligated under the POA to provide Soldier Field, a first-class facility, for use by the Bears for home games. This facility is to be provided for such use in accordance with all requirements , whether mandated by the NFL or otherwise, needed for the presentation of an NFL game. To the extent that the Bears are obligated to pay for particular costs and expenses associated with the use of Soldier Field, such costs and expenses are set forth in the POA. The costs associated with mandates of the NFL with regard to security procedures to be implemented for all NFL games would fall under the Chicago Park District's general obligations in the POA.

In addition, under Article 22 of the POA, which is entitled "Game Day Costs, Expenses and Responsibilities," the Chicago Park District is obligated to pay for costs associated with the operation of Solider Field on "Game Days." More specifically, paragraph 22.2.1 provides that "[i]n general, the CPD shall be responsible for the performance and payment of Game Day Expenses." It is the Bears' position that among the "Game Day Expenses" for which the Chicago Park District is responsible is the cost of implementing pat down screening, consistent with the NFL's mandate and guidelines.

The Bears reserve the right to make further submissions in support of the claim at the hearing of this arbitration and at such other time and in such other manner as the parties may agree.

CHI\4513175.1

## MEMORANDUM

**TO:**           Chief Executives and Club Presidents

**FROM:**       Commissioner Tagliabue

**DATE:**        August 18, 2005

**SUBJECT:**    Stadium Security on Game Days:
                Mandatory Pat Down Screening of Fans Attending Games

At the August 10th Special League Meeting in Chicago, the membership endorsed the recommendation of the League's Security Department that the mandatory security measures for all clubs should be expanded to include "pat downs" of fans to be carried out by properly trained security personnel in accord with guidelines shortly to be distributed by the League's Security Department.

As discussed at the Chicago meeting, a large number of clubs are already screening patrons attending games using "pat down" procedures. All other clubs should have already trained security personnel to promptly implement such security measures. All clubs putting such measures into practice for the first time during the upcoming season will be given a reasonable period for re-training to affect the mandatory screening procedures now to be applied. Absent highly unusual circumstances, we would expect that these procedures would be fully implemented at all stadiums by no later than the third weekend of the regular season, i.e., by September 25th.

An important aspect of employing these procedures will be to provide clear, advance notice to fans attending games. This can be accomplished in a variety of ways, including through press releases that provide notice in local media ; mailings to season ticket holders; notices on team websites and in other team publications (such as weekly team newspapers); public address announcements at upcoming games; and signage clearly posted in parking lots or at the approaches to gates in stadiums.

We will shortly distribute to each club suggested language for inclusion in club media releases and other notices to fans. For your information, we are attaching an illustrative release issued recently by the Pittsburgh Steelers relative to these stadium screening and pat down procedures.



EXHIBIT

ALL-STATE® INTERNATIONAL

The League's Security Department will shortly distribute to all clubs a detailed memorandum setting forth guidelines to be followed by all clubs in implementing these security measures.

If you wish to discuss any aspect of this in the meantime, please contact Milt Ahlerich or Jeff Pash so that our Security Department can be of assistance in implementing this policy.

PT:gd



SCHIFFHARDIN LLP

6600 Sears Tower
Chicago, Illinois  60606
t 312.258.5500
f 312.258.5600
www.schiffhardin.com

John N. Scholnick
(312) 258-5813
jscholnick@schiffhardin.com

April 12, 2006

<u>VIA FACSIMILE</u>

Ms. Candi E. Harris
Case Manager
American Arbitration Association
13455 Noel Road
Suite 1750
Dallas, TX 75240

> Re:    51 196 00498 06
>        Chicago Bears Football Club, Inc.
>        and
>        <u>Chicago Park District</u>

Dear Ms. Harris:

Please find enclosed an Amended Statement of the Nature of the Dispute which is to be attached to the Demand for Arbitration submitted by the Chicago Bears Football Club, Inc. Please substitute this Amended Statement of the Nature of the Dispute for the description of the Nature of the Dispute that was originally attached to the Demand for Arbitration.

By copy of this letter to Mr. Richard W. Burke I have delivered a copy of the Amended Statement of the Nature of the Dispute to counsel for the Chicago Park District.

If you should have any questions about this, please contact me.

Sincerely,

John N. Scholnick

Attachment
cc:    Richard W. Burke, Esq. (via facsimile)
       Gary Mowder, Esq.
CH1\4524938.1

CHICAGO | WASHINGTON | NEW YORK | LAKE FOREST | ATLANTA | DUBLIN

Matter No. 51 196 00498 06

Chicago Bears Football Club, Inc.
and
Chicago Park District

## AMENDED STATEMENT OF THE NATURE OF THE DISPUTE

Pursuant to Article 32 of the Permit and Operating Agreement between the Chicago Park District and the Chicago Bears Football Club, Inc., dated as of August 1, 2001, (which Agreement shall hereinafter be referred to as the "POA") and the further agreements of the parties regarding resolution of the dispute described herein, the Chicago Bears Football Club, Inc. (hereinafter the "Bears") request that the dispute described herein be decided by Expedited Arbitration. A copy of Article 32 of the POA, together with the Provisional Agreement for Pat Down Security Checks at Chicago Bears Home Games and the February 16, 2006 letter confirming the extension for initiating this arbitration, are enclosed for your convenience.

The POA is the agreement between the Bears and the Chicago Park District that, among other things, allocates between the parties the responsibilities and costs for operations in connection with the Bear's use of Soldier Field for home games.

This dispute relates to which of the parties is required under the terms of the POA to pay for the costs of certain security measures mandated by the National Football League (hereinafter the "NFL") to be performed at all NFL games.

On or about August 18, 2005, the Commissioner of the NFL issued a mandate to all member clubs requiring them to have instituted at all NFL games a pat down procedure. A copy of the memorandum to all clubs dated August 18, 2005 issuing the mandate is attached hereto at Exhibit 1. All NFL clubs were to have instituted pat down procedures for all games no later than September 25, 2005.

The pat down policy was instituted by the NFL in light of the events of September 11, 2001, the recognition that sporting events taking place in large stadiums could be potential targets of terrorist attacks, and the high visibility and national attention associated with NFL games (America's number one spectator sport with broad television coverage). Therefore, the NFL mandated that pat down screening be undertaken at all football games to ensure the safety of the people attending those games.

Following the NFL Commissioner's issuance of the August 18, 2005 memorandum the Bears notified the Chicago Park District that under the terms of the POA the Chicago Park District was responsible for making arrangements for, establishing procedures for (consistent with the NFL's requirements) and paying for the costs of pat down procedures that were mandated for games by the NFL Commissioner. The Chicago

Park District has denied any responsibility for the costs of establishing and implementing pat down procedures at Soldier Field for Bears home games.

Although the parties entered into a provisional agreement for the 2005-2006 football season for the implementation of the NFL's pat down policy, there has been no permanent resolution of the dispute over which party is responsible under the terms of the POA for the payment of costs for pat down screening. The parties have, therefore, agreed to submit this dispute to Expedited Arbitration under Article 32 of the POA, subject to such additional arbitration procedures as the parties may agree to.

In general, the Chicago Park District is obligated under the POA to provide Soldier Field, a first-class facility, for use by the Bears for home games. This facility is to be provided for such use in accordance with all requirements, whether mandated by the NFL or otherwise, needed for the presentation of an NFL game. To the extent that the Bears are obligated to pay for particular costs and expenses associated with the use of Soldier Field, such costs and expenses are set forth in the POA. The costs associated with mandates of the NFL with regard to security procedures to be implemented for all NFL games would fall under the Chicago Park District's general obligations in the POA.

Pursuant to Article 25 of the POA, which is entitled "Security and Crowd Control," the Chicago Park District is obligated to pay for costs associated with security and crowd control on "Game Days." More specifically, paragraph 25.1 provides that "[e]xcept for locker rooms, Team Areas and the Field, the CPD shall be responsible for the performance and payment of security and crowd control on Game Days." Since pat down screening does not involve the locker rooms, the Team Areas and the Field, the Chicago Park District is responsible for the performance and payment of such screening.

In addition, under Article 22 of the POA, which is entitled "Game Day Costs, Expenses and Responsibilities," the Chicago Park District is obligated to pay for costs associated with the operation of Solider Field on "Game Days." More specifically, paragraph 22.2.1 provides that "[i]n general, the CPD shall be responsible for the performance and payment of Game Day Expenses." It is the Bears' position that among the "Game Day Expenses" for which the Chicago Park District is responsible is the cost of implementing pat down screening, consistent with the NFL's mandate and guidelines.

The Bears reserve the right to make further submissions in support of the claim at the hearing of this arbitration and at such other time and in such other manner as the parties may agree.

CHI\4518195.1

# EXHIBIT D

**Contact** American Arbitration Association
13455 Noel Road - Suite 1750
Dallas, TX 75240

**Commercial Panel**

## S. Elaine McChesney, Esq.

**Current Employer-Title** Sidley Austin LLP - Of Counsel; Northwestern University School of Law - Professor

**Profession** Attorney, Arbitrator - Commercial Business Transactions

**Work History** Professor, Northwestern University School of Law, 2003-present; Of Counsel, Sidley Austin LLP, 2000-present; Attorney, Private Practice, 1996-00; Counsel, Sutherland, Asbill and Brennan, 1986-96; Assistant General Counsel, Scientific-Atlanta, Inc., 1983-86; Attorney, American International Group, Inc., 1981-83; Associate, Steptoe and Johnson, 1980-81; Associate, Cameron, Hornbostel, Adelman and Butterman, 1977-80; Lecturer in Law, London University, 1974-75.

**Experience** Over 25 years experience in United States and international commercial and business transactions including technology licensing. Sample transactions include software, biotechnology and other technology development and licensing, e-commerce ventures, international sales representative and distribution agreements; sale of goods; outsourcing agreements; employment and consulting agreements; expert/import matters; the structuring, establishment and winding up of joint ventures and strategic alliances; and general corporate matters including mergers and acquisitions. Expertise in: manufacturing; automotive; construction and construction materials; telecommunications; medical products; pharmaceuticals; insurance; electronics, e-commerce; computer software and hardware. Extensive expertise in all European countries, Latin America, North Africa, Australia, Canada, and Japan. Conducted seminars in international joint ventures, controls on the export of technology, and issues in technology transfer and intellectual property licensing.

**Alternative Dispute Resolution Experience** Has served as a sole, chair or panel arbitrator in commercial and international disputes for the American Arbitration Association. Issues include breach of contract, failure to perform, and fraud or misrepresentation. Resolved disputes involving parties from Italy, Sweden, Switzerland, England, Japan, Brazil, the Caribbean, the Philippines, The Netherlands, Australia, Mexico, and Canada.

**Alternative Dispute Resolution Training** ACE001 - Arbitration Awards: Safeguarding, Deciding & Writing Awards, 01/06; AAA International Arbitration Symposium, Washington, DC, 4/05; ACE001 - Arbitration Awards: Safeguarding, Deciding & Writing Awards, 5/03; AAA Commercial Arbitrator II Training, Chicago, 12/01; AAA Arbitrator Update 2001; AAA Commercial Arbitrator Training, Atlanta, 9/00; AAA International Arbitrator Training, Washington, D.C., 6/00;

*S. Elaine McChesney, Esq.*
*123863*

Resolution Resources, Mediation Training, 1996; AAA Large Complex Case Panel Training, Atlanta, 5/93.

**Professional Licenses**   Admitted to the Bar: District of Columbia, 1981; Georgia, 1987; Illinois, 2001.

**Professional Associations**   American Bar Association; American Corporate Counsel Association; Georgia Bar Association (Intellectual Property Section); Washington, D.C., Bar Association (Intellectual Property Section).

**Education**   University of Birmingham, United Kingdom (LLB, with honors-1974); University of Amsterdam, Europa Institute (Graduate Diploma, European Integration-1976); George Washington University (LLM, Comparative Law-1980).

**Publications and Speaking Engagements** "Doing Business with the USA," MANAGING YOUR BUSINESS, United Kingdom 2000 Group, September 1994; "Technology Transfer," TRADING WITH THE USA, United Kingdom Department of Trade and Industry, 1994; frequent speaker on international contracting, international joint ventures, and technology issues..

**Compensation**     $3,200.00 Per Day
                     $400.00 Per Hour
Also has office in Washington, DC. Available for hearings in New York and elsewhere in the United States.

**Languages** French, Italian

**Citizenship** United Kingdom

**Locale** Chicago, IL

*S. Elaine McChesney, Esq.*
*123863*